**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **JANE DOE**, *proceeding by pseudonym*  )<br><br>Plaintiff,  )<br>  )<br>v.  )<br>  )<br>**SIGMA CHI INTERNATIONAL FRATERNITY,**  )<br>**INCORPORATED**, individually, and as an agent and  )<br>alter ego of: Psi Psi Chapter of Sigma Chi Fraternity  )<br>at Syracuse University; Sigma Chi Foundation, Inc.;  )<br>and 737 Comstock Avenue, Inc.;  )<br>  )<br>and  )<br>  )<br>**LUKE ROGERS and ETHAN HIRSH,** in their  )<br>capacity as President and Treasurer, respectively,  )<br>for and on behalf of the unincorporated association  )<br>operating at Syracuse University as the  )<br>**PSI PSI CHAPTER OF SIGMA CHI FRATERNITY,**  )<br>individually, and as agent and alter ego of:  )<br>Sigma Chi International Fraternity, Inc.; Sigma Chi  )<br>Foundation; and 737 Comstock Avenue, Inc.;  )<br>  )<br>and  )<br>  )<br>**SIGMA CHI FOUNDATION**, as agent and alter ego of:  )<br>Sigma Chi International Fraternity, Inc.; Psi Psi Chapter  )<br>of Sigma Chi Fraternity; and 737 Comstock Avenue, Inc.;  )<br>  )<br>and  )<br>  )<br>**737 COMSTOCK AVENUE, INC.**, individually, and as  )<br>agent and alter ego of: Sigma Chi International Fraternity,  )<br>Inc.; Psi Psi Chapter of Sigma Chi Fraternity; and  )<br>Sigma Chi Foundation;  )<br>  )<br>and  )<br>  )<br>**DELTA DELTA DELTA,**  )<br>individually, and as agent and alter ego of: Omicron  )<br>Chapter of Delta Delta Delta operating at Syracuse  )<br>University; and Omicron House Corporation of Delta  )<br>Delta Delta;  )<br>  ) | Civ. Action No.:<br>5:23-cv-01452-BKS-ML<br><br>**FIRST AMENDED**<br>**COMPLAINT**<br><br>Jury Trial Demanded |

and                                                    )
                                                       )
**CLAIRE HARRIS and EMMA SPADEA,** in their            )
capacity as President and Treasurer, respectively, for and )
on behalf of the unincorporated association operating at )
Syracuse University as the **OMICRON CHAPTER**         )
**OF DELTA DELTA DELTA,** individually, and agent      )
and alter ego of: Delta Delta Delta; and Omicron House )
Corporation of Delta Delta Delta;                      )
                                                       )
and                                                    )
                                                       )
**SYRACUSE UNIVERSITY**;                               )
                                                       )
and                                                    )
                                                       )
**MICHAEL MONTALTO,** individually and as a            )
member and agent of Sigma Chi Fraternity              )
and the Psi Psi Chapter;                               )
                                                       )
        Defendants.                                    )
_____        )

## FIRST AMENDED COMPLAINT

NOW COMES Plaintiff, Jane Doe,[1] and through her attorneys, The Fierberg National

Law Group, LLC, who for her First Amended Complaint, filed pursuant to Fed. R. Civ. P.

15(a)(1)(A), alleges as follows:

## INTRODUCTION

1.      In August 1991, Plaintiff was 18 years old when she flew across the country from

her family home to begin her studies at Syracuse University (the "University"), with similar

hopes, expectations and trepidations of other high school graduates embarking on something so

seemingly monumental. She arrived on a campus where the University actively promoted Greek

membership as a "vital" part of the campus community and endorsed these organizations as well-

_____

[1] Plaintiff will be filing a Motion for Leave to Proceed under the Pseudonym "Jane Doe" in this
matter to protect her identity.

managed, worthy pathways to new friendships and improving one's educational and professional opportunities. Large fraternity and sorority houses were in prominent locations on campus.

2.      Before and when Plaintiff set foot on campus, she never knew that the University had been the scene of numerous incidents of non-stranger sexual assault and rape in the months and years prior to her arrival. Students were afraid, protesting, and demanding reforms and disclosure of information the University exclusively held, so they could protect themselves. The University had established a rape task force, and campus organizations, such as "Students Concerned About Rape Education" ("S.C.A.R.ED."), were pressuring the University to make the campus safer, implement anti-sexual violence training in Greek houses, and advise incoming students about their risks of being raped and the resources available to them after being harmed.

3.      Plaintiff also never knew that the dangers of fraternities were so widespread in the decade before her arrival that they had been ranked as the "sixth worst risk for insurance companies – just behind hazardous waste disposal companies and asbestos contractors." So dangerous were their activities that their commercial insurance carriers declined insuring them any further.

4.      National fraternities and sororities and their executives knew that fraternity chapters and members were incapable of responsibly managing the provision, use and misuse of alcohol and drugs in fraternity houses, during recruiting, and at Greek-sponsored events. One fraternity executive and industry leader confirmed that 99% of insurance claims were related to the misuse of alcohol. Fraternity recruiting events with alcohol would eventually be labeled by another fraternity executive and industry leader as being the "deadliest nights."

5.      In 1987, a Colgate University student alleged being gang-raped by fraternity members after becoming intoxicated at a fraternity party at Sigma Chi's chapter house. When Plaintiff enrolled at Syracuse, the Sigma Chi chapter at Colgate had been shuttered, and the

ensuing federal litigation was pending and had been widely reported on in Syracuse. In May 1991 – five months before Plaintiff arrived at the University – a woman reported being sexually assaulted in Sigma Chi's chapter house at Cornell. That, too, made local press in Syracuse. Multiple allegations of rape against Sigma Chi, its chapters, and its members had been made elsewhere, and have continued to be made to the present day.

6.      When Plaintiff set foot on campus, she immediately encountered the glorified – yet materially false and misleading – information and presence of Greek life.

7.      Delta Delta Delta ("Tri Delta"), a national sorority established at the University in 1896, operated and recruited new members and revenue through its Omicron chapter, which was housed in a stately, pillared mansion in a prominent location on campus.

8.      The University provided its facilities, staff and resources to schedule and organize "rush," which encouraged students to join these organizations after reviewing and relying upon the promotional information it and the Greek organizations provided.

9.      Plaintiff followed the pathway, applied for, and accepted a bid to pledge Tri Delta. Tri Delta quickly became her first choice after rush began.  She was drawn to the sorority and its promises of sisterhood and lifelong friendships, the status it conferred on its members, and the community it provided on campus when she was 3,000 miles away from home. By this date, Tri Delta's leadership had banned the presence and use of alcohol and drugs in its chapter houses, presumably based upon its knowledge that its mismanagement had resulted in numerous incidents of rapes and other injuries.

10.      On September 19, 1991, to celebrate the prospective new members of Tri Delta, Tri Delta, Sigma Chi and their respective local officers and members co-sponsored a recruitment and bid event at the Fraternity Defendants' chapter house on the University's campus, where alcohol had not been banned, and which was closed to the public and fueled with champagne

purchased by the Tri Delta chapter at the University, a trash can filled with alcoholic punch –

that, unbeknownst to Plaintiff was made with 190 proof grain alcohol – and a thermos of "special

punch" brought by alumni members of Tri Delta for the pledges. Plaintiff would later learn that

Omicron officers admitted at a chapter meeting that the thermos punch had been secretly

drugged with ecstasy by Tri Delta alumni members. "Punch pushers," fraternity and sorority

members, directed and encouraged under-aged Tri Delta pledges to drink the drugged punch so

they could have the "best night of their lives."

11.     Plaintiff drank champagne and punch, and quickly became intoxicated. Plaintiff

went upstairs with a Sigma Chi member, Defendant Michael Montalto. Defendant Montalto

kissed Plaintiff and made sexual advances towards her. Plaintiff expressly told Defendant

Montalto that she had a boyfriend, would not sleep with him, and specifically told him "No,

don't do that," but he proceeded to rape her by penetrating her vagina with his penis. Another

fraternity member entered the room but failed to act or stop the rape.  Plaintiff escaped by

climbing down the fraternity house fire escape. The next day she went to the University's Health

Clinic, which through an exam confirmed sexual penetration. No other information, advocacy or

services were offered or provided to her by the Health Clinic, contrary to the extensive efforts by

student advocacy groups, protestors, and Task Force members to ensure survivors would obtain

such resources.

12.     Plaintiff then filed a report with the local police and went to the local hospital for

a rape examination. Plaintiff also reported the rape to members of Tri Delta.

13.     To Plaintiff's surprise and severe distress, her allegations of sexual assault were

reported on the front page of the campus newspaper on September 23, 1991. Plaintiff crumpled

on the floor upon reading the article and retreated to her dorm room confused and alone. Tri

Delta was sanctioned, and Tri Delta members blamed and retaliated against her for putting them

and their chapter at risk and pressured her to leave.

14.     Plaintiff withdrew from the sorority, felt unwelcome and alone, lost friendships,

declined to press forward with prosecution to avoid further harm and harassment, and struggled

through trauma to remain at the University, ultimately withdrawing following her sophomore

year. As a result of being raped and the other acts of wrongdoing as alleged herein, Plaintiff has

suffered significant physical and emotional trauma, harm and injuries spanning decades that have

adversely affected, and will continue to adversely affect, countless aspects of her life. Plaintiff

has engaged in extensive counseling and incurred considerable expenses treating her trauma.

Through this lawsuit she seeks to obtain long-delayed justice and recover for such injuries,

expenses, and other damages to the fullest extent of the law.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of

interests and costs, and is between citizens of different States.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the

institutional defendants can be found and transact business in this judicial district and/or a

substantial part of the events or omissions by all defendants giving rise to this action occurred in

this judicial district.

17.     This suit and the claims and allegations against the Defendants identified herein

are timely filed pursuant to the New York Adult Survivor's Act ("ASA"), N.Y. CPLR § 214-j, as

the suit is brought against Defendants alleging intentional and/or negligent acts or omissions by

them for physical and psychological injuries resulting from conduct which would constitute a

sexual offense as defined in Article 130 of New York Penal Law, and Plaintiff Jane Doe was 18 years old when she was raped.

## THE PARTIES

18.     Plaintiff is domiciled in and a resident and citizen of the State of Washington. Plaintiff was a resident of the State of California when she enrolled as a student at Syracuse University for the fall semester of 1991. Plaintiff subsequently withdrew from the University and moved from the State of New York to complete her studies elsewhere.

19.     Defendant Sigma Chi International Fraternity, Inc. (hereinafter "Sigma Chi" or "Defendant Sigma Chi"), individually and as an alter ego of defendants Psi Psi Chapter of Sigma Chi Fraternity at Syracuse University, Sigma Chi Foundation, 737 Comstock Avenue, Inc., and Psi Psi Chapter of Sigma Fraternity at Syracuse University (collectively, the "Fraternity Defendants"), is a non-profit corporation organized and existing under the laws of the State of Indiana having its principal place of business at 1714 Hinman Avenue, Evanston, Illinois. Defendant Sigma Chi was formed in 1855 and currently has approximately 244 active chapters and 152 alumni chapters operating on college campuses throughout the United States and Canada, with many of those existing and, now former, chapters having been closed, removed, sanctioned, or kicked off various college campuses for dangerous misconduct, including hazing, sexual assault, abuse of alcohol and controlled substances, and other acts and omissions resulting in traumatic injuries and death.

20.     Defendants Luke Rogers and Ethan Hirsh, in their capacity as President and Treasurer, respectively, for and on behalf of the unincorporated association continuously operating at Syracuse University as Psi Psi Chapter of Sigma Chi Fraternity (hereinafter "Psi Psi" or "Defendant Psi Psi") are being sued, in accordance with New York General Associations Law § 13, on behalf of Defendant Psi Psi, an unincorporated association chartered by, operating,

controlled by, and existing as a jural entity under the exclusive authority and as an alter ego of Sigma Chi. At all relevant times, Defendant Sigma Chi has been a controlling member of Psi Psi, which serves as one of many chapters from which Sigma Chi generates its principal revenue by recruiting members from college campuses. At all relevant times, Sigma Chi has intentionally undercapitalized Psi Psi and its other chapters as one of a series of measures implemented by Sigma Chi for the purpose of protecting its significant assets and frustrating foreseeable creditors, such as undergraduate students, like Plaintiff, traumatically hurt through the negligence of Sigma Chi, its members, and its chapters. Upon information and belief, none of Defendant Psi Psi's members are citizens of the State of Washington.

