**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

JANE DOE,

                                Plaintiff,                   5:23-cv-1452 (BKS/ML)

v.

SIGMA CHI INTERNATIONAL FRATERNITY,
INCORPORATED, individually, and as an agent and alter
ego of: Psi Psi Chapter of Sigma Chi Fraternity at Syracuse
University, Sigma Chi Foundation, Inc., and 737 Comstock
Avenue, Inc.; LUKE ROGERS and ETHAN HIRSH, in
their capacity as President and Treasurer, respectively, for
and on behalf of the unincorporated association operating
at Syracuse University as the PSI PSI CHAPTER OF
SIGMA CHI FRATERNITY, individually, and as agent
and alter ego of: Sigma Chi International Fraternity, Inc.,
Sigma Chi Foundation, and 737 Comstock Avenue, Inc.;
SIGMA CHI FOUNDATION, as agent and alter ego of:
Sigma Chi International Fraternity, Inc., Psi Psi Chapter of
Sigma Chi Fraternity, and 737 Comstock Avenue, Inc.; 737
COMSTOCK AVENUE, INC., individually, and as agent
and alter ego of: Sigma Chi International Fraternity, Inc.,
Psi Psi Chapter of Sigma Chi Fraternity, and Sigma Chi
Foundation; DELTA DELTA DELTA, individually, and as
agent and alter ego of: Omicron Chapter of Delta Delta
Delta operating at Syracuse University; and Omicron
House Corporation of Delta Delta Delta; CLAIRE
HARRIS, in her capacity as President for and on behalf of
the unincorporated association operating at Syracuse
University as the OMICRON CHAPTER OF DELTA
DELTA DELTA, individually, and as agent and alter ego
of: Delta Delta Delta and Omicron House Corporation of
Delta Delta Delta; SYRACUSE UNIVERSITY; and
MICHAEL MONTALTO, individually and as a member
and agent of Sigma Chi Fraternity and the Psi Psi Chapter.

                                Defendants.

---

**Appearances:**

*For Plaintiff*:
Olympias I. Konidaris

The Fierberg National Law Group, PLLC
305 Broadway, Seventh Floor
New York, NY 10007

Douglas E. Fierberg
Jonathon N. Fazzola
The Fierberg National Law Group, PLLC
201 East 17th Street, Suite A
Traverse City, MI 49684

*For Defendants Sigma Chi International Fraternity, Incorporated; Luke Rogers; Ethan Hirsh; Sigma Chi Foundation; and 737 Comstock Avenue, Inc.*:
Ryan M. Jerome
Saul Ewing LLP
1270 Avenue of the Americas, Suite 2800
New York, NY 10020

William T. Eveland
Saul Ewing LLP
161 North Clark, Suite 4200
Chicago, IL 60601

*For Defendants Delta Delta Delta and Claire Harris:*
Paul V. Mullin
Sugarman Law Firm LLP
211 West Jefferson Street
Syracuse, NY 13202

Arthur F. Hoge, III
Littleton Tazewell Ellett, IV
Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.
100 North Broadway, Suite 2900
Oklahoma City, OK 73102

*For Defendant Syracuse University:*
Lorraine M. Mertell
William B. Hunt
Mackenzie Hughes LLP
Mackenzie Hughes Tower
440 South Warren Street, Suite 400
Syracuse, NY 13202

*For Defendant Michael Montalto:*
Frank S. Occhipinti
Lynn Occhipinti, LLP
90 Broad Street, 10th Floor

New York, NY 10004

**Hon. Brenda K. Sannes, Chief United States District Judge:**

<strong>MEMORANDUM-DECISION AND ORDER</strong>

## I.     INTRODUCTION

Plaintiff Jane Doe[1] brings this diversity action alleging: negligence, negligent breach of assumed duties, negligence per se, and willful and wanton misconduct claims against Defendants Sigma Chi International Fraternity, Inc. ("Sigma Chi"), Sigma Chi Foundation (the "Foundation"), 737 Comstock Avenue, Inc. ("Comstock"), the Psi Psi Chapter of Sigma Chi ("Psi Psi"), and Luke Rogers and Ethan Hirsh, as President and Treasurer of Psi Psi (collectively, the "Fraternity Defendants") (Count I); negligence, negligent breach of assumed duties, negligent misrepresentation, negligence per se, and willful and wanton misconduct claims against Defendants Delta Delta Delta ("Tri Delta"), the Omicron Chapter of Tri Delta ("Omicron"), and Claire Harris, as President of Omicron (collectively, the "Sorority Defendants") (Count II); negligence, negligent breach of assumed duties, and negligent misrepresentation claims against Defendant Syracuse University (the "University") (Count III); and sexual assault, battery, and intentional infliction of extreme emotional distress claims against Defendant Michael Montalto (Count IV). (Dkt. No. 5). Presently before the Court are the Fraternity Defendants', Sorority Defendants', and University's motions to dismiss the amended complaint, (Dkt. Nos. 55–56, 58), which are fully briefed, (Dkt. Nos. 67–72). For the following reasons, the Court grants Fraternity Defendants' motion in part and denies it in part, denies Sorority Defendants' motion, and grants University Defendant's motion in part and denies it in part.

---

[1] Plaintiff is proceeding by pseudonym pursuant to a stipulated protective order. (Dkt. No. 64).

II.    FACTS[2]

A.    **The Parties**

Plaintiff is a resident of the State of Washington. (Dkt. No. 5, ¶ 18). At the time of the events underlying this action, Plaintiff was a freshman student at Defendant University, (*id.* ¶¶ 1, 18), a private research university in Syracuse, New York, founded in 1813, (*id.* ¶ 26). Plaintiff later withdrew from the University to complete her studies elsewhere. (*Id.* ¶ 18).

Defendant Sigma Chi is a non-profit corporation organized and existing under the laws of the State of Indiana. (*Id.* ¶ 19). "Sigma Chi was formed in 1855 and currently has approximately 244 active chapters and 152 alumni chapters operating on college campuses throughout the United States and Canada." (*Id.*). Defendants Luke Rogers and Ethan Hirsh are President and Treasurer, respectively, of Defendant Psi Psi, which is the chapter of Sigma Chi that operates at the University. (*Id.* ¶ 20). Psi Psi is controlled by Sigma Chi and "serves as one of many chapters from which Sigma Chi generates its principal revenue by recruiting members from college campuses." (*Id.*).

Defendant Foundation is a non-profit corporation organized and existing under the laws of the State of Colorado. (*Id.* ¶ 21). Foundation "accepts and holds tax-deductible contributions and substantial assets used to fund, support, and expand the activities of Defendant Sigma Chi and its chapters, including awarding grants to students and funding risk-management and educational services." (*Id.*). Defendant Comstock is a non-profit corporation organized and existing under the laws of the State of New York. (*Id.* ¶ 22). Comstock is managed by alumni of

---

[2] These facts are drawn from the amended complaint. (Dkt. No. 5). The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations, *see Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020), but does not accept as true any legal conclusions, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Psi Psi and exists to "hold title to and manage the real estate exclusively used by the Fraternity

Defendants on the campus of the [] University to generate new members and revenues." (*Id.*).

Defendant Tri Delta is a non-profit corporation organized and existing under the laws of

the State of Illinois. (*Id.* ¶ 23). "Tri Delta was formed in 1888 and currently has approximately

138 active chapters and 222 alumni chapters operating on college campuses throughout North

America." (*Id.*). Defendant Claire Harris is President of Defendant Omicron, the chapter of Tri

Delta that operates at the University.[3] (*Id.* ¶ 24). Omicron is controlled by Tri Delta and "serves

as one of many chapters from which Tri Delta generates its principal revenue by recruiting

members from college campuses." (*Id.*). At the time of the events described in the Amended

Complaint, Omicron was "housed in a stately, pillared mansion in a prominent location on

campus," (*id.* ¶ 7), owned by the Omicron House Corporation, (*id.* ¶ 25).

Defendant Michael Montalto is a resident of the State of Connecticut. He was, during the

events underlying this action, an undergraduate student at the University and a member of Sigma

Chi, initiated by and active at Psi Psi. (*Id.* ¶ 27).

### B.      Promoting Greek Organizations at the University

When Plaintiff arrived on campus in 1991, "[l]arge fraternity and sorority houses were in

prominent locations on campus." (*Id.* ¶ 1). "[T]he University actively promoted Greek

membership as a 'vital' part of the campus community and endorsed these organizations as well-

managed, worthy pathways to new friendships and improving one's educational and professional

opportunities." (*Id.*). The University "retained, trained, and provided staff, facilities, publications

and other resources to establish a seamless means for incoming students to learn about and join

---

[3] Emma Spadea, Treasurer of Defendant Omicron, was also named as a defendant in the Amended Complaint, (*id.* ¶ 24), but was voluntarily dismissed by Plaintiff on March 5, 2024, and is no longer part of this action, (Dkt. No. 66).

[fraternities and sororities]," (*id.* ¶ 49), and provided students and their parents with documents and other materials intended to "encourage students to join and live in Greek housing, and, generally, convey substantial financial benefits on the Greek organizations," (*id.* ¶ 48). The University has benefitted from the additional student housing that the Greek organizations provide. (*Id.*). And Greek organizations "have been able to thrive at the University since many of their management and promotional functions and expenses are provided directly, underwritten, or otherwise substantially supported by the University." (*Id.* ¶ 49).

### C.    The Alleged Rape

In August 1991, Plaintiff arrived at the University as an eighteen-year-old freshman and immediately encountered "glorified" information about Greek Life, which she alleges was "materially false and misleading." (*Id.* ¶¶ 1, 6). During "rush," Plaintiff applied for and accepted "a bid to pledge Tri Delta." (*Id.* ¶ 9). She was drawn to the sorority's "promises of sisterhood and lifelong friendships, the status it conferred on its members, and the community it provided on campus when she was 3,000 miles away from home." (*Id.*).

On September 19, 1991, Omicron co-sponsored an event with Psi Psi to celebrate Tri Delta's pledges. (*Id.* ¶¶ 10, 77). Plaintiff was invited to attend. (*Id.* ¶ 78). This event was held "at the Fraternity Defendants' chapter house on the University's campus, where alcohol had not been banned, and which was closed to the public and fueled with champagne purchased by the Tri Delta chapter at the University, a trash can filled with alcoholic punch – that, unbeknownst to Plaintiff was made with 190 proof grain alcohol – and a thermos of 'special punch' brought by alumni members of Tri Delta for the pledges." (*Id.* ¶ 10). During the event, "'[p]unch pushers, fraternity and sorority members, directed and encouraged under-aged Tri Delta pledges to drink the drugged punch so they could have the 'best night of their lives.'" (*Id.*).

According to Plaintiff, Omicron's officers and members "approved this event, and the purchase and provision of alcohol, and 'special punch.'" (*Id.* ¶ 77). She asserts that this event would eventually be referred to as one of "three deadly nights" in part because "of the pressure imposed on new members to consume gross amounts of alcohol." (*Id.*).

That night, "Plaintiff drank champagne and punch, and quickly became intoxicated." (*Id.* ¶ 11). She went upstairs with Defendant Montalto, who began "kissing her in a bedroom." (*Id.* ¶ 81). Plaintiff told him that she "was not interested in having sex" and "had a boyfriend." (*Id.*). When he "continued trying to engage in sex acts with her," she said, "no, don't do that," but he "proceeded to rape her by penetrating her vagina with his penis." (*Id.* ¶¶ 11, 81). Another fraternity member entered the room "but failed to act or stop the rape." (*Id.* ¶ 11). "Plaintiff managed to get away from Defendant Montalto and climb down the fire escape to leave the fraternity premises." (*Id.* ¶ 81).

The next day, Plaintiff went to University Health Services "where she reported being raped and an examination confirmed sexual penetration." (*Id.* ¶ 82). But "Health Services did not notify the police and failed to provide [Plaintiff] further support or resources concerning education, counseling, and support services." (*Id.*). "Plaintiff also reported [the alleged rape] to the local police, had a rape examination at a local hospital, and provided law enforcement with the clothing she had worn at the event. However, police took no action and told Plaintiff she needed to further identify her attacker and provide them with a name before they would investigate." (*Id.* ¶ 83).

Plaintiff told other pledges and members of Tri Delta of the alleged rape. (*Id.* ¶ 84). To her "surprise and severe distress," her allegations "were reported on the front page of the campus newspaper on September 23, 1991," (*id.* ¶ 13), even though "she never spoke with the press or

otherwise authorized such report," (*id.* ¶ 84). And although "the newspaper did not identify her or her attacker by name, Plaintiff was traumatized." (*Id.*).

According to Plaintiff, Omicron officers and members "began humiliating, harassing, and retaliating against Plaintiff for making the report of rape and potentially causing trouble for them, their sorority, and the fraternity and its members, and [for] 'ruining their senior year.'" (*Id.* ¶ 85). When Plaintiff tried to attend a sorority meeting after the article was published, "she was retaliated against and told she was no longer welcome in the sorority." (*Id.* ¶ 86).

"Plaintiff withdrew from the sorority, felt unwelcome and alone, lost friendships, declined to press forward with prosecution to avoid further harm and harassment, and struggled through trauma to remain at the University." (*Id.* ¶ 14). She later withdrew from the University after her sophomore year. (*Id.* ¶ 87).