21.     Defendant Sigma Chi Foundation (hereinafter the "Foundation" or "Defendant Foundation") is a non-profit corporation organized and existing under the laws of the State of Colorado having its principal place of business at 1714 Hinman Avenue, Evanston, Illinois, and at all relevant times operating under the direction of and as an alter ego of Sigma Chi. The Foundation accepts and holds tax-deductible contributions and substantial assets used to fund, support, and expand the activities of Defendant Sigma Chi and its chapters, including awarding grants to students and funding risk-management and educational services. Its stated sole purpose is to "to secure financial resources and provide faithful stewardship in support of Sigma Chi."

22.     Defendant 737 Comstock Avenue, Inc. (hereinafter "Comstock" or "Defendant Comstock") is a not-for-profit corporation organized under the laws of and operating in the State of New York, with a principal place of business at 737 Comstock Avenue, Syracuse, NY.  At all relevant times, Defendant Comstock has been managed by alumni of Defendant Psi Psi, whose sole purposes are to hold title to and manage the real estate exclusively used by the Fraternity Defendants on the campus of Syracuse University to generate new members and revenues. Defendant Comstock has all relevant times been acting as an alter ego of Defendant Sigma Chi

and fits within the structure intentionally created by Defendant Sigma Chi that deprives chapters of the ownership of valuable real estate, entrusts the management and control of such premises to older, more responsible, and trained persons, and, purposefully, protecting this significant asset from foreseeable creditors, such as undergraduate students, like Plaintiff, traumatically hurt through the negligence of Sigma Chi, its members, and its chapters.

23.     Defendant Delta Delta Delta (hereinafter "Tri Delta" or "Defendant Tri Delta"), individually and as an alter ego of Defendant Omicron Chapter of Delta Delta Delta at Syracuse University and Omicron House Corporation of Delta Delta Delta (hereinafter "Omicron House Corporation") is a non-profit corporation organized and existing under the laws of the State of Illinois having its principal place of business at 14951 North Dallas Parkway, Suite 500, Dallas, Texas. Tri Delta was formed in 1888 and currently has approximately 138 active chapters and 222 alumni chapters operating on college campuses throughout North America.

24.     Defendants Claire Harris and Emma Spadea, in their capacity as President and Treasurer, respectively, for and on behalf of the unincorporated association continuously operating at Syracuse University as Omicron Chapter of Delta Delta Delta (herein after the "Omicron Chapter" or "Defendant Omicron"), are being sued, in accordance with New York General Associations Law § 13, on behalf of Defendant Omicron, an unincorporated association chartered by, operating, controlled by, and existing as a jural entity under the exclusive authority and as an alter ego of Tri Delta. At all relevant times, Defendant Tri Delta has been a controlling member of Defendant Omicron, which serves as one of many chapters from which Tri Delta generates its principal revenue by recruiting members from college campuses.  At all relevant times, Tri Delta has intentionally undercapitalized the Omicron Chapter and its other chapters as one of a series of measures implemented by Tri Delta for the purpose of protecting its significant assets and frustrating foreseeable creditors, such as undergraduate students, like Plaintiff,

traumatically hurt through the negligence of Tri Delta, its members, and its chapters. Upon information and belief, none of Defendant Omicron's members are citizens of the State of Washington.

25.     Defendants Tri Delta and its Omicron Chapter (collectively, the "Sorority Defendants") at all relevant times have operated from a premises located on Syracuse University's campus at 300 Walnut Place, Syracuse, New York 13210, that is owned by the Omicron House Corporation.  The Omicron House Corporation was established by and at relevant times has operated under the authority and as an alter ego of Defendant Tri Delta, and is part of the sorority's plan to create an organizational structure that deprives chapters of the ownership of valuable real estate, entrusts the management and control of such premises to older, more responsible, and trained persons, and, purposefully, protects this significant asset from foreseeable creditors, such as undergraduate students, like Plaintiff, traumatically hurt through the negligence of Tri Delta, its members, and its chapters.

26.     Defendant Syracuse University is a private research university, founded in 1813, with a campus located in Syracuse, New York, and its principal place of business at 900 South Crouse Avenue, Syracuse, NY 13244.

27.     Defendant Michael Montalto is domiciled in and a resident and citizen of the State of Connecticut. At all material times, Defendant Montalto was an undergraduate student attending Syracuse University, a member of Defendant Sigma Chi, initiated by and active at the Defendant Psi Psi, and the person who raped Plaintiff at the dangerous, alcohol-fueled new member event sponsored by Defendants Psi Psi and Defendant Omicron at 737 Comstock Avenue on September 19, 1991.

10

## THE UNPRECEDENTED DANGERS OF SEXUAL MISCONDUCT AND THE MISUSE OF ALCOHOL WITHIN FRATERNITY HOUSES AND AT FRATERNITY AND SORORITY EVENTS WERE KNOWN BY THE FRATERNITY AND SORORITY DEFENDANTS PRIOR TO WHEN PLAINTIFF WAS RAPED

28.     At the time Plaintiff was raped, and in the decades since, fraternities and sororities such as the Fraternity and Sorority Defendants in this case, have known that in the 1980s "fraternities and sororities were ranked by the National Association of Insurance Commissioners ("NAIC") as the sixth worst risk for insurance companies – just behind hazardous waste disposal companies and asbestos contractors." This fact is published as a historical notation in the widely circulated Risk Management Manual of the entity originally known as the Fraternity Insurance Purchasing Group ("FIPG"), the group established by fraternities in the late 1980s to obtain the insurance coverage that their insurers were denying on the basis of excessive risk.

29.     Before NAIC's ranking, and since, Defendants Sigma Chi and Tri Delta knew, or in the absence of negligence should have known, that sorority members and female guests at fraternity houses and at fraternity events were in danger of being sexually assaulted as a direct result of, *inter alia*, the mismanagement of, abuse, and unlawful provision of alcohol and drugs, the complete absence of independent or trained security or management within fraternity houses, and the ability of perpetrators to isolate and assault women within those facilities.

30.     Before NAIC's ranking, and since, Defendants Sigma Chi and Tri Delta knew, or in the absence of negligence should have known, that fraternities often engaged in misogynistic activities and rituals that portrayed rape in a favorable light since many such incidents received wide-spread publication. Defendant Sigma Chi and other fraternities often had secret fraternity song books containing misogynistic lyrics reflecting prevalent attitudes and actions of these organizations towards women. So prevalent were these actions and attitudes within Defendant Sigma Chi that it eventually enacted a policy prohibiting the use of such songs and other

11

misogynistic actions, though its leadership knew, or in the absence of negligence should have known, that Sigma Chi members had gathered to sing such songs and engage in such behavior for decades.

31.     The NAIC ranking was the direct result of the number of claims and insurance payouts relating to sexual assaults, injuries, and deaths resulting at fraternity houses and at fraternity events. As of 1987, there had been large verdicts against fraternities for injuries and deaths caused, in primary part, by the misuse of alcohol and its mismanagement. In 1988, a fraternity pledge attending a bid night celebration at the University of Arizona left the event and crashed his vehicle into a vehicle driven by Ruben Hernandez, leaving Mr. Hernandez a paraplegic. The Arizona Supreme Court opined: "We are hard pressed to find a setting where the risk of an alcohol-related injury is more likely than from underaged drinking at a university fraternity party the first week of the new college year."

32.     One long-term fraternity executive, Durward Owens, who was active with other fraternity leaders in the industry, verified that "there was a large exodus by insurance companies from the general liability insurance market for fraternities. Note, sororities were not then and still have not been considered by insurance companies to be a bad risk. Traditionally sororities have transferred their alcohol risks to fraternities, therefore, their experience records are quite clean, especially when compared to fraternities. With the elimination of general liability insurance coverage for college Greek-letter fraternities over an eighteen-month period, there became a crisis within the Greek-letter system."

33.     Upon information and belief, Mr. Owens' statement about sororities transferring liability to fraternities was an indication that "fault" for the injuries and rapes suffered by sorority women resulted, in primary part, from the negligence of fraternities and their misuse and abuse of alcohol.

34.     In or around 1990, the New Hampshire Insurance Company notified national fraternities that it was discontinuing its coverage for all Greek-lettered organizations, presumably because of the number and severity of injuries and resultant size of legal claims and pay-outs.

35.     Durward Owens wrote that the challenge for fraternities seeking to maintain insurance coverage for their operations in the late 1980s was to become "respectable."

36.     Thus, in the late 1980s, fraternities began organizing and pooling their purchasing power to obtain insurance. By way of one example, the Fraternal Insurance Purchasing Group ("FIPG") was formed by a consortium of Greek organizations to coordinate risk-management strategies, share liability information, and assist each other in obtaining insurance. Some fraternities jointly created and/or invested in captive insurance companies, including FRMT, Ltd. (established in 1996 by 12 fraternities), and, upon information and belief, RMF (established in 1988), as a means of purchasing insurance otherwise denied by commercial carriers.

37.     The consortium of fraternities comprising FIPG for the first time agreed upon a risk management policy, the FIPG Risk Management Policy, that addressed, *inter alia*, aspects of the misuse and abuse alcohol, though they declined to make fraternity houses and events alcohol-free and left the management of alcohol in those circumstances – where it had been used as a weapon to incapacitate and rape women – in the hands of undergraduate members, who time and again had failed to manage risks, engaged in the very misconduct that resulted in traumatic injuries and deaths, and often were not even of the age to consume the product national fraternities tasked them to manage. Rather than implement the types of management reforms reasonably required under the circumstances, Defendant Sigma Chi and other fraternities conspired and pooled resources to purchase insurance and continue their operations without meaningful reforms or increased costs.

38.     In the summer of 1991, *immediately prior to Plaintiff's enrollment at Syracuse*, the presidents of all 26 National Panhellenic Conference groups (including Tri Delta), concerned for the "health and well-being of our members," executed a Position Statement pronouncing opposition to the misuse of alcohol and declaring it "inadvisable to host a party involving alcohol when the majority of guests attending are under the legal drinking age." The express hope of these sorority leaders was to "give college chapters the courage and ability to initiate the discussion and formulate a Panhellenic stand on the subject of alcohol." It also stated that "no college chapter funds may be used to purchase alcohol" and referred to potential shared liability of event co-sponsors. By then, Tri Delta and other sororities had enacted policies rendering their chapter houses alcohol-free, and Tri Delta placed "house directors" in their chapter housing to assist in managing residences safely.

39.     In Fall 1990, Tri Delta included in its official publication for its members and alumni members, the Trident, excerpts from the State of the Fraternity remarks made by its President, Angela Driver. Ms. Driver stated that the sorority "must make positive advances controlling the high rate of alcohol use and the devastating side effect of abuse of women."  The President followed those comments in the Winter 1991 Trident, stating that hazing "is a disease that must be eliminated in the Greek system!" She further wrote: "I must tell you that incidents of hazing *do* happen in Tri Delta." (Emphasis in original.) No such information was ever disclosed or communicated to Plaintiff.

40.     By the time the Position Statement was issued and the Tri Delta President made those remarks, members of Tri Delta chapters and thousands of women on college campuses were enrolled in self-defense training as a result of widely published information that the greatest risk of rape was from acquaintances – from individuals they would meet on campus at events and

activities. By then, statistics showed that one in six women would be raped at college before earning their degrees.

41.     The very idea that fraternity chapters and their undergraduate leaders had such control over the misuse and illegal provision of alcohol that had harmed so many by this date, and that national fraternity and sorority leaders were encouraging chapters to get the "courage" to initiate *conversations* on the subject demonstrates the Fraternity and Sorority Defendants' knowledge of the risks and failures to act reasonably when, as here, their respective organizational documents vested them with near total control over their chapters.

42.     The negligence by national fraternities of entrusting untrained, unsupervised undergraduate members with the implementation and management of alcohol use in chapter houses and during fraternity events was known, or in the absence of negligence, should have been known by fraternities, including the Fraternity Defendants, when insurance carriers were denying them coverage.

43.     The negligence by national fraternities of employing and relying on leadership consultants to visit, educate, and supervise chapters and chapter officers as a principal means of oversight of chapter operations and risk management was known, or in the absence of negligence, should have been known by fraternities, including the Fraternity Defendants, when insurance carriers were denying them coverage.

44.     In 1997, the National Interfraternity Council ("NIC"), then comprising of 66 Greek national organizations with 5500 chapters on 800 campuses throughout the United States and Canada, concluded that improper fraternity oversight of alcohol use was "frighteningly pervasive." The NIC passed a Resolution addressing the "misuse of alcohol" that, in part, "encourages its member fraternities to pursue alcohol-free chapter facilities." Only a handful of fraternities established alcohol-free facilities in the years following this Resolution.  Defendant

Sigma Chi was not one of them. One study that analyzed the impact of alcohol-free fraternity chapter facilities over a 10-year period determined that incidents of injury had been reduced by approximately 67% and the severity of such incidents – as a factor of the amount of insurance pay-outs – *was reduced by approximately 98%.*

45.     In 1998, the national fraternity, Phi Sigma Kappa, appointed a Senior Committee of its fraternity leaders to analyze the prevailing risk and crisis-management programs implemented by Greek organizations, which includes, in principal part, the FIPG policies and programs implemented then and now by Defendant Sigma Chi. The Committee concluded that the risk-management policy is "not unilaterally working. There are still far too many incidents and violations, some of which involve chapters who are repeat offenders, sometimes occurring each semester."