### D.      Defendants' Knowledge of the Risk of Sexual Violence

Plaintiff alleges that the Fraternity and Sorority Defendants knew that in the 1980s, as a "direct result of the number of claims and insurance payouts relating to sexual assaults, injuries, and deaths resulting at fraternity houses and at fraternity events," (*id.* ¶ 31), "fraternities and sororities were ranked by the National Association of Insurance Commissioners ('NAIC') as the sixth worst risk for insurance companies," (*id.* ¶ 28). This statistic appears in the "Risk Management Manual of the entity originally known as the Fraternity Insurance Purchasing Group ('FIPG'), the group established by fraternities in the late 1980s to obtain the insurance coverage that their insurers were denying on the basis of excessive risk." (*Id.*).

In the late 1980s, through groups like FIPG, "fraternities began organizing and pooling their purchasing power to obtain insurance." (*Id.* ¶ 36). "The consortium of fraternities comprising FIPG for the first time agreed upon a risk management policy, the FIPG Risk Management Policy, that addressed, *inter alia*, aspects of the misuse and abuse of alcohol,

though they declined to make fraternity houses and events alcohol-free and left the management of alcohol in those circumstances . . . in the hands of undergraduate members." (*Id.* ¶ 37).

In the fall of 1990, Tri Delta included in its official publication for members and alumni members, *Trident*, "excerpts from the State of the Fraternity remarks made by its President, Angela Driver," who said, "the sorority 'must make positive advances controlling the high rate of alcohol use and the devastating side effect of abuse of women.'" (*Id.* ¶ 39). More statements from Driver appeared in the publication's Winter 1991 edition: "hazing 'is a disease that must be eliminated in the Greek system!'" and "I must tell you that incidents of hazing *do* happen in Tri Delta." (*Id.* (emphasis in original)). Plaintiff alleges that this information was never disclosed to her. (*Id.*).

In the summer of 1991, "the presidents of all 26 National Panhellenic Conference groups (including Tri Delta) . . . executed a Position Statement pronouncing opposition to the misuse of alcohol and declaring it 'inadvisable to host a party involving alcohol when the majority of guests attending are under the legal drinking age.'" (*Id.* ¶ 38). This Position Statement "also stated that 'no college chapter funds may be used to purchase alcohol' and referred to potential shared liability of event co-sponsors." (*Id.*).

By this time, sororities including Tri Delta had "enacted policies rendering their chapter houses alcohol-free, and Tri Delta [had] placed 'house directors' in their chapter housing to assist in managing residences safely." (*Id.*). "[M]embers of Tri Delta chapters and thousands of women on college campuses were [also] enrolled in self-defense training as a result of widely published information that the greatest risk of rape was from acquaintances." (*Id.* ¶ 40).

The Fraternity and Sorority Defendants had also "retained, supervised and compensated 'leadership consultants' to visit and meet with their respective chapters and members on a

regular basis," including to "counsel them on risk management principles." (*Id.* ¶ 97). The fall 1991 issue of *Trident* describes the duties of a leadership consultant:

> [P]roviding analysis of management, operations, and programming for collegiate chapters located throughout the United States and Canada; producing comprehensive written reports of findings and recommendations for each chapter; conducting workshops; public speaking; facility quality circles; meeting with college administrators and alumnae, attending seminars and training sessions; developing training curriculum for national leadership seminars; and, participating in long-range Fraternity planning.

(*Id.*)

Plaintiff also alleges that the University knew or should have known "about the risks to sorority members and other women of being raped at fraternity and sorority events, particularly those held in fraternity houses." (*Id.* ¶ 58). In the months and years prior to her arrival on campus, "the University had been the scene of numerous incidents of non-stranger sexual assault and rape." (*Id.* ¶ 2). A New York Times article published on October 22, 1989, noted that "seven rapes had been reported on or near the University's campus since the summer, including on the lawn of the chancellor's house," although the University had not made public or disclosed these allegations to its students. (*Id.* ¶ 68). A follow up article, published on November 20, 1989, was titled: "Rapes Alter Student Life At Syracuse." (*Id.*). In the Spring of 1991, "multiple rapes on campus were reported to the University and/or police, including at the Sigma Chi fraternity house. Between August 27, 1990, and August 1, 1991, there were at least 14 reports of sexual assaults on campus, 10 of which were non-stranger rapes, involving approximately 8 women in their first year of college." (*Id.* ¶ 70).

According to Plaintiff, "the University and Sigma Chi were aware of allegations against the Psi Psi Chapter and its members in the years preceding the rape of Plaintiff concerning the misuse and unlawful provision of alcohol in the fraternity house and at fraternity events, sexual

assault, and other dangerous misconduct."[4] (*Id.* ¶ 75). Plaintiff asserts that Defendants Sigma Chi and Tri Delta were similarly aware that "fraternities' entrustment of chapter officers to reasonably and safely implement risk management policies, university rules and regulations, and the use and provision of alcohol in fraternity houses and at fraternity events was unreasonable and dangerous."[5] (*Id.*).

In 1990, the State of New York enacted legislation requiring that, as of September 1, 1991, universities in New York "inform incoming students about sexual assault prevention measures through programs which may include workshops, seminars, discussion groups, and film presentations, in or to disseminate information about sexual assault, promote discussion, encourage reporting of incidents of sexual assault, and facilitate prevention of such incidents." (*Id.* ¶ 66). Under the law, "such information 'shall include,' *inter alia*, 'the nature of and common circumstances relating to sex offenses on college campuses.'" (*Id.* ¶ 67).

In July 1991, the University's Safety Advisory Committee, which the University was required to establish under the newly enacted law, attempted to comply with the law's disclosure mandates by including the required information in the July 1991 issue of *The (Syracuse) Record*. (*Id.* ¶ 71). However, the University blocked this attempt. (*Id.*). A member of the Committee reported that the Admissions Office staff "did not feel it appropriate that our information be released as we intended." (*Id.*).

---

[4] Plaintiff's complaint contains a "partial inventory from public records" of allegations of sexual violence made against Sigma Chi, its chapters, and members. (*See* Dkt. No. 5, ¶ 76). This list indicates that seven such sets of allegations were made between April 1983 and May 1991. (*Id.*).

[5] By 1990, "the inability of chapter officers to safely manage fraternity housing, events, and the use and misuse of alcohol was widely known to universities, national fraternities, the housing corporations that owned fraternity housing, and their insurers to be a substantial cause of the injuries and deaths." (Dkt. No. 5, ¶ 55). Despite this, Defendant Sigma Chi did not install adult management in its chapter houses and Defendant Comstock did not install adult management in the Sigma Chi chapter house located at the University. (*Id.*).

By August 1991, the Committee recommended that the University "provide a detailed, four-page information sheet to incoming students before they arrived on campus advising them about the risks of rape on campus and how students could be updated about security issues." (*Id.* ¶ 72). The University declined to follow this recommendation. (*Id.*).

"Students were afraid, protesting, and demanding reforms and disclosure of information the University exclusively held, so they could protect themselves." (*Id.* ¶ 2). "The University had established a rape task force, and campus organizations, such as 'Students Concerned About Rape Education' ('S.C.A.R.E.D.'), were pressuring the University to make the campus safer, implement anti-sexual violence training in Greek houses, and advise incoming students about their risks of being raped and the resources available to them after being harmed." (*Id.*). The task force "noted that the Greek subculture contributed to the problem on [the University's] campus, yet no reforms directed to Greek organizations were proposed or implemented." (*Id.* ¶ 69).

Plaintiff alleges that although the University "received, investigated, and adjudicated numerous allegations of the misuse and abuse of alcohol by persons in fraternity houses on campus or at fraternity sponsored events involving incidents of sexual misconduct and rape" prior to the alleged rape at issue in this case, (*id.* ¶ 59), the University "refused to disclose such accurate and material information to Plaintiff and other students," (*id.* ¶ 60), and did not provide this information to the task force it established to "review the problem of rapes within the Greek community and at fraternity houses and make recommendations for reform," (*id.* ¶ 61). Prior to and as of the date Plaintiff was allegedly raped, the University failed to "identify for [ ] students[, including Plaintiff], parents, and the campus community the specific reasons why fraternities and sororities on campus . . . have been disciplined or lost recognition." (*Id.* ¶ 62).

E.      **Relevant University Policies**

The University required fraternities and sororities "to apply for and hold 'recognized' status" in order "to obtain the significant 'privileges, services and resources' offered by the University and to operate as official Social Greek Letter Organizations of the University." (*Id.* ¶ 50). As part of this process, the University "undert[ook] the specific obligation to review the fraternities and sororities and determine, *inter alia*, that they are 'managed responsibly' and reflect the University's highest ideals." (*Id.*). The University "regularly met with staff from national fraternities and sororities, as well as local chapter officers[,] and [ ] employed and trained numerous staff to specialize in Greek affairs, attend related conferences and seminars, and advise and counsel Greek organizations, their members, and their prospective members." (*Id.*).

By applying for "recognized" status, fraternities and sororities agreed to abide by certain University rules and regulations, including those which made them "responsible for the conduct of their guests at sponsored events." (*Id.* ¶ 53). If a fraternity or sorority failed to comply with these rules and regulations, the University had "the power to investigate the alleged wrongdoing, discipline its members, the organization, and/or revoke its recognition." (*Id.*).

While housing owned by the University was "required to be free of alcohol, managed by a department employing trained residential staff, and regularly patrolled by campus security," (*id.* ¶ 54), the University "did not require fraternities to be alcohol-free . . . , have live-in, trained management, or permit campus security to enter and patrol fraternity properties," (*id.* ¶ 57). Instead, "the implementation and management of all relevant policies relating to the provision, use, and misuse of alcohol and drugs in fraternity and sorority housing were vested in chapter officers, who were . . . untrained, full-time students." (*Id.* ¶ 54).

The University was involved with the "Interfraternity Council and Panhellenic Council[,] which are governing boards for the Greek organization[s] on campus that review allegations of misconduct." (*Id.* ¶ 51). And the University had "established a University Judicial System that review[ed] and administer[ed] alleged violations of the Code of Student Conduct (the 'Code'), including allegations of misconduct by students in fraternity and sorority houses or at their sponsored events." (*Id.*). The University Judicial System's jurisdiction "extended 'to alleged misconduct that t[ook] place on University owned or controlled property or on property close to the University, including the Greek chapter houses, alleged misconduct that takes place at any University sponsored event, and alleged misconduct that has a significant impact on the educational mission and well-being of the University that takes place at any location off-campus." (*Id.*). Although the University "now requires students joining fraternities to attend workshops on Title IX, alcohol, gender bias and hazing," the University "did not have such a requirement in 1991." (*Id.* ¶ 52).

"The University states that it established the Code to set forth the 'minimal expectations' required of students and student organizations to provide 'an environment where persons are safe, property is secure, the individual rights of all persons are respected, and education of the highest quality is achieved.'" (*Id.* ¶ 89). The Fraternity and Sorority Defendants, who sought recognition from the University, were required to comply with the Code and the "Minimum Standards for Recognition of Syracuse University's Social Greek Letter Organizations," as well as with New York State law. (*Id.* ¶¶ 89–91). "[T]he University, under disciplinary systems it established, has had the power and authority to accept, investigate and adjudicate alleged violations of the Code and related University standards." (*Id.* ¶ 96).

At all times relevant to this case, the Code provided that "the 'sale, serving, and consumption of alcoholic beverages in fraternity and sorority houses must be in compliance with the University alcohol policy and any further rules and regulations promulgated by the Greek Council.'" (*Id.* ¶ 91). It also provided that "alcoholic beverages 'are not to be served at membership recruitment functions (e.g., fraternity rush . . . .)'" and that "events that involve the service of alcohol by fraternities and sororities must be in compliance with guidelines established by the University Events Office." (*Id.* ¶ 92). The Code prohibited "alcohol from being purchased by or served to persons under the age of 21," (*id.* ¶ 92); "Greek organizations and persons from engaging in conduct that threatens the mental health or physical health and safety of any person or persons including hazing, drug and/or alcohol abuse," (*id.* ¶ 93); and "students or student organizations from harming any 'person or persons, including but not limited to: assault, sexual abuse or other forms of personal abuse,'" (*id.* ¶ 95), "expressly provid[ing] that such actions violate the Code whether the student or student organization was acting alone or with any other person,'" (*id.*).

In 1991, hazing was a crime under New York State Law, and "a person engage[d] in unlawful hazing when in connection with 'another person's initiation into or affiliation with any organization, he intentionally or recklessly engage[d] in conduct which create[d] substantial risk of physical injury to such other person or a third person' and/or 'thereby cause[d] such injury.'" (*Id.* ¶ 94).

### F.    Relevant Fraternity Policies

Defendant Sigma Chi is a national fraternity that recruits undergraduate members and generates revenue at colleges and universities across the county, including at the University. (*Id.* ¶ 99). Sigma Chi "establishes and wields the right to control every essential aspect of its chapters, their operations, and the activities of its members through the fraternity's Governing

Laws, which it refers to as the 'Governing Law.'"[6] (*Id.*). Plaintiff asserts that Sigma Chi has used its control over its "chapters, members and the purchase of insurance to frustrate claims that, for decades, have been asserted by creditors." (*Id.* ¶ 116).