46.     Through their affiliation in numerous trade groups, such as the Fraternity Executives Association ("FEA"), the National Panhellenic Conference, the NIC, and through their shared insurance and outside legal counsel, among other resources, fraternities and sororities were directly aware of such risks and the causes thereof. Upon information and belief, in pooling resources to purchase insurance, and/or in forming and participating in captive insurance companies, and/or in participating in joint Greek activities and conferences locally and nationally, fraternities and sororities shared actual loss histories and related information provided by insurance carriers common to all as such information was applicable to their own operations and otherwise affected the costs and terms of insurance being purchased or provided.

47.     In addition to the known risks of the misuse and abuse of alcohol was the knowledge that the provision of alcohol at principal membership events, such as bid night celebrations, big brother-little brother night, and membership crossover was particularly

dangerous, eventually causing one long-term fraternity executive to label these nights and rituals as the "three deadly nights."

**SYRACUSE UNIVERSITY UNDERTOOK THE OBLIGATIONS TO PROMOTE FRATERNITIES AND SORORITIES, PROVIDE THEM OFFICIAL UNIVERSITY RECOGNITION, OVERSEE THEIR OPERATIONS, AND ENCOURAGED STUDENTS TO JOIN THESE ORGANIZATIONS AND RESIDE IN GREEK HOUSING**

48.      Defendant Syracuse has for decades – if not more than a century – committed substantial resources and staff to promote fraternities and sororities to students on its campus. Syracuse advises incoming students and their parents that Greek Life is a "vital part of the Syracuse University community." The University currently – on its official website and at its expense – advises students and their parents that the Greek community on its campus is "vibrant" and dates to 1871. The website and other documents and materials provided by the University to students and their parents – now and as of 1990 – are intended to promote these organizations, encourage students to join and live in Greek housing, and, generally, convey substantial financial benefits on the Greek organizations. Upon information and belief, the University has at all relevant times specifically tracked revenues and contributions to the University made by its Greek alumnae and related organizations.  Upon information and belief, at all relevant times, the University has also benefitted from the additional student housing that Greek organizations provide University students.

49.      At all material times, Defendant Syracuse promoted to its students, such as Plaintiff, the histories of sororities and fraternities, their purported values, ideals, contributions to campus life and society, and the values of membership, and retained, trained, and provided staff, facilities, publications and other resources to establish a seamless means for incoming students to learn about and join these entities. These organizations have been able to thrive at the University

since many of their management and promotional functions and expenses are provided directly, underwritten, or otherwise substantially supported by the University.

50.     At all relevant times, for fraternities and sororities to obtain the significant "privileges, services and resources" offered by the University and to operate as official Social Greek Letter Organizations of the University, they have been required to apply for and hold "recognized" status. To achieve that status, at all relevant times, the University has undertaken the specific obligation to review the fraternities and sororities and determine, *inter alia*, that they are "managed responsibly" and reflect the University's highest ideals. In undertaking this responsibility, at all relevant times, the University has regularly met with staff from national fraternities and sororities, as well as local chapter officers. and has employed and trained numerous staff to specialize in Greek affairs, attend related conferences and seminars, and advise and counsel Greek organizations, their members, and their prospective members.

51.     At all relevant times, the University has undertaken substantial responsibilities for the oversight of fraternities, their "recognition" status, and of the membership and social activities taking place in fraternity houses, including through its involvement with Interfraternity Council and Panhellenic Council which are governing boards for the Greek organization on campus that review allegations of misconduct. The University also has established a University Judicial System that reviews and administers alleged violations of the Code of Student Conduct (the "Code"), including allegations of misconduct by students in fraternity and sorority houses or at their sponsored events.  At all relevant times, including in 1991, the jurisdiction of the University Judicial System has extended "to alleged misconduct that takes place on University owned or controlled property or on property close to the University, including the Greek chapter houses, alleged misconduct that takes place at any University sponsored event, and alleged

18

misconduct that has a significant impact on the educational mission and well-being of the University that takes place at any location off-campus."

52.     The University now requires students joining fraternities to attend workshops on Title IX, alcohol, gender bias and hazing, all pertaining to circumstances that the University knew, or in the absence of negligence should have known, were injuring and killing students in, at or involved with fraternities in the years preceding the rape of Plaintiff. Upon information and belief, the University did not have such a requirement in 1991. Such circumstances and risks existed and were well known to and documented by the fraternities, sororities, and their insurers as of 1990, as partially identified above, and otherwise available to the University had the University, its staff, or the Task Forces it established made any reasonable investigation into the organizations it was actively promoting.

53.     At all relevant times, including in 1991, by applying for status as "recognized," fraternities and sororities have been required to agree to the rules and regulations established by the University for such status, including being responsible for the conduct of their guests at sponsored events. At all relevant times, including in 1991, if a fraternity or sorority failed to comply with such rules and regulations the University has had the power to investigate the alleged wrongdoing, discipline its members, the organization and/or revoke its recognition.

54.     At all relevant times, the University, in undertaking to oversee the fraternities and sororities and their compliance with the requirements of recognition status, also has gained direct insight into dangerous aspects of the activities and management structure of fraternities. While University owned and managed housing was required to be free of alcohol, managed by a department employing trained residential staff, and regularly patrolled by campus security, at all relevant times, the University did not require any such management by fraternities as a condition of recognition though it had the power to do so. Instead, at all relevant times, the implementation

and management of all relevant policies relating to the provision, use and misuse of alcohol and drugs in fraternity and sorority housing were vested in chapter officers, who were, among other shortcomings, untrained, full-time students often legally prohibited from consuming the products the University and fraternities charged them with managing.

55.     As of 1990, the inability of chapter officers to safely manage fraternity housing, events, and the use and misuse of alcohol was widely known to universities, national fraternities, the housing corporations that owned fraternity housing, and their insurers to be a substantial cause of the injuries and deaths causing them to lose insurance coverage. In the reasonable exercise of its undertaken responsibilities, such information was known or should have been known by the University. Despite such knowledge, Sigma Chi did not install adult management in its chapter houses, such as the "house directors" in sororities, though it had the power to do so. Despite such knowledge, Defendant Comstock did not install adult management in the Sigma Chi chapter house located on the campus of the University, though it had the power to do so. Despite such knowledge, the University did not require Sigma Chi, or any other fraternities or housing corporations to do so, despite having the power to insist upon such mature, trained management as a condition of obtaining recognition.

56.     At its conference in 2012, FEA's legal counsel identified this as a "greatest challenge" to the prevention of injuries because of the constant turnover of officers, the difficulty of training them to recognize and prevent risks, and the fact that they're "just kids" and "changing their behavior is difficult."

57.     At all relevant times, the University did not require fraternities to be alcohol-free like other housing on campus, have live-in, trained management, or permit campus security to enter and patrol fraternity properties even though the chapter houses for Sigma Chi and Tri Delta were located on campus, housed students under the age of 21, and sponsored recruitment

activities and social events for underaged students therein. From its oversight of fraternities on campus, and knowledge of how sororities staffed their facilities, the University, upon information and belief, knew, or in the absence of negligence should have known, that this management structure was ineffective, unreasonable and dangerous.

58.     At all relevant times, in promoting fraternity and sorority membership and the purported benefits to students and their parents, the University knew, or in the absence of negligence should have known, of or otherwise sought to learn about the risks to sorority members and other women of being raped at fraternity and sorority events, particularly those held in fraternity houses where alcohol and drugs were essentially unregulated and unsupervised.

59.     Upon information and belief, the University – prior to and after the rape of Plaintiff – received, investigated, and adjudicated numerous allegations of the misuse and abuse of alcohol by persons in fraternity houses on campus or at fraternity sponsored events involving incidents of sexual misconduct and rape.

60.     Upon information and belief, the University knowingly refused to disclose such accurate and material information to Plaintiff and other students, thereby preventing them from having the knowledge to take steps to protect themselves.

61.     Upon information and belief, the University never provided such information to the Task Forces it established to review the problem of rapes within the Greek community and at fraternity houses and make recommendations for reform, as further alleged herein, and the University, at all times material hereto, never used such information to make reasonable reforms in the way fraternities and sororities were approved for recognition, promoted by the University, managed themselves, or otherwise handled the delegated responsibilities of using and providing alcohol in fraternity houses and at fraternity and sorority sponsored events.

62.     At all relevant times, while promoting the benefits of Greek membership directly to students and parents, the University failed – prior to and as of the date when Plaintiff was raped – and even today fails, to identify for such students, parents, and the campus community the specific reasons why fraternities and sororities on campus – that have not abided by the University's rules or applicable risk management standards – have been disciplined or lost recognition. Prior to Plaintiff's attendance at the University, the University failed to provide her with any meaningful or otherwise accurate information regarding the dangers posed to her by fraternity houses and fraternity events with alcohol, despite knowing of such dangers and actively and exclusively promoting the purported benefits of Greek membership.

63.     Presently, the University identifies some 13 Greek organizations that have lost recognition status but – intentionally – does not disclose and chooses to keep secret the causes and circumstances for such actions, which would provide accurate and meaningful information to its students and community about the risks of fraternities and their mismanagement known almost exclusively by the University and any students associated with the organizations when they were stripped of recognition. Over the years, the Psi Psi Chapter of Sigma Chi has had its University recognition revoked, including losing its charter from 1998-2006 for reasons unreported.

64.     Timely and accurate disclosures of information about sexual assaults are important to students, generally, as they are adults and entitled to know the risks they face so they can take actions to protect themselves. This is particularly true for incoming students, such as Plaintiff, who was 18 years old and traveling across the country to attend the University that she had briefly visited before enrolling. Plaintiff did not know prior to being raped that women were afraid on campus and advocacy groups were protesting to compel the University to disclose such important information.

65.     The importance of notifying students of risks on campus became dramatically apparent to universities, including Syracuse and the public, no later than 1986, when Jeanne Clery was brutally raped and murdered in her residence at Lehigh University. Unknown to Jeanne at that time was the fact that her dormitory had previously experienced dangerous criminal misconduct, which Lehigh knew of yet failed to disclose to its incoming students. As a result of Jeanne's death, and the fact that universities and colleges had exclusive knowledge of, yet historically failed to disclose, important crime information to students, parents and the campus community, the U.S. Congress passed the Clery Act in 1990 (the "Act"). The Act required universities to disclose, *inter alia*, valuable information about reported rapes and crimes on campus.

66.     New York also recognized the rights of students and families to be timely and accurately advised of the risks of rape and other crimes on campus by enacting in 1990 specific legislation, which became effective in 1991. This law required New York universities, as of September 1, 1991, to "inform incoming students about sexual assault prevention measures through programs which may include workshops, seminars, discussion groups, and film presentations, in or to disseminate information about sexual assault, promote discussion, encourage reporting of incidents of sexual assault, and facilitate prevention of such incidents." 1990 N.Y. ALS 739, 1990 N.Y. LAWS 739, 1990 N.Y. A.N. 11755.

67.     Under the law, such information "shall include," *inter alia*, "the nature of and common circumstances relating to sex offenses on college campuses." *Id.*

68.     Disclosing accurate and meaningful information about the risks of sexual violence and the resources available to survivors, and complying with the newly-enacted State law, was important as the campus at Syracuse had been the scene of multiple reported rapes in the years preceding Plaintiff's arrival on campus. For example, on October 22, 1989, the New York Times

published an article identifying that seven rapes had been reported on or near the University's

campus since the summer, including on the lawn of the chancellor's house. Those allegations had

not been made public and/or disclosed to students by the University. A follow up article in the

New York Times on November 20, 1989, was entitled: "Rapes Alter Student Life At Syracuse."

69.     Students at the University were afraid, protesting on campus about the risks of

being raped on campus, demanding reforms, and some founded a campus organization named

"Students Concerned About Rape Education." The University set up a rape task force that

semester ("Task Force") to make recommendations for protecting women, and the Syracuse

University Women's Center and students were pressuring the University to implement all of its

recommendations. The Task Force noted that the Greek subculture contributed to the problem on

Syracuse's campus, yet no reforms directed to Greek organizations were proposed or

implemented. The University made plans to open a center to provide education, counseling, and

support services to rape victims by July of 1990.