The Governing Law vests Sigma Chi with powers and responsibilities to control "every meaningful activity" of its chapters, including, *inter alia*, "how chapters admit undergraduates, including the ritual(s) required to be used," "prohibited initiation activities," "the conditions for a member to become an officer or participate in athletics or social events of the chapter," "the form for bylaws adopted by chapters," "whether members are disciplined," "the requirement that chapters purchase an amount of insurance established by Sigma Chi," "the powers to suspend chapter operations, discipline chapters on specific terms, and/or remove a chapter's charter," "the right to compel chapters to regularly participate in the 'supervision' by a Grand Praetor, who reports to the Executive Director of Sigma Chi," "the right to control, and 'determine the use and ultimate disposition of such property or the proceeds thereof' of any assets held by chapters when they become inactive," and "the power to enter into contracts to lease, buy, sell and transfer assets, and determine the legal entity which shall hold title to and manage assets for the benefit of chapters." (*Id.* ¶ 100).

Plaintiff contends that Defendant Sigma Chi and its chapters are "so unified in their existence, operations and control that the supreme legislative power over these entities is merged in and held by Sigma Chi." (*Id.* ¶ 101). "That power is then exercised at bi-annual conventions at which Sigma Chi, its chapters, and other entities established by Sigma Chi and operating for the

---

[6] Plaintiff states in her complaint that, "[u]pon information and belief, the Governing Law provisions referenced herein are similar in all material respects to those extant at the time Plaintiff was raped." (*Id.* ¶ 99)

benefit of the fraternity have the right to vote [ ] on policy changes affecting the fraternity or their respective operations. (*Id.*).

Under the Sigma Chi Statutes, Sigma Chi has the authority to establish "house corporations" to take and hold title to the chapter houses on campuses across the country from which chapters recruit new members and generate revenue for the fraternity. (*Id.* ¶ 104). Sigma Chi is authorized to install "property committees" to manage these properties and to hold first and second mortgages on them and determine their use and ultimate disposition. (*Id.*). Defendant Comstock, a corporation, holds title to and manages the Sigma Chi chapter house at the University, which is a "multi-level historic structure that has housed members of Sigma Chi and its Psi Psi Chapter for decades" and is allegedly "worth several millions of dollars." (*Id.* ¶ 107).

Sigma Chi is a tax-exempt organization formed under Section 501(c)(3) of the Internal Revenue Code ("IRC"). (*Id.* ¶ 105). For the 2021 fiscal year, Sigma Chi reported total revenues of $6,615,292.00 and net assets of $12,617,568.00. (*Id.*). Defendant Foundation, a tax-exempt organization formed under the same section of the IRC, is "[d]irectly related to Sigma Chi" and operates as part of and under its control. (*Id.* ¶ 106). For the 2021 fiscal year, Foundation reported net assets of $34,620,464.00, including a limited partnership interest valued at $2,246,348. (*Id.*). This interest is "in the Risk Management Foundation ('RMF')," "a limited liability entity formed under the laws of the State of Illinois and headquartered at the same location as Sigma Chi," which "provides risk-management services for Defendant Sigma Chi and other national fraternities." (*Id.* ¶¶110–11). Plaintiff contends that RMF is "a captive insurance company formed by Sigma Chi with other fraternities in 1988" and that it "brokers and issues the insurance policies negotiated by Defendant Sigma Chi." (*Id.* ¶ 111).

According to Plaintiff, "Defendant Sigma Chi has . . . established and controlled how the Chapter's finances are held and managed" and "has contracted for software services that manage the finances of its chapters and vests in Sigma Chi the power to access, control and disburse the funds therein." (*Id.* ¶ 108). Sigma Chi has also controlled the purchase and payment for insurance by its chapters. (*Id.* ¶ 109). This insurance "includes coverage exclusions applicable solely to chapters and members, including, without limitation, related to the misuse of alcohol, hazing, sexual misconduct, and violations of university and fraternity risk-management policies." (*Id.* ¶ 112).

### G.    Relevant Sorority Policies

Plaintiff alleges that "[t]he legal structure of Tri Delta, its complete control over every material aspect of the organization and actions of its chapters, and the resultant and intended undercapitalization of its chapters to evade the claims of foreseeable creditors[,] is virtually identical to that of Defendant Sigma Chi." (*Id.* ¶ 118).

Tri Delta is referred to in its Bylaws as the "Fraternity" and is given "discretion over 'membership matters, chapters of the Fraternity, and related organizations and entities associated with the Fraternity.'" (*Id.* ¶ 119). Article II of the Bylaws states:

> "The Fraternity shall be primarily a collegiate organization made up of members affiliated with collegiate chapters . . . . The administration of the Fraternity functions through a Convention that includes entities, officers and governing bodies of Tri Delta, along with chapters, house corporations and other operating under the direction of Tri Delta', which 'shall have direction over the business and legal affairs of the Fraternity.'"

(*Id.*).

Tri Delta determines who may be initiated into the sorority as a charter member and has the power to withdraw a chapter's charter. (*Id.* ¶ 122). "Tri Delta has assumed the responsibilities for supervising and directing chapters, providing that its designated representatives 'shall have

supervision over collegiate chapters and the local advisory committees.'" (*Id.* ¶ 123). Chapters are required to elect new members according to policies and rituals of Tri Delta, and chapter operations and management are designated in and required to be in accordance with the Bylaws. (*Id.*). The chapters' financial affairs are subject to Tri Delta's review. (*Id.*).

Tri Delta's Fraternity Policies on collegiate chapters establish all risk crisis management requirements and policies of the chapters, and the insurance for the chapters and members related to and covering such risk "is negotiated and controlled by Tri Delta through its agreements with the MJ Insurance Sorority Division." (*Id.* ¶ 127). Plaintiff believes that "chapters and members pay for the purchase and issuance of insurance, and the obligations to defend and indemnify are subject to exclusions related to the misuse of alcohol, hazing, sexual misconduct, and violations of university and fraternity risk-management policies." (*Id.* ¶ 128).

According to Plaintiff, such exclusions negotiated by Tri Delta are not applicable to Tri Delta or the entities holdings the sorority's real property and personal assets. (*Id.* ¶ 129). Consequently, Plaintiff asserts that chapters such as Omicron are "knowingly and intentionally undercapitalized by Tri Delta." (*Id.* ¶ 129).

## III.   MOTION TO DISMISS LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc*., 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140, at *5 (S.D.N.Y. Sept. 22,

2017) (quoting *Twombly*, 550 U.S. at 555). A court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth*., 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

"Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself," *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006), "documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint," *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A court may also consider a document on which "the complaint 'relies heavily . . . ,' thereby rendering the document 'integral' to the complaint." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *DiFolco*, 622 F.3d at 111). But "[m]erely mentioning a document in the complaint will not satisfy this standard; indeed, even offering 'limited quotation[s]' from the document is not enough." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (second alteration in original) (quoting *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006)).

## IV.   DISCUSSION

### A.   Negligence

Plaintiff brings a variety of claims largely rooted in negligence against the Fraternity Defendants, the Sorority Defendants, and Defendant University, (Dkt. No. 5), each of whom move to dismiss these claims. (Dkt. Nos. 55–56, 58). "To state a negligence claim under New York law, a plaintiff must allege 'the existence of a duty, the breach of which may be considered the proximate cause of the damages suffered by the injured party.'" *Doe v. Union Coll.*, No. 1:19-cv-284, 2020 WL 1063063, at *6, 2020 U.S. Dist. LEXIS 38136, at *16 (N.D.N.Y. Mar. 5,

2020) (quoting *Becker v. Schwartz*, 46 N.Y.2d 401, 410 (1978)). "The existence of such a duty is a question of law for the court." *Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336, 361 (N.D.N.Y. 2014).

### 1.      Fraternity Defendants

Plaintiff brings claims of negligence, negligent breach of assumed duties, negligence per se, and willful and wanton misconduct[7] against the Fraternity Defendants. (Dkt. No. 5, at ¶¶ 136–149). The Fraternity Defendants argue that "Plaintiff fails to state a claim against the Fraternity Defendants and her claims should be dismissed, with prejudice." (Dkt. No. 56-1, at 8). The Court considers each claim and motion separately and finds Plaintiff plausibly alleged (a) a duty against Comstock and (b) Psi Psi under premises liability, (c) a negligent breach of assumed duties claim against Psi Psi and Sigma Chi, (d) a negligence *per se* claim against Fraternity Defendants, (e) a negligence claim against Sigma Chi under a theory of vicarious liability, and (f) that Psi Psi and Sigma Chi are alter egos.

### a.      Comstock's Negligence

Plaintiff alleges a claim of negligence under a theory of premises liability against Defendant Comstock, a not-for-profit corporation managed by alumni of Defendant Psi Psi, "whose sole purposes are to hold title to and manage the real estate exclusively used by the Fraternity Defendants on the campus of Syracuse University." (Dkt. No. 5, ¶ 22, 138). The Fraternity Defendants allege that Comstock's "mere ownership of the local chapter's house is insufficient to establish a duty to Plaintiff and is not a basis for liability." (Dkt. No. 56-1, at 12).

---

[7] The Court notes that the Fraternity Defendants' memorandum of law in support of its motion to dismiss states that "Plaintiff fails to state a claim against the Fraternity Defendants and her claims should be dismissed, with prejudice." (Dkt. No. 56-1, at 8). This statement appears to address all of Plaintiff's claims. The memorandum of law analyzes the negligence, assumption of duty, and negligence *per se* claims but makes no reference to the willful and wanton misconduct claim. As such, the Court does not evaluate the willful and wanton misconduct claim, and the claim stands.

Generally, the owner of a fraternity house does not have a legal duty to affirmatively supervise those present in the house and prevent them from engaging in conduct that creates a risk of harm to themselves. *Rothbard v. Colgate Univ.*, 235 A.D.2d 675, 677 (3d Dep't 1997). But a duty can be imposed where the defendant had actual or constructive knowledge of a dangerous activity taking place in the house and failed to control that activity. *Oja v. Grand Chapter of Theta Chi Fraternity, Inc.*, 255 A.D.2d 781, 781–82 (3d Dep't 1998). Fraternity Defendants agree that "a landowner can be liable for the criminal acts of third parties on its property where the conduct was foreseeable, *i.e.* 'reasonably predictable based on the prior occurrence of the same or similar criminal activity at a location sufficiently proximate to the subject location.'" (Dkt. No. 56-1, at 12) (quoting *Beato v. Cosmopolitan Assocs.*, *LLC*, 69 A.D.3d 774, 776 (2d Dep't 2010), *lv denied* 15 N.Y.3d 708 (2010) (quoting *Novikova v. Greenbriar Owners Corp.*, 258 A.D.2d 149, 153 (2d Dep't 1999)).

In this case, Plaintiff's alleged sexual assault was reasonably foreseeable, and Comstock had actual or constructive knowledge of dangerous activity taking place in the house and failed to control that activity. Plaintiff alleges that the Fraternity Defendants co-sponsored and hosted the party at which Plaintiff was raped, (Dkt. No. 5, ¶¶ 10, 77), knowing that such parties presented some risk of sexual violence, (*see* Dkt. No. 5, ¶¶ 70 ("[i]n the Spring of 1991, before Plaintiff enrolled at the University, multiple rapes on campus were reported to the University and/or police, including at the Sigma Chi fraternity house."), 75 ("the University and Sigma Chi were aware of allegations against the Psi Psi Chapter and its members in the years preceding the rape of Plaintiff concerning the misuse and unlawful provision of alcohol in the fraternity house and at fraternity events, sexual assault, and other dangerous misconduct."), 76 (listing a partial

inventory from public records of the allegations of sexual violence leveled at Sigma Chi, its chapters, and members)).

Fraternity Defendants argue that Plaintiff's allegations are insufficient, because she relies on incidents across the country at different houses owned and occupied by different fraternities. (Dkt. No. 71, at 6–7). While the Complaint does include such allegations (*see e.g.*, Dkt. No. 5, ¶¶ 31, 76), the Complaint also identifies a pattern of incidents at the University itself. For example, the New York Times published two articles discussing the rape epidemic on the University's campus. (*Id.* ¶ 68). In the year preceding the sexual assault at issue, there were at least fourteen reports of sexual assaults on the University's campus, including an alleged assault at the Sigma Chi house. (*Id.* ¶¶ 70, 76). Criminal conduct of such a similar nature occurring on campus has been held sufficient to establish foreseeability. *Jacqueline S. v. City of New York*, 81 N.Y.2d 288, 294–95) (1993) (citing *Miller v. State of New York*, 62 N.Y.2d 506, 509 (1984) ("There is no requirement . . . that the past experience relied on to establish foreseeability be of criminal activity at the exact location where plaintiff was harmed . . . . [T]he occurrence of criminal activity in plaintiff's college dormitory was held to be foreseeable, in part, because of different criminal conduct occurring in other dormitories on the same campus.").

Accepting Plaintiff's facts as true and drawing all reasonable inferences in Plaintiff's favor, the Court finds Fraternity Defendants' argument that there was no duty because there is "no allegation or indication of any prior instances of the [tortfeasor's] inappropriate sexual behavior," (Dkt. No. 56-1, at 13 (quoting *Herskovitz v. Equinox Holdings, Inc.*, No. 151065/2013, 2013 WL 2642956, at *12, 2013 N.Y. Misc. LEXIS 2371, at *29 (Sup. Ct., N.Y. County June 3, 2013)), to be without merit. As such, the Court concludes that Plaintiff has adequately pleaded a duty owed by Defendant Comstock under a theory of premises liability.