70.     In the Spring of 1991, before Plaintiff enrolled at the University, multiple rapes

on campus were reported to the University and/or police, including at the Sigma Chi fraternity

house. Between August 27, 1990 and August 1, 1991, there were at least 14 reports of sexual

assaults on campus, 10 of which were non-stranger rapes, involving approximately 8 women in

their first year of college. Plaintiff arrived on the campus to begin her freshman year in August

1991 and was completely unaware of these incidents or the dangers of rape at the University, in

fraternity housing, or at fraternity events.

71.     In July 1991, a Safety Advisory Committee at the University, which the

University was required to establish under the newly-enacted New York law, intended to try to

comply with the disclosure mandates of New York law by sending out the required information

in a July 1991 issue of *The (Syracuse) Record*.  However, the University blocked that attempt

because, as one member of the committee reported, "[t]he staff of (the Admissions Office) did not feel it appropriate that our information be released as we intended."

72.     By August 1991, the Safety Advisory Committee at the University had advised the University to provide a detailed, four-page information sheet to incoming students before they arrived on campus advising them about the risks of rape on campus and how students could be updated about security issues. The University declined the Committee's recommendations because the Admissions Office "did not feel it appropriate that our information be released as we intended." According to one member of the Safety Advisory Committee, the University refused to provide the information because there was "too much information that would scare students."

73.     One of the co-chairs of the Safety Advisory Committee, then a junior at the University, told *The Daily Orange* that she disagreed with the Office of Admission's reasoning because, *inter alia*, people should be afraid after reading the statistics and "[p]eople need a sense of fear about this issue," in reference to campus sexual assault.

### A PARTIAL HISTORY OF THE ALLEGATIONS MADE AGAINST SIGMA CHI, ITS CHAPTERS AND MEMBERS INVOLVING DANGEROUS MISCONDUCT AND MISMANAGEMENT RESULTING IN SEXUAL VIOLENCE AGAINST WOMEN

74.     Because universities, fraternities, sororities and their respective insurers refuse to publicly report or disclose allegations by women of sexual assault in fraternity houses or at fraternity sponsored events, only anecdotal information is available unless news organizations make reports or courthouse records are searched. In the years preceding the rape of Plaintiff, the absence of the internet or other means of disseminating and preserving news reports makes this process even harder for third parties and survivors, though the same is not true for the University and the Fraternity and Sorority Defendants, as they had and continue to have direct knowledge thereof.

75.     Subject to the foregoing, and upon information and belief, the University and Sigma Chi were aware of allegations against the Psi Psi Chapter and its members in the years preceding the rape of Plaintiff concerning the misuse and unlawful provision of alcohol in the fraternity house and at fraternity events, sexual assault, and other dangerous misconduct. Defendants Sigma Chi and Tri Delta were also aware that fraternities' entrustment of chapter officers to reasonably and safely implement risk management policies, university rules and regulations, and the use and provision of alcohol in fraternity houses and at fraternity events was unreasonable and dangerous.

76.     A partial inventory from public records of the allegations of sexual violence leveled at Sigma Chi, its chapters, and members includes:

- <u>Gettysburg College, April 1983</u>: High school student alleged that she was raped by multiple Sigma Chi members at a party;

- <u>Colgate University, Summer, 1987</u>: A 20-year-old woman fell asleep in an upstairs bedroom of the fraternity house following a fraternity event with alcohol. She reported to the police that she had been raped by 2 men and assaulted by another. The chapter was shut down for a year;

- <u>Lehigh University, Spring 1989</u>: Sigma Chi chapter hired a woman to perform a striptease at a party. The woman reported that she was sexually assaulted at the party. The chapter was disbanded for 4 years;

- <u>University of Missouri, October 7, 1989</u>: A St. Louis University student reported that a 22-year-old Kansas City man raped her across the street from the Sigma Chi house where she met him during a party;

- <u>University of Texas, April 1990</u>: A 16-year-old girl accused members of Sigma Chi of sexually assaulting her at a party;

- <u>Syracuse University, February 1991</u>: A woman reported that a Sigma Chi member raped her;

- <u>Cornell University, May 1991</u>: A 20-year-old woman reported that she was raped by a Sigma Chi member at the Sigma Chi house;

- <u>University of Idaho, April 25, 1992</u>: An 18-year-old woman attended a Sigma Chi party where fraternity members served alcohol to her until she passed out. Sigma

Chi member Peter Marshall Spaulding admitted in court to having sex with the victim while she was unconscious and was convicted of criminal charges;

- Stanford University, October 5, 2003: A woman who was 19 years old at the time reported to the police that she had been raped at the Sigma Chi house;

- Arizona State University, February 2008: A 19-year-old freshman attended a Sigma Chi party at a sushi restaurant and was transported back to the fraternity house. The next morning, she woke up at the Sigma Chi house in severe pain after having been raped and sodomized. There were 5 separate complaints lodged against this chapter in the 5 years prior, including a 2007 sexual assault;

- University of Wisconsin – Madison, October 2008: A female student and sorority member reported that she had been drugged and raped by several members of Sigma Chi;

- University of Minnesota, September 15, 2012: Sigma Chi hosted a social exchange involving 4 fraternity and sorority chapters. The University received reports of 2 separate sexual assaults at this event;

- Montana State University, September 15, 2013: A woman who had been drinking with new acquaintances at the Sigma Chi fraternity reported that she was taken to a room and sexually assaulted by 2 men;

- James Madison University, January 2014: While on spring break in Florida, 3 Sigma Chi members sexually assaulted an intoxicated female, denied having done so when confronted by her, and then posted videos of the sexual assault on social media.

- Brown University, October 3, 2014: Sigma Chi held an unregistered party after which a student reported nonconsensual contact of a sexual nature. The university investigated and found that Sigma Chi had "facilitated sexual misconduct through improperly monitored spaces and inadequate safeguards surrounding the service of alcohol." Brown University suspended the chapter for 1.5 years;

- UC Berkeley, 2015 to 2018: In early 2018, Sigma Chi was placed on social probation after "repeated allegations of drugging and sexual assault" between the fall of 2015 and early 2018. The UC Berkeley Panhellenic Council issued a statement on its stance against sexual violence stating that "the culture that we are working so hard to deconstruct has especially manifested itself in one of the fraternities in the CalGreeks community, the Alpha Beta Chapter of Sigma Chi." Likewise, the Interfraternity Council for UC Berkeley issued a similar statement addressing the pattern of sexual violence "illustrated in allegations against one of the fraternities within our community, the Alpha Beta chapter of Sigma Chi."

**PLAINTIFF IS RENDERED INCAPACITATED AND RAPED AFTER BEING
ENCOURAGED AND PRESSURED TO CONSUME ALCOHOL IN A DANGEROUS
RECRUITING AND BID RITUAL**

77.    After her bid to join Tri Delta was accepted, on September 19, 1991, the Omicron Chapter co-sponsored an event with the Psi Psi Chapter to celebrate Tri Delta's pledges. The presence of alcohol at this type of event and ritual would eventually be identified as being one of the "three deadly nights" for fraternities because, in part, of the pressure imposed on new members to consume gross amounts of alcohol and the flawed oversight and management by chapter members in creating such an event and failing to intervene to protect grossly intoxicated participants from suffering harm. Upon information and belief, all officers and members of the Omicron Chapter approved this event, and the purchase and provision of alcohol, and "special punch," which was spiked with ecstasy.

78.    The event was held on the premises of the Psi Psi Chapter, Plaintiff was invited to attend, and alcohol was purchased by the fraternity and sorority, served in packaged form, including bottles of champagne purchased by the Omicron Chapter, in a trash can filled with alcoholic punch made with 190 proof grain alcohol, and also passed around to pledges by alumni members of the sorority in a thermos.  A fraternity member gave Plaintiff a bottle of champagne, which had been purchased with Omicron Chapter funds.

79.    The presence of common sources of alcohol has long-been a causative factor for injuries suffered in fraternity houses and at fraternity events.

80.    So-called "punch pushers" passed around the "special punch" in a thermos and told and pressured the pledges to drink. Plaintiff would later learn from Tri Delta members that alumni members had secretly spiked the "special punch" with the drug commonly named "ecstasy." Upon information and belief, all officers and members of the Psi Psi Chapter approved

this event, and the purchase and provision of alcohol and "special punch," which was laced with ecstasy.

81.     Plaintiff drank at the event and quickly became intoxicated. She went upstairs with Defendant Montalto, who began kissing her in a bedroom. Plaintiff stated that she was not interested in having sex, had a boyfriend, and said "no, don't do that" when Defendant Montalto continued trying to engage in sex acts with her. Plaintiff felt him penetrate her with his penis. Another fraternity member entered the room but failed to act or stop the rape. Plaintiff managed to get away from Defendant Montalto and climb down the fire escape to leave the fraternity premises.

82.     Plaintiff went to University Health Services the next day where she reported being raped and an examination confirmed sexual penetration. Health Services did not notify the police and failed to provide her further support or resources concerning education, counseling, and support services.

83.     Plaintiff also reported to the local police, had a rape examination at a local hospital, and provided law enforcement with the clothing she had worn at the event. However, police took no action and told Plaintiff she needed to further identify her attacker and provide them with a name before they would investigate.

84.     Plaintiff also disclosed being raped to pledges and members of Tri Delta. Plaintiff's allegation of being raped was printed on the front page of the college newspaper, though she never spoke with the press or otherwise authorized such report. While the newspaper did not identify her or her attacker by name, Plaintiff was traumatized.

85.     Officers and members of the Omicron Chapter began humiliating, harassing, and retaliating against Plaintiff for making the report of rape and potentially causing trouble for them, their sorority, and the fraternity and its members, and "ruining their senior year."

86.     Other members of the Omicron Chapter disclosed their own rape experiences at Syracuse, but said they never reported and ridiculed Plaintiff for reporting.  When Plaintiff tried to attend a sorority meeting after the publication of the article, she was retaliated against and told she was no longer welcome in the sorority.

87.     Plaintiff withdrew from pledging the sorority and had neither the strength nor support from the University to move forward on her report to the police. Plaintiff continued her studies at the University until withdrawing after her sophomore year.

88.     As a direct and proximate result of being raped and enduring the circumstances at the University directly related thereto, Plaintiff has suffered, and for the foreseeable future shall continue to suffer, significant physical and emotional trauma and injuries.

## DUTIES OF CARE UNDERTAKEN BY THE FRATERNITY AND SORORITY DEFENDANTS UNDER THE UNIVERSITY'S CODE OF STUDENT CONDUCT AND OTHERWISE

89.     The University states that it established the Code to set forth the "minimal expectations" required of students and student organizations to provide "an environment where persons are safe, property is secure, the individual rights of all persons are respected, and education of the highest quality is achieved." At all relevant times, including in 1991, fraternities and sororities have been required to comply with the Code and the "Minimum Standards for Recognition of Syracuse University's Social Greek Letter Organizations."

90.     In seeking recognition by the University, the valuable rights and privileges of recognized organizations, and the resultant membership dues from the University's students, Defendants Sigma Chi, Psi Psi, Tri Delta, and Omicron Chapter undertook and agreed to abide by the Code and such minimum standards.

91.     At all relevant times, including in 1991, the Code has provided that the "sale, serving, and consumption of alcoholic beverages in fraternity and sorority houses must be in

compliance with the University alcohol policy and any further rules and regulations promulgated by the Greek Council." At all relevant times, including in 1991, fraternities and sororities have also been obligated under the Code to comply with New York State Law.

92.     At all relevant times, including in 1991, the Code has provided that alcoholic beverages "are not to be served at membership recruitment functions (e.g., fraternity rush . . . .)" At all relevant times, including in 1991, the Code has provided that events that involve the service of alcohol by fraternities and sororities must be in compliance with guidelines established by the University Events Office. At all relevant times, including in 1991, the Code has prohibited alcohol from being purchased by or served to persons under the age of 21. At all relevant times, including in 1991, alcohol has been prohibited in all University residences and dining facilities.

93.     At all relevant times, including in 1991, the Code also has prohibited Greek organizations and persons from engaging in conduct that threatens the mental health or physical health and safety of any person or persons including hazing, drug and/or alcohol abuse . . ."

94.     At all relevant times, including in 1991, hazing was a crime in the State of New York.  Under New York law, at all relevant times, including in 1991, a person engages in unlawful hazing when in connection with "another person's initiation into or affiliation with any organization, he intentionally or recklessly engages in conduct which creates substantial risk of physical injury to such other person or a third person" and/or "thereby causes such injury."