####    b.    Psi Psi's Negligence

Plaintiff sues Luke Rogers and Ethan Hirsh in their capacity as President and Treasurer,

respectively, for and on behalf of the unincorporated association operating at Syracuse

University as the Psi Psi Chapter of the Sigma Chi Fraternity in accordance with New York

General Associations Law § 13 on behalf of Defendant Psi Psi. (Dkt. No. 5, ¶ 20). The Fraternity

Defendants argue that, under the so-called *Martin* rule, Plaintiff's claims against Defendant Psi

Psi must be dismissed because "not all of its members are alleged to have committed

wrongdoing." (Dkt. No. 56-1, at 18–19). Plaintiff responds that the *Martin* rule is inapplicable to

negligence claims and that, in any case, "she has met that (inapplicable) pleading threshold

here." (Dkt. No. 68, at 22).

New York law defines an unincorporated association as "[a]ny partnership, or other

company of persons, which has a president or treasurer," and allows for lawsuits to be

maintained against an unincorporated association if brought against its president or treasurer.

N.Y. Gen. Ass'ns L. § 13. Federal and New York State courts have found local fraternity

chapters to meet this definition, *see Sendon v. Torres*, No. 15-cv-4538, 2016 WL 1746111, at

*2–3, 2016 U.S. Dist. LEXIS 57423, at *4–5 (S.D.N.Y. Apr. 28, 2016) (citing cases), and the

parties in this case seem to agree that Defendant Psi Psi meets this definition as well. (Dkt. No.

56-1, at 18; Dkt. No. 68, at 21).

The *Martin* rule "bars all actions against an unincorporated voluntary membership

association, and bars claims against the officers of such an association in their representative

capacities where there is no allegation that the members of the association authorized or ratified

the wrongful conduct complained of." *Cruz v. United Auto. Workers Union Loc. 2300*, No. 3:18-

cv-48, 2019 WL 3239843, at *16, 2019 U.S. Dist. LEXIS 119662, at *45 (N.D.N.Y. July 18,

2019) (quoting *Bidnick v. Grand Lodge of Free & Accepted Masons of the State of New York*, 72

24

N.Y.S.3d 547, 550 (2d Dep't 2018)). However, as Plaintiff points out, the *Martin* rule "is not applicable to an unincorporated association's unintentional tort." *Torres v. Lacey*, 3 A.D.2d 998, 998 (1st Dep't 1957). As the *Torres* court explained, "to require membership authorization or even ratification of such an unintentional tort is, in effect, to attempt to transmute a negligent act into a willful wrong. This is an inadmissible result, straining both law and logic." (*Id.*). Consequently, the Court declines to dismiss the claims against Psi Psi on this basis.

Having found that the *Martin* rule does not bar Defendant Psi Psi from being held liable, the Court next considers whether Psi Psi had a duty. Fraternity Defendants do not deny that Psi Psi was the "tenant" of the chapter house. (Dkt. No. 71, at 6; Dkt. No. 5, ¶ 22 ("Defendant Comstock . . . manage[s] the real estate exclusively used by the Fraternity Defendants on the campus of Syracuse University[.]")). Premises liability extends to both owners and tenants.[8] *See Provenzano v. Roslyn Gardens Tenants Corp.*, 190 A.D.2d 718, 720 (2d Dep't 1993). As such, the same analysis above with respect to Comstock's liability applies here. At this stage of the proceedings, accepting Plaintiff's well-pleaded allegations as true and drawing all reasonable inferences in her favor, it was reasonably foreseeable to Psi Psi that a member would sexually assault a party guest. As such, the Court concludes that Plaintiff has adequately pleaded a duty owed by Defendant Psi Psi under a theory of premises liability.

Defendant argues that if a claim is allowed to proceed against the Local Chapter, "naming both the president ***and*** treasurer is improper" under the plain language of New York General Associations Law § 13. (Dkt. No. 56-1, at 19) (citing *Mazurajtis v. Maknawyce*, 93

---

[8] Sigma Chi and the Foundation are neither owner nor tenant. Plaintiff argues that these entities "exercise[d] their control over the chapter house at Syracuse," (Dkt. No. 68, at 15) but the Court agrees with Fraternity Defendants that this claim is conclusory and unsupported. (*See* Dkt. No. 71, at 6). Therefore, the Court finds that Plaintiff's claim of negligence as rooted in premises liability survives with respect to Comstock and Psi Psi, but not with respect to Sigma Chi and the Foundation.

Misc. 337, 339 (Sup. Ct., New York County 1916) (emphasis in original)). Plaintiff does not oppose the dismissal of Ethan Hirsh, in his capacity as Treasurer of Psi Psi. (Dkt. No. 68, at 22 n.18). Therefore, the Court denies Fraternity Defendants' motion to dismiss with respect to the claims against Rogers on behalf of Psi Psi and dismisses Hirsh as a defendant.

### c.    Fraternity Defendants' Negligent Breach of Assumed Duties

Plaintiff alleges that the Fraternity Defendants "assumed a duty to oversee and manage the Local Chapter's members' conduct and to prevent the members from making the house unsafe." (Dkt. No. 56-1, at 14). An assumed duty can arise where "the failure to exercise due care increases the risk of harm to the plaintiff" or the plaintiff suffers harm "because of the plaintiff's reliance on the undertaking." *Tavarez v. Lelakis*, 143 F.3d 744, 747 (2d Cir. 1998). Fraternity Defendants contend that no such duty was assumed, because they did not engage in any conduct that increased harm to Plaintiff and there are no allegations that they induced Plaintiff to rely on them for anything. (Dkt. No. 56-1, at 14–15). Plaintiff does not allege reliance on any action or inaction by the Fraternity Defendants (*see* Dkt. No. 71, at 10–11), so the only theory Plaintiff can rely on is that the Fraternity Defendants failed to exercise due care.

Plaintiff alleges that the Fraternity Defendants had a duty to exercise care in the following undertakings:

> Psi Psi undertook to co-sponsor, host, and manage the bid event, (FAC ¶¶ 10, 77), while Sigma Chi, in addition to controlling every meaningful activity of Psi Psi, undertook to evaluate Psi Psi's management, operations, and programming, and to counsel Psi Psi on its understanding of, and compliance with, risk management policies. (FAC ¶ 98.) . . . The Fraternity Defendants knew and should have recognized, particularly given their specialized knowledge regarding the risks women faced at fraternity houses and events, that evaluating Psi Psi's management, operations, and programming, assessing Psi Psi's compliance with risk management policies, abiding by the Code, and safely managing the bid event was necessary to protect female invitees from sexual assault. (FAC ¶¶ 98, 137, 140.)

(Dkt. No. 68, at 18–19). Plaintiff argues that by failing to exercise due care, Fraternity

Defendants "increased the risk of sexual assault Plaintiff faced at the bid event and directly

contributed to her rape." (*Id.* at 19). Given the cited allegations, the Court finds that, at this early

stage of the proceedings, Plaintiff has plausibly stated a claim that Psi Psi and Sigma Chi failed

to exercise due care, increasing the risk of her harm. Therefore, the Court denies the Fraternity

Defendants' motion to dismiss the negligent breach of assumed duties claim.

### d.  Fraternity Defendants' Negligence *Per Se*

Plaintiff argues that Fraternity Defendants are negligent *per se* under N.Y. Penal Laws §

120.16 and § 120.17, both of which criminalize hazing in New York. (Dkt. No. 68, at 19). In

New York, negligence *per se* requires the plaintiff to establish: (1) that "she is among the class of

people for whose particular benefit a statute has been enacted; (2) that a private right of action

would promote the legislative purpose behind the statute; and (3) that creation of the right would

be consistent with the overall legislative scheme." *Johnson v. Hunter Warfield, Inc.*, No. 1:22-

cv-122, 2022 WL 1421815, at *4, 2022 U.S. Dist. LEXIS 81419, at *7 (N.D.N.Y. May 5, 2022)

(quoting *Fagan v. AmerisourceBergen Corp.*, 356 F. Supp. 2d 198, 214 (E.D.N.Y. 2004)). In

addition, a plaintiff must allege that a violation of the statute caused her injury. *Dance v.

Southampton*, 95 A.D.2d 442, 445 (2d Dep't 1983).

Fraternity Defendants first argue that neither of these statutes can support a negligence

*per se* claim, because they are too abstract to impose a specific duty. (Dkt. No. 56-1, at 16–17).

However, the statutes have "been interpreted as to create an implied private civil cause of action

against those who engage in such acts." *Iadanza v. Hudson 410, Inc.*, No.150605/2020, 2023

N.Y. Misc. LEXIS 13321, at *16 (Sup. Ct., Richmond County July 31, 2023) (citing *Oja v.

Grand Chapter of Theta Chi Fraternity, Inc.*, 257 A.D.2d 924 (3d Dep't 1999)). Therefore, a

negligence *per* se claim based on N.Y. Penal Laws § 120.16 and § 120.17 is "rightly permitted to stand," *Oja*, 257 A.D.2d, at 925.

Fraternity Defendants next argue that any violation of the statutes did not cause the sexual assault. (Dkt. No. 56-1, at 17). Plaintiff alleges that the hazing involved an event co-sponsored by Omicron and Psi Psi wherein "[p]unch pushers" who were "fraternity and sorority members" "pressured," "directed and encouraged under-aged Tri Delta pledges to drink" champagne, punch made with 190 proof grain alcohol, and secretly-drugged punch so the pledges could have the "best night of their lives," in a "ritual [that] would eventually be identified as being one of the 'three deadly nights' for fraternities." (Dkt. No. 5, ¶¶ 10, 77, 80). She alleges that this rendered her "intoxicated [and] unable to fully protect herself physically," conditions she alleges Montalto took advantage of to target and isolate her upstairs and rape her. (Dkt. No. 5, ¶¶ 185–86). Similar facts were held to be sufficient to survive a motion to dismiss in *Oja*, where a fraternity pledge was "involved in a hazing ritual during which he was encouraged and instructed to consume excessive amounts of hard alcohol and beer provided by the fraternity." *Oja v. Grand Chapter of Theta Chi Fraternity, Inc.*, 255 A.D.2d 781, 781 (3d Dep't 198). Once he was "visibly intoxicated, unable to stand and incapable of aiding or protecting himself, fraternity members took him to the third floor of the house, laid him face down on a couch with a bucket underneath his head, and left him unattended in an unconscious state," where he died. *Oja*, 257 A.D.2d, at 925. Like *Oja*, Plaintiff here has alleged that she was encouraged and instructed to drink as part of a hazing ritual and that she was left uncapable of protecting herself, causing the harm. The Court recognizes that there is a closer nexus between drinking and aspirating vomit, (*Oja*, 255 A.D.2d, at 781), than there is between drinking and rape, but at this stage of the proceedings, the Court finds that Plaintiff has plausibly plead

causation between the hazing and her injury. Therefore, Fraternity Defendants' motion to dismiss the negligence *per se* claim is denied.

### e.      **Sigma Chi's Vicarious Liability**

Plaintiff "seeks to hold Sigma Chi vicariously liable for the negligence of Psi Psi." (Dkt. No. 68, at 23). A principal can be vicariously liable "for the actions of its agents" even if it "played no part in the occurrence causing the plaintiff's injury" if the tortious conduct occurred within the scope of the agency relationship. *Broderick v. Research Found. of State Univ. of N.Y.*, No. 10-cv-3612, 2010 WL 3173832, at *3, 2010 U.S. Dist. LEXIS 82031, at *7 (E.D.N.Y. Aug. 11, 2010) (quoting 14 N.Y. Prac., Torts § 9:2); *McArthur v. J.M. Main St., Inc.*, 46 A.D.3d 639, 639 (2d Dep't 2007). Fraternity Defendants argue that (1) there is no cognizable special relationship between Sigma Chi and Psi Psi; (2) even if there were, the perpetrator's alleged actions were "so outside the scope of any plausible relationship;" and (3) in any case, Plaintiff's failure to allege foreseeability is fatal to her claim (Dkt. No. 56-1, at 20, 22).

In support of its first argument, Defendant cites to *Barenborg v. Sigma Alpha Epsilon Fraternity*, 33 Cal. App. 5th 70 (2019) and *Parslow v. Leake*, 117 A.D.3d 55, 71 (4th Dep't 2014) for the proposition that the action of a local chapter's members cannot be imputed onto the national fraternity. (Dkt. No. 56-1, at 20). As Plaintiffs respond, (*see* Dkt. No. 68, at 25), *Barenborg* is an out-of-state case decided on summary judgment holding that a national fraternity is not responsible for "monitor[ing] and control[ling] [the local chapter's] day-to-day operations." 33 Cal. App. 5th, at 81. And in *Parslow*, the national entity disbanded the local chapter in 2005 and never reinstated it, which is why the court concluded that the national entity had no agency relationship with or control over the local chapter at the time of the incident. 117 A.D.3d, at 71. In the absence of disbandment and where the claim turns on more than day-to-day control, "a plaintiff can successfully plead . . . that a national fraternity . . . can be liable under an

agency theory." *Brown v. University of Rochester*, 224 A.D.3d 1180, 1182 (3d Dep't 2024). This is especially true where there is a documented relationship between the parties. *Id.* In this case, the First Amended Complaint details the fraternity's governing laws, which are alleged to provide Sigma Chi with the "right to control every essential aspect of its chapters, their operations, and the activities of its members." (Dkt. No. 5, ¶¶ 99, 100). Here, as in *Brown*, there were payments from the local chapter to the national entity, support and guidance from the national entity to the local chapter, and standards imposed by the national entity on the local chapter. *Brown*, 224 A.D.3d, at 1182; (Dkt. No. 5, ¶¶ 97–98, 100). Sigma Chi is alleged to have had the power to suspend, discipline or remove a chapter's charter, and to "compel it to cease any form of undergraduate recruitment or fraternal activities." (Dkt. No. 5, ¶ 100). Because the claim at issue here is not about day-to-day control, and at least one New York court has clearly found that the actions of a local chapter's members can be imputed onto the national fraternity in the absence of disbandment, the Court finds Fraternity Defendants' reliance on *Barenborg* and *Parslow* to be unpersuasive.