95.     At all relevant times, including in 1991, the Code has prohibited students or student organizations from harming any "person or persons, including but not limited to: assault, sexual abuse or other forms of personal abuse." At all relevant times, including in 1991, the Code has expressly provided that such actions violate the Code whether the student or student organization was acting alone or with any other person.

96.    At all relevant times, including in 1991, the University, under disciplinary systems it established, has had the power and authority to accept, investigate and adjudicate alleged violations of the Code and related University standards.

97.    The Fraternity and Sorority Defendants have, at all relevant times, retained, supervised and compensated "leadership consultants" to visit and meet with their respective chapters and members on a regular basis and, *inter alia*, counsel them on risk management principles and their understanding and compliance thereof. In the Fall 1991 issue of the Trident, the duties of a leadership consultant are described as follows: "[T]he employment agreement for consultants outlines duties similar to those of a corporate management consultant: providing analysis of management, operations, and programming for collegiate chapters located throughout the United States and Canada; producing comprehensive written reports of findings and recommendations for each chapter; conducting workshops; public speaking; facility quality circles; meeting with college administrators and alumnae, attending seminars and training sessions; developing training curriculum for national leadership seminars; and, participating in long-range Fraternity planning." Upon information and belief, at all relevant times, Defendant Sigma Chi has employed similar personnel to perform similar responsibilities.

98.    As a result, the Fraternity and Sorority Defendants undertook a duty of care in evaluating their chapters' management, operations, and programming, and in counseling and evaluating their chapters on their understanding of, and compliance with, risk management policies.  The Fraternity and Sorority Defendants knew or, in the absence of negligence should have known, that entrusting untrained, unsupervised undergraduate members with the management of their chapters and implementation and enforcement of their risk management policies was unreasonable, dangerous, and negligent.

**THE SIGMA CHI FRATERNITY DEFENDANTS ARE ALTER EGOS: DEFENDANT SIGMA CHI COMPLETELY CONTROLS THE ENTITIES AND THEIR ASSETS AND OPERATIONS ON CAMPUS AND HAS INTENTIONALLY UNDERCAPITALIZED ITS CHAPTER TO HINDER THE CLAIMS OF CREDITORS LIKE PLAINTIFF**

99.     Defendant Sigma Chi is a national fraternity that recruits new undergraduate members and generates its principal revenue at colleges and universities across the country, including at Syracuse. Sigma Chi establishes and wields the right to control every essential aspect of its chapters, their operations, and the activities of its members through the fraternity's Governing Laws, which it refers to as the "Governing Law." Upon information and belief, the Governing Law provisions referenced herein are similar in all material respects to those extant at the time Plaintiff was raped.

100.     Under Article IV of the Governing Law, "the fraternity shall establish and maintain active and alumni chapters." Under the Governing Law, Defendant Sigma Chi is vested with powers and responsibilities to control every meaningful activity of chapters it chooses to establish, including, *inter alia*,

    a.    whether, how, and where chapters will be granted a charter (Statute No. 4);

    b.    the name and legal form of chapters (an "association of members," Statute No. 4);

    c.    who qualifies to be a member of chapters, with final review and approval of members vested in Sigma Chi (Statute No. 3);

    d.    how chapters admit undergraduates, including the ritual(s) required to be used (*Id.*), the length and timing of a new member pledge program (Statute No. 6), and prohibited initiation activities (Statement of Position Concerning Pledge Training & the Ritual);

    e.    the conditions for a member to become an officer or participate in athletics or social events of the chapter (Statute No. 3);

    f.    the title, duties and responsibilities of chapter officers, how and when they should meet, and how officer transitions should take place (Sigma Chi Chapter Leadership Resources);

    g.    the form for bylaws adopted by chapters (Sigma Chi Chapter Leadership Resources);

    h.    whether members are disciplined, including having the power to mandate the type of discipline or remove a member without the action or consent of a chapter or its members (Statute No. 7);

i.   establishing restrictions on how, when and what sanctions chapters can impose when it disciplines members (Statute No. 7);

j.   the amount, timing for payment and forms used for initiation and membership fees due Sigma Chi, and the requirement that chapters purchase an amount of insurance established by Sigma Chi (Statutes No. 3 and 6);

k.   the powers to suspend chapter operations, discipline chapters on specific terms, and/or remove a chapter's charter and compel it to cease any form of undergraduate recruitment or fraternal activities (Statute No. 4);

l.   the right to compel chapters to regularly participate in the "supervision" by a Grand Praetor, who reports to the Executive Director of Sigma Chi (Statute No. 4);

m.   the right to control, and "determine the use and ultimate disposition of such property or the proceeds thereof" of any assets held by chapters when they become inactive (Statute No. 5); and

n.   the power to enter into contracts to lease, buy, sell and transfer assets, and determine the legal entity which shall hold title to and manage assets for the benefit of chapters (Statute No. 5).

101.   Defendant Sigma Chi and its chapters are so unified in their existence, operations and control that the supreme legislative power over these entities is merged in and held by Sigma Chi (Statute No. 4). That power is then exercised at bi-annual conventions at which Sigma Chi, its chapters, and other entities established by Sigma Chi and operating for the benefit of the fraternity have the right to vote over on policy changes affecting the fraternity or their respective operations (Statute No. 4).

102.   Under the Sigma Chi Statutes, Sigma Chi has the power to establish alumni associations for chapters within a particular locale (Statute No. 4). The local chapters do not have that power.

103.   Under the Sigma Chi Statutes, Sigma Chi has undertaken and assumed the responsibilities to establish and monitor Grand Praetors, who are empowered to appoint chapter advisors to assist him in supervising chapters and filing reports with Sigma Chi's Executive Director (Statute No. 4). Defendant Sigma Chi has also undertaken and assumed the

responsibilities of investigating claims of wrongdoing by chapters and members, and imposing discipline as a result thereof (Statute No. 7).

104.    Under the Sigma Chi Statutes, Defendant Sigma Chi has authority to establish entities (house corporations) to take title to and hold real property (fraternity houses) from which chapters recruit new members and revenue for Sigma Chi, and from which Sigma Chi acquires substantial and valuable real estate assets on campuses across the country (Statute No. 5). Defendant Sigma Chi has the power to install the property committees managing such assets (*Id.*). Defendant Sigma Chi is authorized to hold first and second mortgages on chapter houses as "proper investments" and has the power to determine the use and ultimate disposition of such property (Statute No. 5).

105.    In the exercise of its control over the fraternity, Sigma Chi has organized itself as a tax-exempt organization pursuant to IRC 501(c)(3). For the fiscal year 2021, Sigma Chi reported total revenues of $6,615,292.00 and net assets of $12,617,568.00.

106.    Directly related to Sigma Chi and operating as part of and under the control of the fraternity is Defendant Foundation, which is a tax-exempt organization pursuant to IRC 501(c)(3).  For the fiscal year 2021, the Foundation reported net assets of $34,620,464.00, including a Limited Partnership interest valued at $2,246,348.

107.    Defendant Comstock is organized as a corporation and holds title to and manages the valuable real estate and improvements on the campus of Syracuse University. The property is a multi-level historic structure that has housed members of Sigma Chi and its Psi Psi Chapter for decades, resulting in substantial revenues for Defendant Sigma Chi. Upon information and belief, the property is worth several millions of dollars, based upon its size, location, historic nature, and ability to generate revenues regularly and perpetually from students at Syracuse University who desire housing in a prime location on campus.

108.    As to the Defendant Psi Psi, Defendant Sigma Chi has, upon information and belief, at all relevant times, established and controlled how the Chapter's finances are held and managed. Upon information and belief, Defendant Sigma Chi has contracted for software services that manage the finances of its chapters and vests in Sigma Chi the power to access, control and disburse the funds therein.

109.    At all relevant times, Defendant Sigma Chi has controlled the purchase and payment for insurance by its chapters and members that purportedly cover the chapter, members and Defendant Sigma Chi.

110.    Upon information and belief, the Limited Partnership interest identified by the Defendant Foundation is in the Risk Management Foundation ("RMF"), which is a limited liability entity formed under the laws of the State of Illinois and headquartered at the same location as Sigma Chi.

111.    RMF provides risk-management services for Defendant Sigma Chi and other national fraternities and is, upon information and belief, a captive insurance company formed by Sigma Chi with other fraternities in 1988. RMF brokers and issues the insurance policies negotiated by Defendant Sigma Chi.

112.    Defendant Sigma Chi, directly, and, upon information and belief, through its ownership interest in RMF, negotiates and provides for insurance covering the numerous fraternity entities it establishes that includes coverage exclusions applicable solely to chapters and members, including, without limitation, related to the misuse of alcohol, hazing, sexual misconduct, and violations of university and fraternity risk-management policies.

113.    Defendant Sigma Chi as an organization and through its employees is a member of the Fraternity Executives Association ("FEA"). Tri Delta's Executive Director in 2012 was Cari Fitzgerald Cook, who served as the Treasurer/Secretary of the FEA. In 2012, the FEA

retained attorney James Ewbank to prepare and present a Litigation Update for its membership at its July 2012 Conference. For decades, Mr. Ewbank served as defense counsel in numerous cases filed against fraternities and sororities alleging death or injuries from rape and other misconduct, claiming that he had been lead counsel for "most of the major high profile cases involving fraternities since 1990."

114.    Following that conference, the FEA posted Mr. Ewbank's presentation on its website for nine (9) months, where it was viewed and downloaded by countless people, including the media which has publicly disclosed portions of the Litigation Update. As such, its confidentiality had been waived, and the FEA has known at least since 2014 that the Litigation Update has been in the possession of undersigned counsel and others and has taken no action to protect its confidentiality.

115.    At the FEA Conference, fraternities were specifically advised on ways to protect fraternity assets from the reach of creditors, including, without limitation, by negotiating broad insurance exclusions because, in part, they would give "leverage" over plaintiffs if coverage problems exist for chapters and members. Defendant Sigma Chi is paid by chapters and members for the purchase and issuance of insurance. When claims happen, Sigma Chi and its insurer rely on the exclusion they negotiated to deny a defense or indemnification to its members. Such obligations are often passed onto homeowners' insurance carriers for members and used by fraternities and sororities as leverage against creditors asserting claims.

116.    Sigma Chi and, as further set forth below Tri Delta, have used their control over their chapters, members and the purchase of insurance to frustrate claims that, for decades, have been asserted by creditors of fraternity and sorority chapters having significant legal claims, including persons who have died, been sexually assaulted, or suffered catastrophic injuries as a result of misconduct by chapters, members, guests, or at the events sponsored within fraternity

houses. Such claims were a principal reason why major insurance carriers were denying

coverage to fraternity organizations at or around the time RMF was incorporated, resulting in

national fraternities, such as Sigma Chi, combining their resources to form captive insurance

companies.

117.    Through its plans and investments, Defendant Sigma Chi, directly and/or through

Defendant Foundation, profits from RMF and, specifically, from the risk of injuries and deaths

that it has failed to mitigate through reasonable conduct and policies. By design and plan,

chapters, such as Defendant Psi Psi, are knowingly and intentionally undercapitalized by

Defendant Sigma Chi so that they neither own, hold, nor through applicable insurance coverage,

have meaningful assets to cover the anticipated claims of creditors. Such scheme has also

enabled Defendant Sigma Chi to avoid – for decades – institution of the safety and risk-

management reforms that responsible industries and companies implement when incidents of

catastrophic injury and death cause increased insurance premiums, costs, economic losses and

related pressures to act reasonably.

### THE SORORITY DEFENDANTS ARE ALTER EGOS: DEFENDANT TRI DELTA COMPLETELY CONTROLS THE ENTITIES AND THEIR ASSETS AND OPERATIONS ON CAMPUS AND UNDERCAPITALIZES ITS CHAPTERS TO HINDER THE CLAIMS OF CREDITORS LIKE PLAINTIFF

118.    The legal structure of Tri Delta, its complete control over every material aspect of

the organization and actions of its chapters, and the resultant and intended undercapitalization of

its chapters to evade the claims of foreseeable creditors is virtually identical to that of Defendant

Sigma Chi, differing materially only in the documents and language used to describe the

structure. Upon information and belief, the Bylaw provisions referenced herein are similar in all

material respects to those extant at the time Plaintiff was raped.

119.     In the Bylaws of Delta Delta Delta Fraternity, the organization is referred to as the "Fraternity," the business of which functions through Tri Delta (Article II of the Bylaws). In Article II, Tri Delta has direction over "membership matters, chapters of the Fraternity, and related organizations and entities associated with the Fraternity." Article II further states: "The Fraternity shall be primarily a collegiate organization made up of members affiliated with collegiate chapters . . . The administration of the Fraternity functions through a Convention that includes entities, officers and governing bodies of Tri Delta, along with chapters, house corporations and other operating under the direction of Tri Delta", which "shall have direction over the business and legal affairs of the Fraternity." Tri Delta is identified as the corporation "through which all financial affairs and business transactions of the Fraternity are and shall be handled."