The next question is whether the local chapter member's actions were within the scope of the relationship. Fraternity Defendants argue that it is "well-established" that sexual assault is not in the scope of the relationship including in the fraternity-member relationship, especially where the sexual assault is contrary to the fraternity's policies. (Dkt. No 56-1, at 22 (citing *N.X. v. Cabrini Med. Ctr.*, 97 N.Y.2d 247, 251 (2002); *Steinborn v. Himmel*, 9 A.D.3d 531, 532–33 (3d Dep't 2004); *Brown v. Delta Tau Delta*, 118 A.3d 789, 791 (Me. 2015))). Plaintiff does not explicitly respond to this argument, but rather relies exclusively on *Brown v. University of Rochester* in asserting Sigma Chi's vicarious liability. (Dkt. No. 68, at 23–25). The *Brown* court did not address whether the alleged sexual assault was in the scope of the fraternity-member

relationship but did emphasize that the national fraternity had "actual and/or constructive notice of ongoing, illegal activities involving alcohol and sex abuse at [the local chapter]." 224 A.D.3d, at 1182. This seemingly brought the misconduct within the scope of the relationship, because the complaint adequately stated that the national fraternity "had a duty to take responsive actions to the alleged illegal activities but failed to do so." *Id.* at 1182–83. As such, the *Brown* court denied the national fraternity's motion to dismiss. *Id.* at 1183. As in *Brown*, the Plaintiff here has plead that Sigma Chi was "aware of allegations against the Psi Psi Chapter and its members in the years preceding the rape of Plaintiff concerning the misuse and unlawful provision of alcohol in the fraternity house and at fraternity events, sexual assault, and other dangerous misconduct." (Dkt. No. 5, ¶ 75). Sigma Chi's motion to dismiss on this ground must therefore be denied.

Fraternity Defendants' last argument is that Plaintiff's "failure to allege the Fraternity Defendants reasonably knew or foresaw a risk of [the local chapter member] acting unlawfully is fatal to her claim." (Dkt. No. 56-1, at 22–23 (citing *Grenier v. Comm'r of Transp.*, 306 Conn. 523, 554 (2012)). Although *Grenier* is not binding here, the Court notes its holding that "whether a national fraternity may be held liable for the actions of one of its local chapters depends both on its ability to exercise control over the local chapter as well as its knowledge either that risk management policies are not being followed or that the local chapter is engaging in inappropriate behavior." 306 Conn., at 554. Plaintiff has plead here that Sigma Chi both had control over the local chapter and had the requisite knowledge. (Dkt. No. 5, ¶¶ 75 ("Sigma Chi . . . w[as] also aware that fraternities' entrustment of chapter officers to reasonably and safely implement risk management policies, university rules and regulations, and the use and provision of alcohol in fraternity houses and at fraternity events was unreasonable and dangerous."), 99 ("Sigma Chi establishes and wields the right to control every essential aspect of its chapters[.]")).

Because a national fraternity can be liable under an agency theory and Plaintiff has sufficiently pleaded that Sigma Chi had notice of misconduct and control over the chapter, the Court denies Fraternity Defendants' motion to dismiss with respect to vicarious liability.

### f.    Fraternity Defendants as Alter Egos

Plaintiff alleges that Sigma Chi, Psi Psi, Comstock, and the Foundation are alter egos of one another, meaning they can each be held liable for the other's tortious conduct. (Dkt. No. 5, at 1). To establish alter ego liability such that the corporate veil should be pierced, a party must demonstrate that "(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in the plaintiff's injury." *Xiotech Corp. v. Express Data Prods. Corp., ESI, LLC*, 11 F. Supp. 3d 225, 236 (N.D.N.Y. 2014) (quoting *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 306 F. Supp. 2d 482, 485 (S.D.N.Y. 2004)). While "purely conclusory allegations of alter-ego status will not survive a motion to dismiss," *Consol. Risk Servs., Inc. v. Auto. Dealers WC Self Ins. Tr.*, No. 1:06-cv-871, 2007 WL 951565, at *5, 2007 U.S. Dist. LEXIS 22097, at *17 (N.D.N.Y. Mar. 27, 2007), "plausible allegations of domination and control" can allow the claim to survive to discovery. *Sphere Digital, LLC v. Armstrong*, 20-cv-4313, 2020 WL 6064156, at *6, 2020 U.S. Dist. LEXIS 190516, at *16–17 (S.D.N.Y. Oct. 14, 2020); *Robles v. Copstat Sec., Inc.*, No. 08-cv-9572, 2009 WL 4403188, at *2, 2009 U.S. Dist. LEXIS 112003, at *9 (S.D.N.Y. Dec. 2, 2009). Courts consider the following factors in deciding whether the requisite domination is present:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the

amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Xiotech Corp.*, 11 F. Supp. 3d, at 236. "Courts are not required to find that every factor is present, and no one factor is dispositive." *Shantou Real Lingerie Mfg. Co. v. Native Grp. Int'l, Ltd.*, 401 F. Supp. 3d 433, 440 (S.D.N.Y. 2018).

Fraternity Defendants argue that Plaintiff's allegations are conclusory and insufficient. (Dkt. No. 56-1, at 24–25). However, the allegations here are much more detailed than the cases cited by Fraternity Defendants where alter ego liability was not found. (Dkt. No. 68, at 28–29); *Webb v. Mentor Worldwide LLC*, 453 F. Supp. 3d 550, 561 (N.D.N.Y. 2020) (finding no alter ego where the only allegations were that (1) the corporate entities were "so interwoven that they act[ed] as a single entity" and (2) "each of the defendants was an . . . alter ego . . . of each of the remaining defendants . . . and each [d]efendant has ratified and approved the acts of each of the remaining [d]efendants"); *Consol. Risk Servs., Inc.*, 2007 WL 951565 at *5, 2007 U.S. Dist. LEXIS 22097, at *18 (finding no alter ego where the only allegations were that (1) one entity performed most or all of the other's daily claims handling and (2) the entities shared officers, employees, offices, other facilities, business activities, and functions). In contrast, Plaintiff here has alleged in significant detail the control and domination asserted by Sigma Chi over Psi Psi, establishing a number of the above-listed factors, including inadequate capitalization for the purpose of protecting assets and frustrating creditors. (Dkt. No. 5, ¶¶ 20 (explaining that Sigma Chi generates principal revenue from Psi Psi and that Sigma Chi has intentionally undercapitalized Psi Psi), 22 (alleging that Sigma Chi intentionally structured ownership of the

chapter house in a way that would protect it from foreseeable creditors), 99–104 (listing Sigma

Chi's powers and responsibilities over Psi Psi pursuant to Sigma Chi's "Governing Law,"

describing Sigma Chi's bi-annual conventions where policy changes affecting local chapters are

voted on, and alleging other powers held by Sigma Chi such as the powers to establish alumni

associations, establish and monitor Grand Praetors who appoint chapter advisors, investigate

claims of wrongdoing by chapters and impose discipline, and take title to real property used by

the local chapter), 108–09 (explaining that Sigma Chi controls Psi Psi's finances and insurance),

115 ("Sigma Chi is paid by chapters and members for the purchase and issuance of insurance"),

117 ("Psi Psi [is] knowingly and intentionally undercapitalized by Defendant Sigma Chi so that

[it] neither own[s], hold[s], nor through applicable insurance coverage, ha[s] meaningful assets

to cover the anticipated claims of creditors."). Inadequate capitalization for the purpose of

"mak[ing] a corporation judgment-proof constitutes a wrong for the purposes of determining

whether the corporate veil should be pierced." *Fannie Mae v. Olympia Mortg. Corp.*, 724 F.

Supp. 2d 308, 320 (E.D.N.Y. 2010). The Court therefore finds that Plaintiff has plausibly alleged

that Sigma Chi and Psi Psi are alter egos.

  With respect to the Foundation, Plaintiff alleges that (1) the Foundation's sole purpose is

"to secure financial resources and provide faithful stewardship in support of Sigma Chi," and it

uses its substantial assets to fund, support, and expand the activities of Sigma Chi, (Dkt. No. 5, ¶

21), (2) the Foundation and Sigma Chi have the same principal place of business, (*id.* ¶¶ 19, 21),

and (3) the Foundation has an interest in the Risk Management Foundation, an entity

headquartered in the same location as Sigma Chi, which Sigma Chi formed to profit from the

risks its operations create, (*id.* ¶¶ 110, 117). These allegations more closely mirror the

conclusory ones in *Consol. Risk Servs., Inc.*, 2007 WL 951565, 2007 U.S. Dist. LEXIS 22097.

Therefore, the Court finds that Plaintiff has not plausibly alleged that the Foundation is an alter ego of the other Fraternity Defendants.

Lastly, with respect to Comstock, Plaintiff alleges that (1) Comstock is managed by Psi Psi alumni and was established by Sigma Chi as a means to protect the fraternity house from foreseeable creditors, (Dkt. No. 5, ¶ 22), and (2) the fraternity house has housed members of Sigma Chi and Psi Psi for decades and generated substantial revenues for Sigma Chi, (*id.* ¶¶ 104, 107).[9] The Court finds these allegations to be of a conclusory nature as well, such that Plaintiff has not plausibly alleged that Comstock is an alter ego of the other Fraternity Defendants.

### 2.  Sorority Defendants

The First Amended Complaint alleges, *inter alia*, that the Sorority Defendants undertook a duty of care to their pledges to "oversee the recruitment and bid event in a reasonably safe and prudent manner." (*Id.* ¶ 151). Omicron Chapter and its officers and members are alleged to have co-sponsored an alcohol-fueled recruitment and bid function at the Fraternity Defendant's chapter house, knowing that unsafe and unreasonable conduct could take place unhindered there; the Omicron and Psi Psi Chapters and their officers allegedly jointly planned and purchased the alcoholic-punch, and passed around bottles of champagne and a thermos of alcohol spiked with ecstasy; and it is alleged that the Sorority Defendants should have known that "leaving it to college students to manage the provision and use of alcohol" at fraternity events was unreasonably dangerous, especially "because such circumstances had previously resulted in members and pledges of Tri Delta and other sororities being sexually assaulted, raped and

---

[9] Plaintiff argues that discovery will uncover further evidence of the domination and control exercised by Sigma Chi over Comstock and relies on a Declaration of Trust submitted by Defendant University to show Sigma Chi's control. (Dkt. No. 68, at 28 n.25). The Court acknowledges that discovery may allow Plaintiff to better plead her claim, but at this stage of the proceedings, the Court is confined to the complaint and attached exhibits and cannot consider extrinsic evidence. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

otherwise seriously injured." (*Id.*, ¶¶ 151-154). Plaintiff brings claims of negligence, negligent breach of assumed duties, negligent misrepresentation, negligence *per se*, and willful and wanton misconduct[10] against Tri Delta and the Omicron chapter of Tri Delta ("Omicron"). (*Id.* ¶¶ 150–69). The Court evaluates each claim individually and finds Plaintiff plausibly stated (a) a claim against Omicron for negligence, (b) a claim against Omicron for negligence *per se*, (c) a negligence claim against Tri Delta under a theory of vicarious liability, (d) a claim against Omicron and Tri Delta for negligent breach of assumed duties, and (e) that Omicron and Tri Delta are alter egos.

### a. Omicron's Negligence

Plaintiff seeks to hold the Omicron chapter liable for "negligent and reckless conduct, including hazing, that foreseeably, created the conditions that enabled [the fraternity member] to take advantage of and isolate Plaintiff upstairs and rape her." (Dkt. No. 69, at 15). Sorority Defendants argue that (1) the *Martin* rule bars the claim, (2) there is no cause of action under New York law for the negligent provision of alcohol, and (3) there is no allegation of causation between the drugged punch and the rape. (Dkt. No. 60, at 12, 16–18).

---

[10] The Court notes that the Sorority Defendants' memorandum of law in support of its motion to dismiss requests "that the Court grant their motions to dismiss the claims asserted against them in the First Amendment [sic] Complaint with prejudice." (Dkt. No. 60, at 31). Neither Sorority Defendants' memorandum of law, (Dkt. No. 60), nor reply, (Dkt. No. 70), analyzes the willful and wanton misconduct claim. As such, the Court does not evaluate the willful and wanton misconduct claim, and the claim stands.

Likewise, the Sorority Defendants' memorandum of law does not analyze the negligent misrepresentation claim. (Dkt. No. 60). Plaintiff's response argues she sufficiently alleged the claim. (Dkt. No. 69, at 24–26) (arguing that there was a special relationship and that Plaintiff reasonably relied on incorrect information provided by Sorority Defendants to Plaintiff). Sorority Defendants address the claim in their reply but raise new arguments that Plaintiff did not have a chance to respond to. (Dkt. No. 70, at 7–10) (arguing that (1) the claim is not plead with specificity, (2) Plaintiff's theory would create limitless liability, and (3) no allegations support a negligent misrepresentation claim as to Tri Delta). "[N]ew arguments may not be made in a reply brief, and [courts should] decline to entertain the theories so proffered." *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999) (citation omitted). Therefore, the Court does not analyze the negligent misrepresentation claim, and Sorority Defendants' motion to dismiss it is denied.