120.     Article II provides that Tri Delta, its National House Corporation, and House Corporations shall hold title to real property used by the Fraternity, including its chapters. Chapters "may" hold title solely to personal property. House Corporations are subject to review by Tri Delta or any personnel its Executive Board appoints (Article XX). Chapter members and alumnae (of the respective college and of a specified locale) in good standing are deemed members of the House Corporation (*Id.*). Tri Delta can appoint members of the Housing Corporation (*Id.*). Under Tri Delta's Fraternity Policies: Collegiate Chapters are required to "fill the chapter facility to capacity."

121.     Under Article VII of the Bylaws, the Convention is the supreme authority over the Fraternity and has the powers of "supervision and government of the Fraternity, except those reserved for the Executive Board" of Tri Delta. Tri Delta sets the date of, manages, and presides over the Convention. Under Article VII, chapter members cannot be nominated to Tri Delta's Executive Board.

122.    Under Article XIV of the Bylaws, Tri Delta's Executive Board determines whether and how chapters may be established. Tri Delta determines the name of the chapter and who may be initiated into Tri Delta as a charter member. Tri Delta has the power to withdraw a chapter's charter and its decision is final. Upon withdrawal of a chapter's charter or dissolution, any assets remaining after debts are paid "shall be retained" by Tri Delta. At Tri Delta's sole discretion, it may transfer those assets to the "National House Corporation."

123.    Under Article XIV of the Bylaws, Tri Delta has assumed the responsibilities for supervising and directing chapters, providing that its designated representatives "shall have supervision over collegiate chapters and the local advisory committees." Chapters are required to elect new members in accordance with policies and rituals of the Fraternity. Chapter operations and management are designated in and required to be in accordance with the Bylaws. The financial affairs of the chapters are subject to review by Tri Delta and its representatives.

124.    The Bylaws place multiple "regulations" on, and give Tri Delta authority over, activities by chapters to solicit and initiate new members, including who can become a member, what references are required, how long the membership is maintained, and how members are initiated (Article XVI). Under Article XVII, Tri Delta, any member of its Executive Board, or its representative can initiate disciplinary action over a member. The process and standards of member discipline are set and controlled by Tri Delta. Tri Delta's Fraternity Policies: Collegiate Chapters require chapters to have bylaws governing their organization and operations that are provided by Tri Delta.

125.    Article XVII of the Bylaws identifies that all financial affairs and policies of the Fraternity, including chapters, shall be conducted through Tri Delta. All disbursements shall be made to Tri Delta. Tri Delta determines fees and dues paid by each collegiate member, new member fees, and the amount each member must pay to the National Housing Endowment Fund,

which assists in making capital improvements and acquiring furnishings for chapter housing or facilities "for the exclusive use of a collegiate chapter of the Fraternity" (Article XVII). Tri Delta's Fraternity Policies: Collegiate Chapters identify the financial and accounting system, Billhighway, that tracks "member invoices, member delinquency, chapter budgets and more." Tri Delta's Fraternity Policies: Collegiate Chapters prescribe that "chapters must only utilize the savings account established through the Fraternity accounting system. "No additional bank accounts, debit cards or credit cards may be held by the chapter unless required by the host institution [university or college]." Chapter budgets must be created on forms issued by and submitted to Tri Delta. Chapter policies can never supersede the Fraternity's policies.

126.     Tri Delta's Fraternity Policies: Collegiate Chapters designate the Interactive Network – established by Tri Delta – that controls the official website that "shall" be used by chapters for websites and internal communications.

127.     Tri Delta's Fraternity Policies: Collegiate Chapters establish all the risk crisis management requirements and policies of the chapters. The insurance for the chapters and members related to and covering such risk is negotiated and controlled by Tri Delta through its agreements with the MJ Insurance Sorority Division.

128.     Upon information and belief, chapters and members pay for the purchase and issuance of insurance, and the obligations to defend and indemnify are subject to exclusions related to the misuse of alcohol, hazing, sexual misconduct, and violations of university and fraternity risk-management policies. These exclusions are applicable to substantial portions of claims that, for decades, have been asserted by creditors of sorority chapters having significant legal claims, that is, persons who have died, been sexually assaulted, or suffered catastrophic injuries as a result of misconduct by chapters, sorority members, guests, or at the events

sponsored or attended by sororities. Such claims were the reason major insurance carriers were denying coverage to fraternity and sorority organizations in the 1980s.

129.    Upon information and belief, such exclusions negotiated by Tri Delta are not applicable to Tri Delta or the entities holding the Fraternity's substantial real property and personal assets. As a result, chapters, such as Defendant Omicron, are knowingly and intentionally undercapitalized by Tri Delta because they neither own, hold nor, through applicable insurance coverage, have meaningful assets to cover the anticipated claims of creditors. Such scheme has also enabled Defendant Tri Delta to avoid – for decades – institution of the safety and risk-management reforms that most industries implement when incidents of catastrophic injury and death caused increased insurance premiums, costs and economic losses.

130.    The Fraternity and Sorority Defendants specifically design that their respective chapters be formed as unincorporated associations.

131.    Entities organized as unincorporated associations are for many reasons more difficult for creditors to hold responsible for valid claims.

132.    Fraternities and sororities in cases across the country routinely seek to dismiss litigation filed against their chapters after tragedies and revocation of a chapter charter on the grounds that such associations cannot be sued, served, or are no longer extant.

133.    An unincorporated association is generally recognized under law as being an organization formed by two or more persons to accomplish mutual goals.

134.    Defendant Sigma Chi had the superior authority to direct, control, and manage its respective chapter's governance and affairs to accomplish mutual goals and, thus, was at all times relevant to this action a controlling member of the unincorporated association (chapter) it established at Syracuse University.

135.     Defendant Sigma Chi, its chapter, and the other Sigma Chi entities that carried out the business of the Fraternity at Syracuse University, including the Omicron House Corporation, shared a unity and commonality of ownership and interest and were, at all times relevant to this action, one operating entity.

**COUNT I**
***Negligence, Negligent Breach of Assumed Duties, Hazing / Negligence Per Se,***
***Willful and Wanton Misconduct***
**(As Against Fraternity Defendants)**

136.     All of the preceding allegations in this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

137.     The Fraternity Defendants, individually, and through their respective agents and alter egos, owed, and undertook duties of care to Plaintiff and invitees most vulnerable to gender-based violence and sexual assault, who are overwhelmingly female invitees, to the Fraternity Defendants' chapter house to direct, manage and oversee the Fraternity Defendants' operations and events in a reasonably prudent and safe manner. The Fraternity Defendants knew and should have recognized that such duties were necessary to protect such invitees.

138.     The Fraternity Defendants, individually, and through their respective agents and alter egos, owed, and undertook duties of care to Plaintiff as an invitee to the Fraternity Defendants' chapter house to take reasonable care to make the property safe and refrain from creating any unsafe conditions that would injure Plaintiff.

139.     The Fraternity Defendants, individually, and through their respective agents and alter egos, knew, or in the absence of negligence should have known, that entrusting chapters and chapter officers to safely manage the provision and use of alcohol in fraternity houses and at fraternity events was unreasonably dangerous. Such conditions had caused commercial insurers to refuse to insure fraternities because, in part, the nature, frequency and severity of injuries,

43

deaths and misuse of alcohol and drugs resulted in fraternities being ranked the sixth worst insurance risk in this country.

140.    The Fraternity Defendants, individually, and through their respective agents and alter egos, owed and undertook duties of care to Plaintiff to reasonably manage their housing and events to prevent repeated – yet foreseeable and avoidable – incidents of injury, sexual assault, and rape. The Fraternity Defendants, individually, and through their respective agents and alter egos, were negligent in failing to remediate such dangers.

141.    The Fraternity Defendants, individually, and through their respective agents and alter egos, owed and undertook duties of care to Plaintiff, including a duty to refrain from doing any act which a person of ordinary prudence could reasonably apprehend, as a natural and probable consequence thereof, to subject another person to peril.

142.    The Fraternity Defendants, individually, and through their respective agents and alter egos, owed and undertook duties of care to Plaintiff to not engage in conduct that created risk of physical harm or conduct that threatened the mental health or physical health and safety of any person including hazing, drug and/or alcohol abuse.

143.    At all relevant times, under New York law, a person engages in unlawful hazing when, in connection with "another person's initiation into or affiliation with any organization, he intentionally or recklessly engages in conduct which creates substantial risk of physical injury to such other person or a third person" and/or "thereby causes such injury." *See* N.Y. Penal Law §§ 120.16 and 120.17.

144.    N.Y. Penal Law §§ 120.16 and 120.17 create an implied private civil cause of action against those who engage in such acts.

145.    Plaintiff, as a pledge of the Sorority Defendants, was a person for whose benefit N.Y. Penal Law §§ 120.16 and 120.17 were enacted and, consistent with New York precedent, a

private right of action against those who engage in violations of those sections clearly furthers the legislative purposes of deterring the types of dangerous hazing activities to which Plaintiff was subjected.

146.    The Fraternity Defendants, individually, and through their respective agents and alter egos, owed and undertook duties of care to Plaintiff to refrain from the furnishing alcohol in connection with recruitment rituals or functions, from furnishing common sources of alcohol to underage pledges and invitees such as a trash can of alcoholic punch made with 190 proof grain alcohol and a thermos of drug-spiked punch, and from instructing and encouraging (or permitting others to instruct and encourage) underaged pledges to drink in circumstances that created a substantial risk of physical injury to the pledges, including Plaintiff, and therefore constituted "hazing," in violation of N.Y. Penal Law §§ 120.16 and 120.17, the University Code and the Fraternity Defendants' risk management policies.

147.    The Fraternity Defendants violated N.Y. Penal Law §§ 120.16 and 120.17, breached the duties they owed and assumed, and were negligent, by, *inter alia*:

(a)    Affirmatively authorizing, delegating to, and relying upon underage, incompetent, untrained members to manage the Psi Psi Chapter and its activities and to enforce and remain in compliance with applicable laws, codes, risk management policies and standards of care, even when such individuals, upon information and belief, had themselves had been subjected to and were participating in recruiting rituals and other events involving misuse of alcohol;

(b)    Failing to make the Fraternity Defendants' Chapter house alcohol-free and improperly training, or failing to train, the Psi Psi Chapter, members and officers on the safe management of residential facilities, such as the Fraternity Defendants' Chapter

house, and compliance with applicable laws, codes, risk management policies and standards of care;

(c)     Providing ineffective and improper direction and control over the Psi Psi Chapter, Chapter officers and members and their activities and sponsored events;

(d)     Failing to implement reasonable measures or otherwise enforce risk-management policies and codes of conduct prohibiting the use of alcohol during all recruitment activities and events, including those involving underage pledges from other Greek organizations;

(e)     Failing to provide reasonable safeguards and restrictions; failing to implement controls to prevent underage drinking and excessive drinking; failing to prevent the provision of open containers of alcohol, the spiking of alcohol with illegal drugs, the service of alcohol to underage pledges and invitees during recruitment, bid, and pledge rituals and events; and failing to prevent pledges and invitees from being pressured, directed, or encouraged to consume alcohol;

(f)     Creating and/or failing to remediate and make safe dangerous conditions in the Fraternity Defendants' chapter house involving the misuse and provision of open containers of alcohol and alcohol laced with illegal drugs, as well as failing to provide reasonable management, protection, and security in the Chapter house to prevent invitees, who had become disoriented and disabled from the consumption of alcohol and/or alcohol laced with illegal drugs, from being sexually assaulted and raped;

(g)     Failing to provide reasonable management, protection and security in the Fraternity Defendants' chapter house when their acts and omissions, or the acts or omissions of their agents or alter egos, placed Plaintiff in a position of peril;

(h)      Planning, organizing, encouraging, facilitating, participating in, giving substantial assistance to, and/or allowing the hazing of Plaintiff in connection with the bid and recruitment event Psi Psi co-sponsored with the Omicron Chapter, both negligently and in violation of New York law, the Code, the Fraternity Defendants' risk management policies, and other applicable standards of care for universities and educational institutions;

(i)      Undertaking duties of care in hiring and providing consultants, including chapter services consultants, to counsel evaluate chapters on their understanding of, and compliance with, risk management policies, when the Fraternity Defendants knew or should have known that such services were not reasonably effective or sufficient to prevent injuries, sexual assaults, rapes, and deaths;

(j)      Conspiring with other national fraternities to create, own and profit from captive insurance companies to continue their dangerous operations without making reasonable and necessary changes to their corporate, management, and risk-management operations to prevent injuries, sexual assaults, rapes, and deaths;

(k)      Conspiring with other national fraternities and sharing information about the claims for injuries, rapes and deaths, and lawsuits related thereto, for purposes of coordinating the manner in which they operate, manage chapter operations, and implement risk-management strategies without adversely affecting their operations or increasing their costs and liabilities;

(l)      Conspiring with other national fraternities to share legal strategies for: creating the sham appearance of separation between national organizations and chapters; the sham appearance that the national fraternities have no power or ability to manage their local chapters and are thus not responsible for the injuries and deaths caused by chapters,

47

members, activities and events; the sham appearance that fraternities are safely managed and do not pose serious risk of injuries and deaths to students and campus communities; withholding information from universities, students, task forces and others identifying the number and nature of injuries, deaths and legal claims made against fraternities, their chapters and members to create the appearance of being well-managed and safe; and, sharing information among legal counsel on how to preemptively defend against and defeat legal claims by, among other things, undercapitalizing fraternity chapters and creating the appearance that such organizations are separate from national fraternities and reasonably self-managed;

(m)   Failing to act reasonably under the circumstances; and

(n)   Engaging in such other negligent and wrongful acts as discovery may reveal.