The Sorority Defendants first argue that the *Martin* doctrine bars Plaintiff's claim, because Plaintiff does not allege that every member ratified and adopted the alleged act. (*Id.* at 16–18). For the reasons discussed in Section IV(1)(b) with respect to Psi Psi, the requirement that every member ratify and adopt the alleged act does not apply to causes of action that sound in negligence.

Second, Sorority Defendants argue that the claim consists of two parts: (1) providing alcohol and (2) secretly drugging the punch with ecstasy, (*id.* at 11), and thus that Plaintiff's claim involves intentional torts and would be barred under the *Martin* rule (*id.* at 16). Sorority Defendants' attempt to distill Plaintiff's claim into two intentional torts is unpersuasive to the Court. Plaintiff's First Amended Complaint alleges that the Sorority Defendants "were negligent, by, *inter alia* . . . [f]ailing to ensure or otherwise provide for safe management of the sorority-sponsored event at the Fraternity Defendants' chapter house . . . and failing to provide for intervention and safe management when pledges, such as Plaintiff, became intoxicated, were in positions of peril and at risk of being sexually assaulted." (Dkt. No. 5, ¶ 167). The claims against Sorority Defendants sound in negligence, not intentional tort law.

Having concluded that the *Martin* rule does not bar these claims, the Court next considers Sorority Defendants' argument that they are not liable for negligence because there is no cause of action under New York law for the negligent provision of alcohol, (Dkt. No. 60, at 12 (citing *D'Amico v. Christie*, 71 N.Y.2d 76, 83 (1987)), and there is no allegation of causation between the drugged punch and the rape (*id.* at 18). Sorority Defendants are correct that there is no cause of action for the negligent provision of alcohol, but again this is an oversimplification of Plaintiff's claims. Sorority Defendants argue that there is no causation because Plaintiff was physically capable of saying "no, don't do that," and climbing down the fraternity house fire

escape. (Dkt. No. 60, at 18). However, Plaintiff has alleged that she was "obviously intoxicated [and] unable to fully protect herself physically" when Defendant Montalto targeted her because of her incapacity. (Dkt. No. 5, ¶¶ 185–186). Plaintiff has plausibly alleged causation. Having found the Sorority Defendants' arguments unpersuasive, the Court denies the motion to dismiss the claim of negligence against Omicron.

**b.      Omicron's Negligence *Per Se***

Plaintiff's amended complaint asserts a negligence *per se* claim against the Sorority Defendants for their violation of N.Y. Penal Laws § 120.16 and § 120.17, (*id.* ¶¶ 168–69), the same hazing statutes underlying the negligence *per se* claim against Fraternity Defendants.[11] Plaintiff argues that under *Oja*, 257 A.D.2d at 924, (1) Sorority Defendants' actions constituted hazing in violation of the statutes, (2) there is a private civil cause of action against those who engage in such acts, and (3) the acts constituting a statutory violation were a proximate cause of Plaintiff's rape. (Dkt. No. 69, at 11–14). Defendants' reply briefly argues that *Oja* is not applicable here, because the *Oja* decision hinged on "other purportedly careless acts by defendants—beyond the mere furnishing of intoxicants" and that there is no claim based on allegations regarding alcohol alone. (Dkt. No. 70, at 5–6) (quoting *Oja*, 257 A.D.2d at 925)).

The language relied upon by Sorority Defendants for the proposition that the negligence in *Oja* was grounded in other purportedly careless acts beyond providing intoxicants is immaterial to the negligence *per se* claim. That language was part of the *Oja* court's analysis of a common-law negligence claim. 257 A.D.2d, at 925. The *Oja* court's analysis of the negligence *per se* claim first established that N.Y. Penal Laws § 120.16 and § 120.17 provide an implied

---

[11] Sorority Defendants' memorandum of law in support of its motion to dismiss does not discuss this claim or these statutes at all. (Dkt. No. 60). Plaintiffs' response argues that she stated a negligence *per se* claim, (Dkt. No. 69, at 11–14) and Defendants' reply addresses Plaintiff's arguments (Dkt. No. 70, at 5–6). Because Sorority Defendants' reply mirrors Plaintiffs' argument, the Court evaluates the claim.

private cause of action, despite "the existence of laws governing the imposition of civil liability in connection with the furnishing of alcoholic beverages." *Id.* The court did acknowledge that this was especially true because the acts in *Oja* "went beyond just supplying the alcoholic beverages," but so too did the acts here. Sorority Defendants did not just supply alcohol, but also allegedly secretly drugged the punch and directed and encouraged under-aged Tri Delta pledges to drink. (Dkt. No. 5, ¶ 10). Because the hazing statutes are "directed at an entirely different wrong from that addressed" by the social host liability laws cited in Sorority Defendants' initial memorandum of law, the negligence *per se* claim stands. 257 A.D.2d, at 925–26; (Dkt. No. 60, at 12).

### c.      Tri Delta's Vicarious Liability for Omicron's Negligence[12]

Plaintiff alleges a vicarious liability claim against Tri Delta for Omicron's negligence. (Dkt. No. 69, at 16–19). As discussed in Section IV(1)(e) with respect to the Fraternity Defendants, under New York law, a national fraternity can be held liable under an agency theory where (1) there is a documented principal/agent relationship and (2) the national entity had "actual and/or constructive notice of ongoing, illegal activities involving alcohol and sex abuse at [the local chapter]." *Brown*, 224 A.D.3d, at 1182. Plaintiff argues that both of the *Brown* elements are satisfied. (Dkt. No. 69, at 17–18).

With respect to the principal/agent relationship, the *Brown* court found such a relationship where the local chapter made payments to the national entity, the national entity

---

[12] To the extent that Plaintiff's First Amended Complaint alleges a direct negligence claim against Tri Delta, the Court finds that the Plaintiff has waived this claim. Sorority Defendants argued in significant length that Tri Delta cannot be directly liable because it did not owe a duty to Plaintiff, (Dkt. No. 60, at 18–24), and Plaintiff did not respond to this argument. Plaintiff had "every incentive," (*see Criterium Capital Funds B.V. v. Tremont (Berm.) Ltd. (In re Kingate Mgt. Litig.)*, 746 F. App'x 40, 43 (2d Cir. 2018)), to respond to this argument if she was seeking to hold Tri Delta directly liable, and Plaintiff put forth numerous other arguments pertaining to alternative theories of holding Tri Delta liable, (Dkt. No. 69, at 16–19, 23–24, 26–30). Plaintiff's failure to do so results in waiver. *See Criterium Capital Funds B.V*, 746 F. App'x, at 43.

provided support and guidance to the local chapter, and the national entity imposed standards on the local chapter. *Brown*, 224 A.D.3d, at 1182. Here, the First Amended Complaint is similarly sufficient. The First Amended Complaint alleges that Tri Delta has "complete control over every material aspect of the organization and actions of its chapters," citing to numerous provisions in the Bylaws. (Dkt. No. 5, ¶ 118); (*See id.*, ¶¶ 97 ("Sorority Defendants have, at all relevant times, retained, supervised and compensated 'leadership consultants' to visit and meet with their respective chapters and members on a regular basis and, *inter alia*, counsel them on risk management principles[.]"), 122 ("Tri Delta's Executive Board determines whether and how chapters may be established[,] . . . the name of the chapter and who may be initiated into Tri Delta as a charter member[, and can] withdraw a chapter's charter[.]"), 124 ("The Bylaws place multiple 'regulations' on, and give Tri Delta authority over, activities by chapters to solicit and initiate new members, including who can become a member, what references are required, how long the membership is maintained, and how members are initiated."), 125 ("[A]ll financial affairs and policies of the Fraternity, including chapters, shall be conducted through Tri Delta. . . . Tri Delta determines fees and dues paid by each collegiate member, new member fees, and the amount each member must pay to the National Housing Endowment Fund . . . for chapter housing[.]")).

Secondly, Plaintiff has alleged that Sorority Defendants had actual or constructive notice of ongoing, illegal activities including alcohol and sex abuse. (Dkt. No. 5, ¶¶ 9 ("Tri Delta's leadership had banned the presence and use of alcohol and drugs in its chapter houses, presumably based upon its knowledge that its mismanagement had resulted in numerous incidents of rapes and other injuries."), 29 ("Tri Delta knew, or in the absence of negligence should have known, that sorority members and female guests at fraternity houses and at

fraternity events were in danger of being sexually assaulted as a direct result of, *inter alia*, the mismanagement of, abuse, and unlawful provision of alcohol and drugs, the complete absence of independent or trained security or management within fraternity houses, and the ability of perpetrators to isolate and assault women within those facilities."), 39 (quoting statements by Tri Delta's President at the time that there was a high rate of alcohol use and abuse of women), 154 ("[M]embers and pledges of Tri Delta and other sororities [were] sexually assaulted, raped, and otherwise seriously injured in incidents across the country, such that national sororities had banned the presence of alcohol in their houses and provided for 'house directors' and similar adults to reside in their properties housing undergraduate members.")).

Sorority Defendants argue that, nevertheless, the acts of providing alcohol and secretly drugged punch are outside the scope of any alleged agency relationship given (1) Tri Delta's policy of college chapters not using sorority funds to purchase alcohol and (2) not every member of Omicron acted within the scope of authority in drugging the punch. (Dkt. No. 60 at 28). However, as with the Fraternity Defendants, that the challenged actions may typically be outside the scope of the relationship is irrelevant, because the national body had actual or constructive notice of ongoing, illegal activities. *Brown*, 224 A.D.3d, at 1182. As such, it does not matter whether Tri Delta controlled day to day decisions or authorized Omicron to act on its behalf for the subject social event. (Dkt. No. 70, at 11). Therefore, as in *Brown*, Sorority Defendants' motion to dismiss with respect to Tri Delta's vicarious liability is denied.

### d.      Sorority Defendants' Negligent Breach of Assumed Duties

Plaintiff alleges that the Sorority Defendants "undertook duties of care to their pledges," in part by agreeing to abide by Defendant University's Code of Student Conduct and the "Minimum Standards for Recognition of Syracuse University's Social Greek Letter

Organizations," and "breached the duties they . . . assumed." (Dkt. No. 5, ¶¶ 90, 151, 160, 161, 166, 167). The Court evaluates the conduct of each Sorority Defendant individually.

### i.      Omicron's Assumption of Duty

With respect to Omicron, Sorority Defendants argue that the Code is an internal guideline that does not create legal duties so it cannot serve as the basis for the assumption of a duty and that the remainder of the alleged undertaken duties are "legal conclusions and threadbare assertions." (Dkt. No. 60, at 13–14).

"[I]nternal guidelines [that] go beyond the standard of ordinary care . . . cannot serve as a basis for imposing liability." *Gilson v. Metropolitan Opera*, 5 N.Y.3d 574, 577 (2005). To allow otherwise would "significantly enlarge the duty" beyond "reasonable care" such that it could place an "undue burden" on duty-holders. *Id.* Plaintiff alleges, however, that the Code set forth "minimal expectations" (Dkt. No. 5, ¶ 89) and that as such, it did not go beyond the standard of ordinary care. (Dkt. No. 69, at 20). Plaintiff also argues that the Code is not an *internal* guideline, because it was established by Defendant University and Sorority Defendants agreed to abide by it in pursuit of university recognition. (*Id.*). The Court agrees with Plaintiff that the Code is not an internal policy, and Sorority Defendants do not explain how the Code went above the standard of ordinary care. As such, the Court finds the case law cited by Sorority Defendants inapposite.

Sorority Defendants' next argument that the alleged undertaken duties of care are "legal conclusions and threadbare assertions" (Dkt. No. 60, at 14) also fails. Sorority Defendants do not cite to the allegedly conclusory allegations or explain how they are threadbare. The Court disagrees with Sorority Defendants' assessment. Plaintiff alleges that Omicron undertook duties of care to their pledges to direct, manage, and oversee the recruitment and bid event in a reasonably prudent and safe manner to prevent repeated and foreseeable incidents of hazing,

injury, sexual assault, and rape, (Dkt. No. 5, ¶¶ 151, 160) and supports such allegations with specific facts. (*Id.* ¶¶ 9–11, 77–78, 80–81, 157–58, 168–69, 185). Having found Sorority Defendants' arguments with respect to Omicron unpersuasive, the Court denies their motion to dismiss the negligent breach of assumed duties claim against Omicron.

### ii.      Tri Delta's Assumption of Duty

As to Tri Delta, Sorority Defendants first argue that the Code is not applicable to the national organization, (Dkt. No. 60, at 24), because it applies only to "students and student organizations." (Dkt. No. 5, ¶ 89). Plaintiff describes Tri Delta as a "non-profit corporation organized and existing under the laws of the State of Illinois . . . [with] approximately 138 active chapters and 222 alumni chapters operating on college campus throughout North America" (*id.* ¶ 23) whereas Omicron is the chapter "operating at Syracuse University." (*Id.* ¶ 24). Omicron is a student organization composed of students, so the Code is applicable. The same cannot be said with respect to Tri Delta. As such, the Code cannot form the basis for an assumption of duty claim against Tri Delta.