148.   As a direct and proximate result of the Fraternity Defendants' violation of N.Y. Penal Law §§ 120.16 and 120.17 and breach of all their duties described above, Plaintiff was raped and suffered, and shall continue to suffer, substantial physical and emotional injuries, pain and suffering, expenses, and damages.

149.   The Fraternity Defendants knew, or should have known, that conduct that violated N.Y. Penal Law §§ 120.16 and 120.17 and their breaches of the duties owed to Plaintiff posed an unreasonable risk of harm likely to result in injury, and that these and similar actions and failures to act had previously resulted in serious injuries and harm to others, such that their misconduct and failures to act involving Plaintiff were in conscious disregard of her rights and constituted willful, wanton and malicious misconduct, including the act(s) of hazing that constitute a crime under New York law.

WHEREFORE, Plaintiff demands judgment against the Fraternity Defendants, jointly and severally, as follows: (a) for compensatory damages well in excess of $75,000.00, exclusive

of interests and costs; (b) for punitive damages in the amount of Twenty-Five Million Dollars ($25,000,000); (c) for costs incurred in connection with this suit; (d) for pre- and post-judgment interest as permitted by law; and (e) for such other and further relief as this Court deems appropriate.

### COUNT II
***Negligence, Negligent Breach of Assumed Duties, Negligent Misrepresentation, Hazing /
Negligence Per Se, Willful and Wanton Misconduct***
**(As Against Sorority Defendants)**

150.    All of the preceding allegations in this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

151.    The Sorority Defendants, individually, and through their respective agents and alter egos, owed and undertook duties of care to their pledges and the pledges they invited to the Fraternity Defendants' Chapter house, including Plaintiff, to direct, manage, and oversee the recruitment and bid event in a reasonably prudent and safe manner. The Sorority Defendants knew and should have recognized that such duties were necessary to protect their pledges and invitees, particularly female invitees.

152.    Despite owing and undertaking those duties, upon information and belief, the Omicron Chapter and its officers and members purposely planned, scheduled, and co-sponsored an alcohol-fueled recruitment and bid function at the Fraternity Defendants' chapter house because they knew that their wrongful, unsafe, and unreasonable misconduct could take place at that location unhindered, as planned and without discovery. Upon information and belief, the Omicron Chapter and Psi Psi Chapter and their officers jointly planned, purchased, and placed in the Fraternity Defendants' chapter house an open trash can of alcoholic-punch made with 190 proof grain alcohol and passed around to the Omicron Chapter pledges bottles of champagne and

a thermos of alcohol that was spiked with ecstasy, making the event and location dangerous given their intentions and planned activities therein.

153.     The Sorority Defendants, individually, and through their respective agents and alter egos, knew, or in the absence of negligence should have known, that leaving it to college students to manage the provision and use of alcohol with fraternities, in fraternity houses, and at fraternity events was unreasonably dangerous because such circumstances had caused commercial insurers to refuse to insure fraternities because, in part, the nature, frequency and severity of injuries, deaths and misuse of alcohol and drugs resulted in fraternities being ranked the sixth worst insurance risk in this country.

154.     The Sorority Defendants,  individually, and through their respective agents and alter egos, knew, or in the absence of negligence should have known, that leaving it to college students to manage the provision and use of alcohol with fraternities, in fraternity houses, and at fraternity events was unreasonably dangerous because such circumstances had previously resulted in members and pledges of Tri Delta and other sororities being sexually assaulted, raped and otherwise seriously injured in incidents across the country, such that national sororities had banned the presence of alcohol in their houses and provided for "house directors" and similar adults to reside in their properties housing undergraduate members.

155.     The Sorority Defendants, individually, and through their respective agents and alter egos, were in a special position of confidence and trust with Plaintiff, a prospective member and pledge of their sorority.

156.     The Sorority Defendants, individually, and through their respective agents and alter egos, had unique and specialized expertise and knowledge about the risk of injury, sexual assault, rape, and hazing sorority members and pledges, like Plaintiff, faced during sorority events co-hosted or co-sponsored with fraternities and/or held at fraternity houses that involved

the provision of and misuse of alcohol and drugs, including recruitment, bid, and pledge rituals and events.

157.    The Sorority Defendants, individually, and through their respective agents and alter egos, knew, or in the exercise of reasonable care should have known, that prospective members and pledges of their sorority, including Plaintiff, would justifiably rely on the Sorority Defendants for accurate information about their sorority and its recruitment and pledge process, including the risks they would face during recruitment and bid events that involved the provision of and misuse of alcohol and drugs, including such events co-hosted or co-sponsored with fraternities and/or held at fraternity houses.

158.    Plaintiff justifiably relied on the Sorority Defendants to provide her accurate information about their sorority and its recruitment and pledge process, including the risks she would face during the process and at recruitment and bid events.  The Sorority Defendants made promises to Plaintiff of lifelong sisterhood and friendships, community on campus, and social status.

159.    The Sorority Defendants accordingly owed Plaintiff a duty to speak and communicate with care when they provided Plaintiff information about their sorority and its recruitment and pledge process, which included a duty not to conceal, omit, or misrepresent the risks Plaintiff would face as a recruit and pledge of the Sorority Defendants during sorority events co-hosted or co-sponsored with fraternities and/or held at fraternity houses that involved the provision of and misuse of alcohol and drugs, including recruiting and bid rituals and events.

160.    The Sorority Defendants, individually, and through their respective agents and alter egos, also owed and undertook duties of care to Plaintiff to reasonably manage their events to prevent repeated – yet foreseeable and avoidable – incidents of hazing, injury, sexual assault, and rape.

161.     The Sorority Defendants, individually, and through their respective agents and alter egos, owed and undertook duties of care to Plaintiff to refrain from doing any act which a person of ordinary prudence could reasonably apprehend, as a natural and probable consequence thereof, would subject another person to peril.

162.     The Sorority Defendants, individually, and through their respective agents and alter egos, owed Plaintiff a duty of care to not engage in conduct that created risk of physical harm or conduct that threatened the mental health or physical health and safety of any person including hazing, drug and/or alcohol abuse.

163.     At all relevant times, under New York law, a person engages in unlawful hazing when, in connection with "another person's initiation into or affiliation with any organization, he intentionally or recklessly engages in conduct which creates substantial risk of physical injury to such other person or a third person" and/or "thereby causes such injury." *See* N.Y. Penal Law §§ 120.16 and 120.17.

164.     N.Y. Penal Law §§ 120.16 and 120.17 create an implied private civil cause of action against those who engage in such acts.

165.     Plaintiff, as a pledge of the Sorority Defendants, was a person for whose benefit N.Y. Penal Law §§ 120.16 and 120.17 were enacted and, consistent with New York precedent, a private right of action against those who engage in violations of those sections clearly furthers the legislative purposes of deterring the types of dangerous hazing activities to which Plaintiff was subjected.

166.     The Sorority Defendants, individually, and through their respective agents and alter egos, owed and undertook duties of care to Plaintiff to refrain from furnishing alcohol in connection with recruitment rituals or functions, from furnishing common sources of alcohol to underage pledges and invitees, including Plaintiff, such as a trash can of alcoholic punch made

with 190 proof grain alcohol and a thermos of drug-spiked punch, and from instructing and encouraging (or permitting others to instruct and encourage) underaged pledges to drink in circumstances that that created a substantial risk of physical injury to the pledges and therefore constituted "hazing," in violation of N.Y. Penal Law §§ 120.16 and 120.17, the University Code, and the risk management policies of the Sorority Defendants.

167.    The Sorority Defendants violated N.Y. Penal Law §§ 120.16 and 120.17, breached the duties they owed and assumed, and were negligent, by, *inter alia*:

(a)    Affirmatively authorizing, planning, and conducting a recruiting ritual and function that was unreasonable, dangerous and constituted hazing in violation of New York law, the University Code, the Sorority Defendants' risk management policies and other accepted standards of conduct at universities and other educational institutions;

(b)    Failing to ensure or otherwise provide for safe management of the sorority-sponsored event at the Fraternity Defendants' chapter house to prevent the unsafe, unreasonable and illegal provision of alcohol and drug-spiked alcohol to under-aged pledges, and failing to provide for intervention and safe management when pledges, such as Plaintiff, became intoxicated, were in positions of peril and at risk of being sexually assaulted;

(c)    Providing ineffective and improper direction and control over the recruitment and bid night event planned with the Psi Psi Chapter;

(d)    Failing to implement reasonable measures or otherwise enforce the University Code and risk-management policies prohibiting the use of alcohol during all recruitment and bid activities and events, including events at locations other than at the Omicron Chapter House;

(e)     Failing to provide reasonable safeguards and restrictions and to implement controls to prevent underage drinking and excessive drinking, prevent the provision of open containers of alcohol, the spiking of alcohol with drugs, the service of alcohol to underage pledges during recruitment, bid, and pledge rituals and events, and pledges from being pressured, directed, or encouraged to consume alcohol;

(f)     Creating and/or failing to remediate and make safe dangerous conditions in the Fraternity Defendants' chapter house involving the misuse and provision of open containers of alcohol and alcohol laced with illegal drugs, as well as failing to provide reasonable management, protection, and security during the event the Omicron Chapter planned and co-sponsored in the Chapter house to prevent their pledges, who had become disoriented and disabled from the consumption of alcohol and/or alcohol laced with illegal drugs, from being sexually assaulted and raped;

(g)     Failing to provide reasonable management, protection and security at the recruitment and bid event it planned and sponsored with Psi Psi when their acts and failures to act placed Plaintiff in a position of peril;

(h)     Planning, organizing, encouraging, facilitating, participating in, giving substantial assistance to, and/or allowing the hazing of Plaintiff in connection with her pledge activities, both negligently and in violation of New York law, the Code, the Sorority Defendants' risk management policies, and other applicable standards of care applicable to universities and educational institutions;

(i)     Failing to reasonably and accurately advise Plaintiff of the risks of suffering injury, sexual assault, or rape at fraternity houses and at events with fraternities that involved the provision of and misuse of alcohol and drugs, including recruiting and bid rituals and events, because the Sorority Defendants had exclusive knowledge of such

information, and knew that Plaintiff was being encouraged to, and would in fact, rely upon the information they were providing Plaintiff about their sorority and recruitment, which was exclusively and misleadingly positive, as an inducement to join the sorority;

(j)      Conspiring with other national fraternities and sororities and sharing information about the claims for injuries, rapes and deaths, and lawsuits related thereto, for purposes of coordinating the manner in which they operate, manage chapter operations, and implement risk-management strategies without adversely affecting their operations or increasing their costs and liabilities;

(k)      Conspiring with other national fraternities and sororities to share legal strategies for: creating the sham appearance of separation between national organizations and chapters; the sham appearance that the national fraternities and sororities have no power or ability to manage their local chapters and are thus not responsible for the injuries and deaths caused by chapters, member, and their activities and events; the sham appearance that fraternities and sororities are safely managed and do not pose serious risk of injuries, sexual assault, rape, and death to students and campus communities; withholding information from universities, students, task forces and others identifying the number and nature of injuries, deaths and legal claims made against fraternities and sororities, their chapters and members to create the appearance of being well-managed and safe; and sharing information among legal counsel on how to preemptively defend against and defeat legal claims by, among other things, undercapitalizing fraternity and sorority chapters and creating the appearance that such organizations are separate from national fraternities and sororities and reasonably self-managed;

(l)      Failing to act reasonably under the circumstances; and

(m)      Engaging in such other negligent and wrongful acts as discovery may reveal.