Plaintiff also alleges that Tri Delta assumed a duty by (1) encouraging her to join the sorority and making representations about the sorority (*id.* ¶¶ 38–39 (describing Tri Delta's position statement in opposition to the misuse of alcohol and other publications decrying the high rate of alcohol use and hazing), 118–29 (explaining how Tri Delta controls Omicron's operations on campus by quoting Tri Delta's Bylaws and discussing the structure of the entities), 156 ("The Sorority Defendants . . . had unique and specialized expertise and knowledge about the risk of injury, sexual assault, rape, and hazing sorority members and pledges, like Plaintiff, faced during sorority events"), 166 ("Sorority Defendants . . . undertook duties of care to Plaintiff to refrain from furnishing alcohol in connection with recruitment rituals or functions . . . and from instruction and encouraging . . . underaged pledges to drink in circumstances that created a

substantial risk of physical injury to the pledges and therefore constituted 'hazing.'")) and (2) hiring consultants to advise chapters on risk management principles and their understanding and compliance thereof. (*Id.* ¶ 97–98). Sorority Defendants argue that Tri Delta does not owe an assumed duty with respect to recruitment and that no assumed duty can arise from hiring leadership consultants to give advice. (Dkt. No. 60, at 24–25). The Court finds that at this stage of the proceedings, Plaintiff has adequately plead that Tri Delta assumed a duty such that it denies the motion to dismiss.

**e.    Sorority Defendants as Alter Egos**

Plaintiff alleges that Tri Delta and Omicron are alter egos, because Tri Delta has "complete control over every material aspect of the organization and actions of its chapters" and "undercapitaliz[ed] its chapters to evade the claims of foreseeable creditors[.]" (Dkt. No. 5, ¶ 118). As discussed in Section IV(1)(f), a party establishes alter ego liability if the party demonstrates that "(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in the plaintiff's injury." *Xiotech Corp.*, 11 F. Supp. 3d at 236 (quoting *JSC Foreign Econ. Ass'n Technostroyexport*, 306 F. Supp. 2d at 485). Inadequate capitalization for the purpose of frustrating foreseeable creditors constitutes a wrong against the plaintiff. *Fannie Mae*, 724 F. Supp. 2d, at 320.

Plaintiff alleges that Tri Delta has dominated Omicron at all relevant times and that it undercapitalized Tri Delta to frustrate foreseeable creditors. (Dkt. No. 5, ¶¶ 24 (describing Omicron as "one of many chapters from which Tri Delta generates its principal revenue" and that "Tri Delta has intentionally undercapitalized the Omicron Chapter"), 119 (describing the control asserted by Tri Delta over local chapters through the organization's bylaws), 120 ("Tri Delta . . . shall hold title to real property used by . . . chapters"), 122 ("Tri Delta's Executive

44

Board determines whether and how chapters may be established" and "who may be initiated into Tri Delta"), 123 ("Tri Delta has assumed the responsibilities for supervising and directing chapters"), 125 ("[A]ll financial affairs and policies of the . . . chapters[ ] shall be conducted through Tri Delta"), 127–129 (describing how Tri Delta controls insurance and makes chapters pay)). Based on these detailed allegations, the Court finds that under the standards and factors discussed in Section IV(1)(f), Plaintiff has plausibly alleged that Omicron and Tri Delta are alter egos.

Sorority Defendants argue, that nevertheless, an alter ego theory is not applicable under New York law until a series of other events occur pertaining to judgments and litigation. (Dkt. No. 60, at 30). Sorority Defendants cite to no case law in support of this argument. New York courts have allowed alter ego issues to persist at this stage of litigation. *See, e.g.*, *Sphere Digital, LLC*, 2020 WL 6064156, at *6, 2020 U.S. Dist. LEXIS 190516, at *16-17 (allowing the issue of alter ego to "survive a motion to dismiss" where there were adequate allegations in the complaint). As such, the Court denies Sorority Defendants' motion to dismiss the allegations asserting an alter ego theory of liability.

### 3.     Defendant University

Plaintiff asserts that Defendant University was negligent by: (1) "[f]ailing to reasonably and safely manage and oversee the actions of the Fraternity and Sorority Defendants;" (2) "[f]ailing to timely, fully and accurately disclose to Plaintiff the risks, dangers and incidents of rape on campus, in fraternity houses and at fraternity events;" and (3) "[f]ailing to offer, provide or identify for Plaintiff any of the services and advocacy available to her at the University following her report of being raped." (Dkt. No. 5, ¶ 182). Defendant University contends that it did not owe a duty to Plaintiff to control the actions of other students, disclose information, or

provide services. (Dkt. No. 55-5). The Court considers each instance of alleged negligence in turn to evaluate whether Defendant University had a duty.

        **a.**        **Duty to Manage and Oversee the Actions of the Fraternity and Sorority Defendants**

"As a general rule, a college has no legal duty to protect students from being sexually assaulted by other students, and New York has affirmatively rejected the doctrine of in loco parentis at the college level." *Union Coll.*, 2020 WL 1063063, at *7, 2020 U.S. Dist. LEXIS 38136, at *18 (citing *Faiaz*, 64 F. Supp. 3d at 361). However, where "a complaint alleges that a university received credible reports of *ongoing and pervasive* criminal conduct against students, perpetrated on campus by other students within the university's control, the university ha[s] a legal duty to take appropriate responsive action." *Brown v. University of Rochester*, 216 A.D.3d 1328, 1332 (3d Dept. 2023) (emphasis in original) (finding a duty where a freshman was raped at a fraternity house on the university's campus after the university had received but failed to investigate credible reports of an "ongoing pattern" of sexual assaults at or around the same fraternity house). Plaintiff has certainly alleged that the University had received credible reports of sexual assaults on campus, including at the Sigma Chi chapter house, that could be seen as ongoing and pervasive. (Dkt. No. 5, ¶¶ 70, 72). Plaintiff has also alleged detailed allegations regarding the "substantial responsibilities" undertaken by the University for the "oversight of fraternities," including awarding "recognition" status to fraternities that are "managed responsibly," employing staff to "advise and counsel Greek organizations," reviewing alleged violations of the Code of Student Conduct by students in fraternity houses, and through the University's involvement with the "governing boards for the Greek Organization on campus that review allegations of misconduct." (*Id.* ¶¶ 50–52, 173). The fraternity members committing misconduct were within the university's control. (*Id.* ¶ 51).

In *Brown*, the university owned the house in question. 216 A.D.3d, at 1330. The Defendant University argues that *Brown* defines a university's obligations as a landlord, and that the case is inapposite here. (Dkt. No. 72-5, at 6). The *Brown* court, however, noted that in the typical landlord-tenant relationship a landlord would normally not have a duty to prevent a tenant from attacking another tenant unless the landlord had "the authority, ability, and opportunity to control the actions of the assailant." 216 A.D.3d, at 1331–32. The Court cited to the unique nature of the university-student relationship, in imposing a duty on the university. *Id.* at 1332 ("A university is in a unique position to establish student conduct policies and to take affirmative disciplinary action against fraternities for ongoing illegal conduct perpetrated by their members while on campus."). This suggests that the *Brown* duty may be rooted in the university's special relationship with its students rather than in a university's obligation to protect students as a property owner.

Defendant University argues that the Sigma Chi chapter house is not owned by the University and therefore is not on the University's campus. [13] (Dkt. No. 55-5, at 9, 18). However, plaintiff alleges that the house was "on campus," (*see* Dkt. No. 5, ¶¶ 1, 22, 57), and at this stage of the proceedings, the Court must accept the allegations of the complaint as true. Furthermore, it is not clear to the Court that the Defendant University's ownership of the Sigma Chi chapter house is necessary to finding a duty here. Plaintiff argues that, in any event, the University had sufficient control over the Chapter House to give rise to a duty. (Dkt. No. 67, at 14). To the extent that *Brown* hinges on premises liability, at least one court applying New York law has

---

[13] Although a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is typically confined to the pleadings, the Court is permitted to take "judicial notice of public records, such as properly recorded deeds, on a motion to dismiss." *Riley v. Rivers*, No. 15-cv-5022, 2016 WL 11263672, at *3, 2016 U.S. Dist. LEXIS 129264, at *10 (E.D.N.Y. Sept. 19, 2016) (citing cases). Defendant University submits documentation demonstrating that it does not hold title to the fraternity or sorority house at issue. (Dkt. No. 55-3). While the Court takes judicial notice of the deed documents, it acknowledges that the dispute here is not ownership, but rather whether the house was "on campus."

found that a university can be held liable on a theory of premises liability for any harm resulting from negligence related to property it has "sufficient control" over even if it does not own the property. *Ginsburg v. City of Ithaca*, 5. F. Supp. 3d 243, 247–48 (N.D.N.Y. 2014). In *Ginsburg*, the court held that an issue of fact for the jury remained as to whether Cornell had "exercised sufficient control over . . . [a] bridge" owned by the City of Ithaca as to share a duty with the city in maintaining the bridge in reasonably safe condition. *Id.* at 250. Plaintiff alleges that there is "sufficient indicia of control over the Chapter Houses to give rise to a duty" here. (Dkt. No. 67, at 14). Defendant argues that a prohibition on certain conduct in the student handbook is insufficient to establish control, (Dkt. No. 55-5, at 17–18 (citing *Rothbard v. Colgate Univ.*, 235 A.D.2d 675, 676 (3d Dept. 1997)), but the University's control over the Chapter Houses here extended far past a mere prohibition. Plaintiff alleges that the University had sufficient control over the Chapter Houses by actively promoting membership in fraternities and sororities as "vital" to the campus community, (Dkt. No. 5, at. ¶¶ 1, 8, 48–49), taking affirmative steps to oversee them, (*id.* ¶¶ 50), and asserting jurisdiction by the University Judicial System over "alleged misconduct that takes place on University owned or controlled property *or on property close to the University, including the Greek chapter houses*[.]" (*id.* ¶ 51 (emphasis added)).

The Court also notes that a duty "may be imposed upon a college where it has encouraged its students to participate in an activity and taken affirmative steps to supervise and control the activity." *Pasquaretto v. Long Island University*, 106 A.D.3d 794, 796 (2d Dep't 2013) (citing *Hores v. Sargent*, 230 A.D.2d 712, 712 (1996)). In *Lloyd v. Alpha Phi Alpha Fraternity*, the court considered whether such a duty applied where a student sued his university for hazing he endured at a fraternity house. Nos. 96-cv-348, 97-cv-565, 1999 WL 47153, at *3, 1999 U.S. Dist. LEXIS 906, at *7–10 (N.D.N.Y. Jan. 26, 1999). There, the complaint pointed to

the university's "failure to warn and to protect [p]laintiff from hazing activities," but did not include allegations that the university took affirmative steps to enforce anti-hazing regulations. 1999 WL 47153, at *3, 1999 U.S. Dist. LEXIS 906, at *8.

Here, however, the complaint indicates the substantial responsibilities undertaken by the University for the oversight of fraternities, as well as the affirmative steps taken by Defendant University in response to the rape epidemic on campus. (*See e.g.*, Dkt. No. 5, ¶¶ 2 ("The University had established a rape task force"), 69 ("The University made plans to open a center to provide education, counseling, and support services to rape victims by July of 1990"), 71 (explaining that the University established a Safety Advisory Committee)).

Defendant University contends that other cases are dispositive here. However, those other cases are easily distinguishable. For example, *Eiseman v. State of New York* found no duty when a student on conditional release from prison murdered two fellow students at their off-campus apartment. 70 N.Y.2d 175, 190–92 (1987). However, the *Eiseman* court emphasized that its holding was a narrow one due to the "profound social issues underlying the case" regarding the "reintegration of former convicts into society," and as such, was not considering "whether a college might or even should investigate and supervise its students differently." *Id.* at 191–92. Defendant University also analogizes to *Killcommons v. Syracuse Univ.*, (Sup. Ct. Rockland Cnty. Index No. 033938/2022 Decision and Order dated and filed 08/30/23) (*see* Dkt. No. 55-5, at 20), a similar negligence claim involving a sexual assault allegation at a Syracuse University fraternity that was dismissed against all defendants. (Dkt. No. 55-4, at 1–2). In *Killcommons*, however, the plaintiff did not present "any involvement of the University that could any way rise to the level of encouraging and monitoring an off-campus fraternity party" and "fail[ed] to allege any history of criminal conduct on the premises . . . [or] that the attack upon the plaintiff by

[fraternity member] was foreseeable[.]" (Dkt. No 55-4, at 4, 7–8). Here, on the other hand, Plaintiff has submitted extensive information regarding Syracuse University's involvement with Greek life, (*see, e.g.*, Dkt. No. 5, at ¶¶ 48–55, 59), jurisdiction over incidents at the Greek chapter houses and off-campus locations, (*id.* at ¶ 51), and foreseeability based on its knowledge of alleged similar criminal conduct during the relevant time both generally and at Sigma Chi specifically (*id.* at ¶¶ 59, 66, 69, 70, 75–76).

On this record, given the detailed factual allegations in the Complaint, the Court finds that Plaintiff has plausibly alleged a duty to take appropriate responsive action to the credible reports of sexual assaults, including at the Sigma Chi chapter house, by students within the Defendant University's control. Accordingly, Defendant University's motion to dismiss Plaintiff's negligence claim for lack of duty is denied.