168.    As a direct and proximate result of the Sorority Defendants' violation of N.Y. Penal Law §§ 120.16 and 120.17 and breach of all their duties described above, Plaintiff was raped and suffered, and shall continue to suffer, substantial physical and emotional injuries, pain and suffering, expenses, and damages.

169.    The Sorority Defendants knew, or should have known, that conduct that violated N.Y. Penal Law §§ 120.16 and 120.17 and their breaches of the duties owed to Plaintiff posed an unreasonable risk of harm likely to result in injury, and that these and similar actions and failures to act had previously resulted in serious injuries and harm to others, such that their misconduct and failures to act involving Plaintiff were in conscious disregard of her rights and constituted willful, wanton and malicious misconduct, including the act(s) of hazing that constitute a crime under New York law.

WHEREFORE, Plaintiff demands judgment against the Sorority Defendants, jointly and severally, as follows: (a) for compensatory damages well in excess of $75,000.00, exclusive of interests and costs; (b) for punitive damages in the amount of Twenty-Five Million Dollars ($25,000,000); (c) for costs incurred in connection with this suit; (d) for pre- and post-judgment interest as permitted by law; and (e) for such other and further relief as this Court deems appropriate.

## COUNT III
### Negligence, Negligent Breach of Assumed Duties, and Negligent Misrepresentation
### (As Against Syracuse University)

170.    All of the preceding allegations in this Complaint are re-alleged and incorporated by reference as though fully set forth herein.

171.    At all relevant times, Defendant Syracuse undertook and has committed substantial resources and staff to promote fraternities and sororities to students on its campus, thereby creating an environment at the University that Syracuse identifies as a "vital part" of the

campus community. At all material times, Defendant Syracuse undertook to learn and then promote to its students, such as Plaintiff, the histories of sororities and fraternities, their purported values, ideals, contributions to campus life and society, and the values of membership.

172.    The University's actions in all material respects were intended to encourage students to join these organizations. The University undertook to establish and provide facilities, publications, and other resources to establish a seamless means for incoming students to learn about and join these entities, and pay dues, fees and other expenses to them.

173.    The University, as part of its process to convey "recognized" status and resultant "privileges, services and resources" on Greek organizations, undertook to determine whether the organizations seeking such status are "managed responsibly" and reflect the University's highest ideals. At all relevant times, in undertaking this responsibility, the University has regularly met with staff from national fraternities and sororities, local chapter officers and employs and has trained numerous staff to specialize in Greek affairs, attend related conferences and seminars, and advise and counsel Greek organizations, their members and prospective members.

174.    At all relevant times, the University has undertaken substantial responsibilities overseeing Greek organizations, managing their governing boards, and implementing disciplinary proceedings against these organizations and individual members for alleged violations of law, the Code and other applicable standards of conduct and safety. As a result, at all relevant times, the University had unique, exclusive, and specialized knowledge about the risks such organizations posed to students, particularly with respect to recruiting and pledging activities, the misuse and abuse of alcohol, and sexual violence.

175.    At all relevant times, the University knew, or in the absence of negligence should have known, of such risks and dangers, both on campus and at other universities in New York and across the country, because such risks were well known within and documented by the

fraternities, sororities, and their insurers as of 1990, as partially identified above, and otherwise available to the University had the University, its staff, or the Task Forces it established made any reasonable investigation into the organizations it was actively promoting.

176. At all relevant times, the University knew or, in the absence of negligence should have known, that the purported management structure of fraternities and sororities was dangerous. At all relevant times, the University knew that the manner in which Greek housing was managed was far different, unreasonable and less safe than the manner in which the University managed similar student housing facilities. At all relevant times, the University had the power to insist upon safer management of Greek housing and activities through its process of setting requirements on recognition.

177. At all relevant times, in promoting fraternity and sorority membership, the University knew it was in a special position of confidence and trust with its students, such as Plaintiff, who the University knew would be justifiably relying on the University's representations.

178. The University undertook and owed Plaintiff a duty to refrain from making misrepresentations that would cause her to rely on inaccurate and untruthful information and cause her injury.

179. The University undertook and owed Plaintiff a duty to tell Plaintiff about the risks of Greek life, the misuse of alcohol, mismanagement and risk of injury, sexual assault, and rape because it was actively promoting the benefits of Greek life, and thereby had an obligation to provide full and accurate information to students, such as Plaintiff, about the risks.

180. By the time Plaintiff attended the University and was raped, the Clery Act and New York law compelled the University to timely and accurately disclose to students material information involving incidents of sexual violence under the premise that such students had a

right to know such information in order to be able to take actions to protect themselves. The University knew that the duties of disclosure imposed upon it via federal and state law were intended to inform students, particularly female students, and the campus community of risks so they could act reasonably to protect themselves and also for the University to implement reasonable and effective measures to prevent sexual assault.

181.    When Plaintiff stepped onto campus in August 1991, she never knew nor could she have independently or reasonably learned of the dangers, and prevalence thereof, known by the University, of pledging a sorority and attending recruiting or pledging events fueled by alcohol and drugs at a fraternity house; never knew nor could she have independently or reasonably learned of the dangers, and prevalence thereof, known by the University, relating to the mismanagement of fraternity chapters and the high risk such organizations posed to women regarding sexual violence and rape; never knew nor could she have independently or reasonably learned of the number of allegations and incidents of misconduct leveled at these organizations involving misuse of alcohol, injuries, and sexual violence and rape, which the University knew but failed to disclose; and, never knew nor could she have independently or reasonably learned of the dangers, known by the University, of the high number of rapes reported on campus that had alarmed students and resulted in protests, the establishment of a student organization, and a University Task Force, which the University intentionally declined to disclose to incoming students because it was "too much information that would scare students."

182.    Syracuse University breached the duties it owed and assumed,, and was negligent by, *inter alia*:

(a)    Failing to reasonably and safely manage and oversee the actions of the Fraternity and Sorority Defendants despite undertaking such obligations to do so and actively promoting to students and Plaintiff their purported qualities and membership;

(b)     Failing to reasonably and safely manage and oversee the actions of the Fraternity and Sorority Defendants despite having unique and specialized knowledge of their risks on campus and on campuses across the nation and knowing that their delegation of risk management duties to undergraduate chapter officers was ill-placed, unreasonable and dangerous;

(c)     Failing to reasonably and safely manage and oversee the actions of the Fraternity and Sorority Defendants with respect to their housing and provision and use of alcohol; choosing to place the management thereof in the hands of student members and officers of these organizations that lacked material training by the University; failing to empower campus security with the right to patrol their actions and their Greek chapter house premises; and with the knowledge that campus staff responsible for the oversight of fraternities would not be working on campus in the late evenings when their high-risk social and recruitment activities took place;

(d)     Failing to timely, fully and accurately disclose to Plaintiff the risks, dangers and incidents of rape on campus, in fraternity houses and at fraternity events, as well as the risks and dangers associated with joining such organizations and participating in events sponsored or hosted by fraternities involving the use of alcohol and drugs, including incidents of sexual assault and rape; and, instead, providing glowing, positive information about Greek Life despite the documented and well-known risks of injury, sexual assault, rape and death on campus, in New York, and across the country involving Greek organizations, their housing and activities;

(e)     Failing to offer, provide or identify for Plaintiff any of the services and advocacy available to her at the University following her report of being raped, thereby leaving her alone and unsupported, in great emotional distress with no knowledge of counseling

services available to her, as she struggled to remain on campus and was unable to proceed

with prosecution of Defendant Montalto or the exercise of her legal rights to seek justice;

(f)     Failing to act reasonably under the circumstances; and

(g)     Engaging in such other negligent and wrongful acts as discovery may reveal.

183.    Plaintiff reasonably relied upon the representations, misrepresentations and

materially false and misleading information provided by the University, decided to rush a

sorority without any cause for concern, and, again, without cause or concern, engaged in a

recruiting and bid event planned by the Fraternity and Sorority Defendants that ultimately

rendered her disoriented and led to her rape.

184.    As a direct and proximate result of the University's breach of its duties described

above, Plaintiff was raped and suffered, and shall continue to suffer, substantial physical and

emotional injuries, pain and suffering, expenses, and damages.

WHEREFORE, Plaintiff demands judgment against Syracuse University as follows: (a)

for compensatory damages well in excess of $75,000.00, exclusive of interests and costs; (b) for

costs incurred in connection with this suit; (c) for pre- and post-judgment interest as permitted by

law; and (d) for such other and further relief as this Court deems appropriate.

**COUNT IV**
***Sexual Assault, Battery, Intentional Infliction of Extreme Emotional Distress***
**(As Against Defendant Montalto)**

185.  Upon information and belief, Defendant Montalto saw and knew that Plaintiff was

under the influence of alcohol, that the garbage can of punch was made with 190 proof grain

alcohol, that the thermos of "special punch" being passed to the pledges had been spiked with

drugs, and that, as a result, she was obviously intoxicated, unable to fully protect herself

physically, and that his fraternity brothers who managed the house and event were unlikely to

intervene when he isolated her upstairs.

186.  Upon information and belief, Defendant Montalto targeted Plaintiff in an upstairs bedroom because of such circumstances and her incapacity.

187.  Plaintiff tried physically to ward off Defendant Montalto's sexual advances, specifically told him that she was not going to have sex with him and told him that he needed to stop. By ignoring and overcoming her physical resistance and protestations, Defendant Montalto intended to cause harmful and/or offensive contact with Plaintiff, and an imminent apprehension of such contact, when he engaged in sex acts and raped her by penetrating her vagina with his penis.

188.  Defendant Montalto acted intentionally, recklessly and/or with reckless disregard of Plaintiffs actions, words, rights, and the consequences thereof. Defendant Montalto's actions and misconduct in light of Plaintiff's actions and commands would offend a person with a reasonable sense of personal dignity. Defendant Montalto's actions were in conscious disregard of Plaintiff's rights and constituted willful, wanton and malicious misconduct.

189.  Nonconsensual contact of a sexual nature is inherently offensive, and Defendant Montalto's actions were atrocious, constituted extreme and outrageous conduct that exceeds all bounds usually tolerated by a decent society, and were utterly intolerable in a civilized community based upon prevailing cultural norms and values.

190.  As a direct and proximate result of Defendant Montalto's intentional and outrageous acts described above, which amount to violations of Article 130 of New York Penal Law, including Sections 130.05, 130.20, and 130.30 of that Article, Plaintiff was raped and suffered, and shall continue to suffer, substantial physical and emotional injuries, pain and suffering, expenses, and damages.

WHEREFORE, Plaintiff demands judgment against Defendant John Montalto as follows: (a) for compensatory damages well in excess of $75,000.00, exclusive of interests and costs; (b)

for punitive damages in the amount of Twenty-Five Million Dollars ($25,000,000); (c) for costs

incurred in connection with this suit; (d) for pre- and post-judgment interest as permitted by law;

and (e) for such other and further relief as this Court deems appropriate.

Respectfully submitted,

Dated: November 20, 2023                   **THE FIERBERG NATIONAL LAW
                                           GROUP, PLLC**

By:_____
Olympias Iliana Konidaris
Bar Roll #: 704883
305 Broadway, Seventh Floor
New York, New York 10007
Phone: (347) 504-0220
Fax: (231) 252-8100
ikonidaris@tfnlgroup.com

Douglas E. Fierberg (*application for pro hac vice
admission to be filed*)
Jonathon N. Fazzola (*application for pro hac vice
admission to be filed*)
201 E. 17th Street, Suite A
Traverse City, MI 49684
Phone: (231) 933-0180
dfierberg@tfnlgroup.com
jfazzola@tfnlgroup.com
COUNSEL FOR PLAINTIFF

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury with respect to each of the claims alleged herein,

to the fullest extent permitted by law.

Respectfully submitted,

Dated: November 20, 2023                   **THE FIERBERG NATIONAL LAW
                                           GROUP, PLLC**

By:_____
Olympias Iliana Konidaris

Bar Roll #: 704883
305 Broadway, Seventh Floor
New York, New York 10007
Phone: (347) 504-0220
Fax: (231) 252-8100
ikonidaris@tfnlgroup.com

Douglas E. Fierberg (*application for pro hac vice admission to be filed*)
Jonathon N. Fazzola (*application for pro hac vice admission to be filed*)
201 E. 17th Street, Suite A
Traverse City, MI 49684
Phone: (231) 933-0180
dfierberg@tfnlgroup.com
jfazzola@tfnlgroup.com
COUNSEL FOR PLAINTIFF