### b.    Duty to Disclose Information

Plaintiff alleges that Defendant University was negligent in its failure to "timely, fully and accurately disclose to Plaintiff the risks, dangers and incidents of rape on campus, in fraternity houses and at fraternity events, as well as the risks and dangers associated with joining such organizations and participating in events sponsored or hosted by fraternities involving the use of alcohol and drugs[.]" (Dkt. No. 5, ¶ 182(d)). Under New York law, such a claim requires: "(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect [or withheld]; and (3) reasonable reliance on the information [or omission]." *Learning Experience Sys., LLC v. Collins*, 2023 WL 5835034, at *23, 2023 U.S. Dist. LEXIS 159388, at *72 (E.D.N.Y. Sept. 7, 2023) (quoting *ICD Capital, LLC v. Codesmart Holdings, Inc.*, 842 F. App'x 705, 706 (2d Cir. 2021) (quoting *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014)). These elements must be plead "with particularity," under Fed. Civ. P. 9(b), meaning the

plaintiff must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Dains v. Bayer HealthCare LLC*, No. 5:22-cv-208, 2022 WL 16572021, at *6, 2022 U.S. Dist. LEXIS 198223, at *14 (N.D.N.Y. Nov. 1, 2022) (quoting *Eternity Glob. Master Fund Ltd. V. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004). Defendant contends here that the Complaint fails to establish a special or privity-like relationship and fails to plead with particularity. (Dkt. No. 55-5, at 28–31). The Court agrees.

"Courts have routinely found that a university holds no special relationship with its students." *Basso v. New York Univ.*, No. 16-cv-7295, 2020 WL 7027589, at *13, 2020 U.S. Dist. LEXIS 223211, at *36 (S.D.N.Y. Nov. 30, 2020) (citing *Matter of Salvador v. Touro Coll.*, 27 N.Y.S.3d 44, 48–49 (1st Dept. 2016) (dismissing students' negligent misrepresentation claim against their university because there was no special relationship). Plaintiff argues that her allegations are sufficient to overcome a motion to dismiss, because even if the existence of a special relationship is sparsely pled, the other two factors are "emphatically alleged." (Dkt. No. 67, at 28) (quoting *Greene v. Gerber Prods. Co.*, 262 F. Supp. 3d 38, 75 (E.D.N.Y. 2017). While this may generally be true, claims by students against a university "present a special case." *Basso*, 2020 WL 7027589, at *13, 2020 U.S. Dist. LEXIS 223211, at *36. Furthermore, the Court does not find that the other factors are emphatically alleged. As Defendant points out, Plaintiff does not emphatically allege her reliance on the information or omission. (Dkt. No. 55-5, at 31). Plaintiff summarily states that she "reasonably relied upon the representations, misrepresentations and materially false and misleading information provided by the University" such that she rushed a sorority and attended the recruitment event "without cause or concern."

(Dkt. No. 5, ¶ 183). Plaintiff does not allege, however, that she would have decided not to rush, not to attend the event, and/or not to consume alcohol at the event had Defendant University imparted more transparent information about the risks and dangers. (Dkt. No. 55-5, at 31). As such, there is no special relationship imposing a duty on Defendant University to disclose the information, and Plaintiff's pleadings cannot overcome that hurdle.

Additionally, even if there were a special relationship, Plaintiff fails to plead with particularity the statements that she contends are fraudulent. The only detailed statements identified by Plaintiff are that Greek life is a "vital part of the Syracuse University community" and that Greek life on campus is "vibrant." (Dkt. No. 5, ¶ 48). Plaintiff does not explain how these statements are fraudulent nor does she explain whether she read these exact statements before rushing Tri Delta and attending the event. "[V]ague allegations" that do not identify "details about precise statements that were made" such as the statement's speaker or the statement's date of publication are insufficient to satisfy the heightened pleading standard under Rule 9(b). *Dains*, 2022 WL 16572021, at *6, 2022 U.S. Dist. LEXIS 198223, at *14.

Accordingly, because the Complaint fails to establish a special or privity-like relationship and fails to plead with particularity, Defendant's motion to dismiss Plaintiff's negligent misrepresentation claim is granted.

### c.     Duty to Offer, Provide, or Identify Services

Plaintiff's final claim against the University alleges that it failed to "offer, provide or identify for Plaintiff any of the services and advocacy available to her at the University[.]" (Dkt. No. 5, ¶ 182(e)). As a threshold matter, Defendant asserts that the statute of limitations has expired on this claim, because it was not revived by the New York Adult Survivor's Act, codified at CPLR § 214-j. (Dkt. No. 55-5, at 21–22). Under the Act, claims are revived if they "alleg[e] intentional or negligent acts or omissions by a person for physical, psychological, or

other injury or condition suffered as a result of conduct which would constitute a sexual offense[.]" CPLR § 214-j. Plaintiff's claim here alleges that the University was negligent, causing her "great emotional distress" suffered as a result of the University's failure to offer support following the alleged rape. (Dkt. No. 5, ¶ 182(e)). The claim is rooted in conduct constituting a sexual offense. As such, the Court finds that this claim is timely.

Plaintiff argues that "once Plaintiff reported her rape to the University, and the University began providing services to her, it had a special relationship with Plaintiff and a duty to act reasonably under the circumstances, to inform her of resources available to her, which the University recognized were necessary to provide to survivors, and to address and mitigate the harm she had experienced." (Dkt. No. 67, at 22–23 (citing *Katz v. United Synagogue of Conservative Judaism*, 135 A.D.3d 458, 459–62 (1st Dept. 2016) (finding that a study-abroad program operator owed a duty to a participant to help her obtain follow-up medical care because it represented that it would assist students with medical care and the defendant was in the "best position to protect against the risk of harm"); *Doe v. Sarah Lawrenc*e, 453 F. Supp. 3d 653, 669 (S.D.N.Y. 2020) (denying motion to dismiss where student reported sexual assault to university and university failed to take prompt action, finding university had formed a "special relationship" with plaintiff after her report of assault)). In *Doe*, the court found that once the student "reported the sexual assault and [the college] led her to believe that an investigation and prompt action would occur, the relationship between [the college] and [the student] was no longer identical to [d]efendants' relationship with all of its students." *Doe*, 453 F. Supp. 3d, at 669. As such, there was "at least a plausible inference" that the university owed the plaintiff a special duty and breached such duty by mishandling her investigation. *Id.*

The Court notes, however, that the defendants in *Katz* and *Doe* led the victim to believe that they would take action, which is what gave rise to the special relationship. Here, Plaintiff does not allege that Defendant University made any such promises. Rather, all Plaintiff alleges is that she reported the rape to University Health Services and that although an examination confirmed sexual penetration, they did not notify the police or provide any support or resources. (Dkt. No. 5, ¶ 82). Plaintiff does allege that Defendant University's rape task force as well as student advocacy groups and protestors were advocating at the time for such resources to be provided (Dkt. No. 5, ¶ 2, 11), but student advocacy does not equate to a duty. Accordingly, because there was no special relationship between Plaintiff and Defendant University here, Defendant's motion to dismiss Plaintiff's negligence claim pertaining to the failure to offer, provide, or identify services is granted.

## V.     MOTION TO STRIKE LEGAL STANDARD

Pursuant to the Federal Rule of Civil Procedure, "[t]he court may strike from a pleading . . . any . . . immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Immaterial allegations are ones that have "no essential or important relationship to the claim for relief." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 402 F. Supp. 2d 434, 437 (S.D.N.Y. 2005). Impertinent allegations consist "of statements that do not pertain to, and are not necessary to resolve, the disputed issues." *Id.* Scandalous allegations are ones that "reflect[ ] unnecessarily on the defendant's moral character, or use[ ] repulsive language that detracts from the dignity of the court." *Cabble v. Rollieson*, No. 04-cv-9413, 2006 WL 464078, at *11, 2006 U.S. Dist. LEXIS 7385, at *32 (S.D.N.Y. Feb. 27, 2006). "Generally, motions to strike are disfavored and usually granted only for scandalous material." *Metrokane, Inc. v. Wine Enthusiast*, 160 F. Supp. 2d 633, 641–42 (S.D.N.Y. 2001). "[T]he courts should not tamper with the pleadings unless there is a strong reason for doing so," especially at "such a preliminary stage of the proceedings." *Lipsky v.*

*Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976). District courts should normally wait to decide relevancy and admissibility in "the context of an ongoing and unfolding trial." *Id.* The Court applies these standards to each set of challenged allegations.

## VI.   DISCUSSION

Fraternity Defendants move to strike paragraphs 28–47 and 74–76 from Plaintiff's First Amended Complaint as "highly prejudicial" and "irrelevant to the claims at issue in this matter." (Dkt. No. 56-1, at 26). Plaintiff responds that the allegations are "highly relevant to Plaintiff's negligence and alter ego claims" and are not "immaterial, or impertinent, let alone scandalous. (Dkt. No. 68, at 30–31).

Allegations 28–47 are labelled in the Complaint, "The Unprecedented Dangers of Sexual Misconduct and the Misuse of Alcohol Within Fraternity Houses and at Fraternity and Sorority Events Were Known by the Fraternity and Sorority Defendants Prior to When Plaintiff Was Raped." (Dkt. No. 5, at 11). Paragraph 28, for example, explains that fraternities and sororities were ranked as the sixth worst risk for insurance company. Paragraphs 29 and 30 discuss Sigma Chi's knowledge of the associated risks and policies enacted by Sigma Chi. Paragraphs 31–43 likewise raise allegations that suggest "the Fraternity Defendants knew or should have known that exercising due care in managing and overseeing the chapter house and events and in their other undertakings at issue . . . was necessary to protect female invitees at the chapter house and events from the foreseeable risk of sexual assault." (Dkt. No. 68, at 31). The knowledge of each Fraternity Defendant with respect to the risk is clearly at issue in Plaintiff's claims. The allegations also speak to Sigma Chi's control over the other Fraternity Defendants and causation with respect to whether due care would have prevented the sexual assault. (*Id.*).

Allegations 74–76 are labelled in the complaint, "A Partial History of the Allegations Made Against Sigma Chi, Its Chapters and Members Involving Dangerous Misconduct and

Mismanagement Resulting in Sexual Violence Against Women." (Dkt. No. 5, at 25). Paragraph 74 alleges the limited public availability of reports by women of sexual assault in fraternity houses and that Defendants would have direct knowledge. Paragraph 75 alleges that Sigma Chi was aware of prior misconduct and the risks. Paragraph 76 lists public records of allegations leveled at Sigma Chi, its chapters, and members from 1983 through 2018 at Sigma Chi chapters across the country. As with respect to the first set of challenged allegations, these allegations also speak to the Fraternity Defendants' knowledge of the risks and whether the misconduct here was foreseeable. (Dkt. No. 68, at 31). The allegations of assaults occurring after Plaintiff's are probative of causation when combined with the allegations that other fraternities implemented reforms and saw dramatic reductions in the number and severity of reported injuries, but Sigma Chi did not enact such reforms and continues to see a pattern of assaults. (*Id.*).

The Court cannot find that the allegations in paragraphs 28–47 and 74–76 are "immaterial" or "impertinent." To the extent that they reflect on Fraternity Defendants' character or are prejudicial, those concerns "will be better addressed through appropriate applications at a later stage in this litigation." *Roe v. City of New York*, 151 F. Supp. 2d 495, 511 (S.D.N.Y. 2001). The Court need not decide now whether the allegations are admissible at trial. (Dkt. No. 56-1, at 29); *Lipsky*, 551 F.2d, at 893. Therefore, Fraternity Defendants' motion to strike is denied.

## VII.   LEAVE TO AMEND

In response to each Defendant's motion to dismiss, Plaintiff requests leave to amend. (Dkt. No. 67, at 29; Dkt. No. 68, at 31; Dkt. No. 69, at 30). None of the Defendants have opposed Plaintiff's request. Under Federal Rule of Civil Procedure 15(a), absent certain circumstances not at play here, a party may amend its pleading only with the opposing party's written consent or the court's leave. *See* Fed. R. Civ. P. 15(a)(1)–(2). Rule 15(a)(2) requires that a court "freely give leave when justice so requires." *See McCarthy v. Dun & Bradstreet Corp.*,

482 F.3d 184, 200 (2d Cir. 2007). A court may, in its discretion, deny leave to amend "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 90 (2d Cir. 2023). There are no such reasons here. Because the Complaint's deficiencies may be fixed with better pleading, the Court grants Plaintiff's request for leave to amend with respect to the dismissed claims.

## VIII.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that Fraternity Defendants' motion to dismiss (Dkt. No. 56) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that all of Plaintiff's claims against Defendants Hirsh and Foundation are **DISMISSED** and that Plaintiff's claims against Defendant Comstock on a theory of alter ego liability are **DISMISSED**; and it is further

**ORDERED** that Defendants Hirsh and Foundation are **DISMISSED** from this action; and it is further

**ORDERED** that Sorority Defendants' motion to dismiss (Dkt. No. 58) is **DENIED**; and it is further

**ORDERED** that University Defendant's motion to dismiss (Dkt. No. 55) is **GRANTED** as to the following claims, and that the following claims are **DISMISSED**: Plaintiff's negligent misrepresentation claim against Defendant University and Plaintiff's negligence claim against Defendant University for failing to offer, provide, or identify services to Plaintiff after she reported the rape; and it is further

**ORDERED** that Fraternity Defendant's motion to strike (Dkt. No. 56) is **DENIED**; and it is further

**ORDERED** that Plaintiff's request to amend the Complaint (Dkt. Nos. 67, 68, 69) is

**GRANTED** with respect to the dismissed claims, and any amended complaint must be filed

within thirty days of the date of this decision.

**IT IS SO ORDERED.**

Dated: <u>September 30, 2024</u>
       Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge